# Exhibit 56

# Shares - disposal date

<u>Previous instance: Order of the National Tax Tribunal of 14 June 2007, 2-5-1262-0093</u>

| | |
|---|---|
| Date of release | 15 Oct 2008 08:25 |
| Date of judgment / ruling / decision / control signal | 23 Sep 2008 14:30 |
| SKM number | SKM2008.825.BR |
| Authority | city Court |
| Case number | BS R5-920 / 2007 |
| Document type | Dom |
| Overall topics | treasure |
| Topics Topics | Shares and other securities as well as intellectual property rights |
| Keywords | Shares, divestiture date, share transfer agreement, money transfers |
| Summary | The question was whether a final binding agreement on the transfer of a shareholding had been concluded in 2000, as the applicant claimed, or not until 2001. |
| | It was stated before the National Tax Court that there was no written share transfer agreement, and the bank where the shares were in custody had declared that the shares had been sold in 2001. There were also a number of ambiguities, including with regard to what different remittances between the parties concerned. Subsequently, a share transfer agreement dated December 2000 was presented. |
| | Among other things. on the basis of the parties' concurring explanations, the court considered that it had been established that the agreement had been concluded in December 2000. |
| Reference (s) | The Capital Gains Tax Act § 2 (current) |
| Reference | Equation Guide 2008-4 <u>SG2.5</u> |

**Parties**

A
(Lawyer Henrik Holm Andersen)

against

Ministry of Taxation
(Kammeradvokaten v / Birgitte Kjærulff Vognsen)

**Rendered by city court judge**

Bente Thanning

Background to the case and the allegations of the parties

The plaintiff, A, had an unused loss on shares to carry forward. The loss was to be used at the latest in the income year 2000 to set off against share gains. A sold shares in the American company H1 USA Inc., whereby she gained a share gain. This case concerns whether the sale of the shares took place in the income year 2000 or 2001.

A has filed a claim that the National Tax Tribunal's order of 14 June 2007 be set aside, so that the capital income for the income year 2001 is reduced by DKK 3,776,095.

The defendant, the Ministry of Taxation, has filed a motion for dismissal.

The plaintiff has stated that at a taxation of 63%, the economic value of the claim is DKK 2,114,723.

**The information in the case**

This judgment does not contain a complete presentation of the case, cf. the Administration of Justice Act, section 218 a, subsection. 2.

A owned shares in a US company that was to further develop a medical product that her husband, B, was involved in developing.

The shares, a total of 27,745 shares, were deposited in Credit Suisse. On 15 November 2000, As's auditor, DJ, requested fax Credit Suisse to assist in a sale of the shares to VN. VN co-founded the American company, and he was also a shareholder in the company. The price was stated in the fax to be 16 2/3 dollars per. share, a total of 462.4165.75 [462.416.75.red.SKAT] dollars, and the bank was asked to issue the share note to VN.

VN faxed an offer to purchase the shares to A. The fax is dated December 16, 2000, and the price is stated at $ 16 2/3 per share. shares. A returned the offer by fax as well as by post with a handwritten endorsement, accepting the offer on condition that VN paid $ 100,000 by 31 December 2000 and the remaining amount as soon as possible, but no later than December 2001.

VN then sent a "stork purchase and sale agreement" per. fax. A signed the document and returned it by fax as well as by post.

Credit Suisse has in a "Transfer Instruction for Securities" dated 27 February 2001 stating the couple's customer number stated that "USD 27,745 H1" should be sent to VN by registered mail.

B worked in parallel with the development of other projects. On May 1, 2001, he entered into an "option contract" with VN. The value of the option was agreed at $ 100,000, to be paid before September 1, 2001.

On December 28, 2000, DKK 800,850 was paid into A's account in F1 Bank, Denmark, and on August 27, 2001, $ 462,416.75 was paid into the couple's joint account in Credit Suisse. Credit Suisse has stated in the appendix that the payment related to the purchase of "27,745 H1 UDA INC".

In A's income statement for 2000, a gain on the sale of shares of DKK 3,668,630 is stated, for which loss carryforwards with a corresponding amount have been used. Under the item receivables, a receivable from VN of DKK 3,102,217 is stated. Under the item securities, the acquisition price for 2,255 shares in H1 USA Inc. stated at DKK 19,033, corresponding to 1 dollar per. share, and a "contingent liability that can be repaid in shares, H1 Inc. USA (acquisition price)" to DKK 14,708,298.

In A's income statement for 2001, no profit is stated on the sale of shares. The receivable from VN is again stated at DKK 3,102,217, as is the information on H1 USA Inc. is repeated under the item securities. Under the item capital explanation, it is stated that a pension of DKK 2,388,168 has been paid.

In a letter dated 31 March 2005, the auditor MS informed the Tax Office that the pension payment can mainly be attributed to payment from an insurance scheme in Nordben Life an Pension Insurance Inc. and is not taxable in Denmark. By letter of 27 April 2005, also to the Tax Office, auditor MS stated that no pension had been paid, but payment of receivables from VN for the sale of shares.

Credit Suisse announced by letter dated March 5, 2007 that on August 27, 2007, 27,745 shares of H1 USA Inc were sold for $ 462,416.75 with a value date of August 29, 2001. By letter dated August 5, 2008, Credit Suisse announced that the bank did not have security in the shares on 17 December 2000 and that the bank could not find documentation that the bank was involved in the agreement on the sale of the shares between A and VN.

The National Tax Court decision of 14 June 2007 is not reproduced in this judgment.

**Explanations**

*A* has, among other things, explained that she is married to B. They have run a business with authorship and B's inventions, primarily in the medical world. She acts as secretary. They have known VN for many years. VN and B would further develop a ... 3, which was first called ... 1 and then ... 4. They spent a lot of money on developing the indicator. The company was established in her name at the instigation of B and the auditors. She did not deal with this but had given power of attorney to B and the accountant. She therefore has no knowledge of the dispositions of the company. It was B who approached VN about buying the shares. VN sent a purchase offer per. fax on December 16, 2000. B gave her the fax and she wrote her handwritten acceptance and signature on December 17. B sent the fax back. It was important that it went fast, because the trade for tax reasons was to take place in 2000. She sent the original by mail. VN was in England when he sent the purchase offer on December 16, 2000. The actual sales agreement was faxed by VN when he returned to the United States. She

signed and sent it back by fax and by mail. She does not remember if she took a copy of the sales agreement, but she probably did.

She does not remember when she bought the shares, but she believes they are option-triggered. She does not have much to do with the shares and finances of the company.

She wrote the acceptance of the takeover bid because the shares stood in her name. She was told what should be in the acceptance. She does not know where the auditor had information on pension payments from. She did not discuss the accounts with the auditor. She did not receive a pension payment in 2000 or 2001. She was not present when SKAT or the National Tax Court dealt with the case. She does not know who represented her in those places. She talks regularly with accountant DJ, partly because they know him privately.

*DJ* has, among other things, explained that he is a state-authorized public accountant. He has been the auditor of A and B in the period from 1998 to 2001. They had an extensive and versatile company. The company consisted primarily of making development projects. The ideas were partly developed by B and partly in collaboration with others in networks. He got in touch with the company with ... 3, when A and B moved to Denmark in 1992. They then worked on a project with a ... 1. Many studies had been done. B and A came in contact with Americans who had a knowledge in the field. The company was run in A's name. The amount for which consideration may be given in shares is an indication that the development work to date has been set at DKK 14,708,298, a documented cost price, which was held in England. It should then be possible to convert it into shares. It was the knowledge of the UN and his knowledge, who decided to take the project to the United States. A US company was established to raise capital in the US market through "private placement" with invited private investors. Shares were offered in line with the need for capital. VN was one of the people in the group of people who managed this part of the company. As funds were raised, projects and studies were launched. The founders were remunerated via shares for the funds they had deposited, options - so-called stock options, and a conversion program. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. which was to raise capital in the US market by "private placement" with invited private investors. Shares were offered in line with the need for capital. VN was one of the people in the group of people who managed this part of the company. As funds were raised, projects and studies were launched. The founders were remunerated via shares for the funds they had deposited, options - so-called stock options, and a conversion program. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. which was to raise capital in the US market by "private placement" with invited private investors. Shares were offered in line with the need for capital. VN was one of the people in the group of people who managed this part of the company. As funds were raised, projects and studies were launched. The founders were remunerated via shares for the funds they had deposited, options - so-called stock options, and a conversion program. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. Shares were offered in line with the need for capital. VN was one of the people in the group of people who managed this part of the company. As funds were raised, projects and studies were launched. The founders were remunerated via shares for the funds they had deposited, options - so-called stock options, and a conversion program. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. Shares were offered in line with the need for capital. VN was one of the people in the group of people who managed this part of the company. As funds were raised, projects and studies were launched. The founders were remunerated via shares for the funds they had deposited, options - so-called stock options, and a conversion program. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. options - so-called stock options, and a converter. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company. options -

so-called stock options, and a converter. One did not get so far that the converter was launched. The services provided in Denmark were invoiced to H1 in the USA. He has no detailed knowledge of the American part of the company.

The company wanted to subscribe for shares at $ 40 per share. shares. A professional financial advisor had done the pricing. However, the market could not keep this price and the first shares were offered at a lower price of $ 16.67 per share. shares.

A and B had previously founded H2 Holding, which invested in real estate. The investments did not go

well, and there was a small share loss, which had to be used no later than 2000. There was therefore a tax need to sell the shares so that the loss could be carried forward within the 5 years. He has not had anything to do with the conclusion of the agreement on the sale of the shares. He did a practical job because the shares were in custody in Credit Suisse. He was told that there was a sale opportunity, that an agreement had been reached and that the shares were being delivered.

He does not know when A acquired the shares. He was given information about which shares were in question and at what price the sale was to take place. He has seen a purchase offer and a letter of acceptance prior to writing the letter in November 2000.

He represented A at the hearing at the tax authorities, the tax appeals board and at the beginning of the hearing at the National Tax Court. The information about pension payments was given to the office by A or B. This is an exact amount, which probably comes from a specific information. There is no posting to a private tax return. Unexplained movements have been asked for. He has not seen vouchers on the pension payment. It has since turned out that this was not correct. If there had been no payout, private consumption would have been negative. It is customary for a private account to be based on disclosed information rather than bookkeeping. It is one of his employees who made the accounts.

During the case processing by the tax authorities, he went deeper into the accounts, including the receivable from VN. It subsequently turned out that VN had paid DKK 3.1 million during the year.

In 2000, a sale of shares was declared taxable, where there was a residual receivable, which has been entered as a receivable. This receivable should have been written down to DKK 0 in 2001. They had allegedly not received the information, so the receivable was not written down. Private consumption would have been realistic with the contribution from VN, and no pension payments would have been made.

The receivable from VN arises from a sale price for the shares reduced by the payment made of $ 100,000. The gain of DKK 3,668,630 is the total amount received for the shares. In the profit and loss statement, cost amounts may be deducted, such as acquisition price, stamp, custody costs, etc. The amount in the accounts is a net amount. These amounts have undoubtedly appeared in an appendix to the accounts. The costs may well amount to a few hundred thousand kroner.

*B* explained, among other things, that he is a cand. with. and general practitioner. Already when he was a general practitioner, he started developing products. He has developed a total of 12 products. He initially called one of the products ... 1, which was later developed into a ... 2. Only now has it succeeded in creating a commercial interest in the product. Great resources have been spent on developing the cursor. The Danish state has given DKK 41 million. He himself has used approx. DKK 14 million, just as capital has been raised abroad, in Europe and mainly from the USA. They then developed a ... 2 in collaboration with G1 and University G1. In Amsterdam in 1999 and in Paris in late 2000, the product was presented at congresses and they were able to attract large sums of money to the project. They thought until the fall of 2001 that they had a promising product, but it was only University G1,

H1 USA Inc. was founded in 1998 together with VN. They first met VN 26 years ago in connection with the distribution of one of the products he had invented. A "road show" was made and a development course, so-called milestones, was planned, both in relation to external investors and those involved in the project. Upon the acquisition of the 3rd mile stone in 2000, he was given options for 30,000 shares.

He has handled all matters relating to the project and the options for A, even though A was the owner of the shares, which was agreed from the start. At a meeting with the auditor, it was said that there was a right to deduct share gains, which had to be exercised within a 5-year deadline at the end of 2000. He contacted VN regarding the purchase of shares. There were several investors who could be used. The shares were currently sold for $ 16 2/3. They considered it a fair course, ie. the same price as investors had. VN said he would like to buy the shares. He told VN that the purchase should take place before the end of 2000. They exchanged documents where everything was agreed. He dictated the acceptance to A, who added this to the offer. They usually use fax covers, but he does not know

where these are today. They kept a copy of the sales agreement, because it was an important deal, but they have not been able to find it. The original annex is the copy that was faxed and sent to VN. When it was to be used during the trial, he got it from VN for approx. a year ago. He did not have the document during the National Tax Court case. There was no cost to the trade in the form of fees or the like.

He does not know why it took a month from the auditor's letter until the purchase offer emerged, but VN was a busy man who often had to be reminded of chores. They faxed the acceptance and sent the original letter by mail.

original letter by mail.

The sales agreement has been prepared on the basis of a standard prepared by VN's lawyer. After signing, he sent the letter both per. fax and per. mail. to VN. VN paid DKK 100,000 to A's account in F1 Bank, Denmark. F2 Bank, Denmark was used as the corresponding bank. The balance was paid before the deadline in the document. By this time, they were aware that there were other more suitable ... 2, and he found it reasonable if VN could join this project where he could use his network. VN had to pay $ 100,000 for the option. This agreement was entered into in May 2001. VN paid the option amount and has since exercised the option. The payment on 27 August 2007 thus consists of the option payment and the remaining amount from the share trading. The option amount had to be paid into their own account. They exchanged money at least once a month during the process, so VN had the account number in F1 Bank, Denmark ,. There were 16 employees in H1 in Denmark. They made a monthly invoice, which was sent to the US company. The money was paid into the company's account in F1 Bank, Denmark. He does not remember where the option amount was paid, but he believes it was paid to Switzerland, the Credit Suisse account.

He does not know where the information about a pension payment comes from. While in England, they paid money into the State Institution for Life Insurance. The pension must not be reported to the tax authorities in Denmark, and he does not know where the auditor's knowledge of the pension comes from. They also have a pension savings in Denmark. None of the schemes have been withdrawn. He does not recall having discussed pension payments with the auditor. DJ represented them in the case with the tax authorities until 2003. He immediately discussed the relationship with DJ, but no answer could be given to the relationship. He therefore contacted R1, who represented him during the proceedings in the National Tax Court.

Among other things, VN has explained that he negotiated with B about the establishment of the company H1 Inc. in 1998 and 1999, and it was established in 2000. He was CEO of the company. There were other employees in the company, including the secretary and accountant. Later, the secretarial function was handled by the company's law firm in the United States. In 2000, promising scientific progress was made, but the company did not make money. Milestones had been set up, and as these were reached, additional external funding was launched. B and he as founders of the company had options, which were triggered by obtaining a mile stone. This happened in the beginning of 2000. The exchange rate was one dollar per. shares. B contacted him with a query as to whether he would buy the shares. They agreed that sales to existing shareholders should be made at the market price, so they did not have special negotiations on the price. B said it was important that the trade should take place in the income year 2000. He expected the shares to rise based on the scientific advances at this time.

Shortly before Christmas, he sent a short purchase offer to B. He received A's acceptance per. fax. Later he received the original by mail. The final sales agreement was subsequently drawn up and sent. He changed the date so that it matched the dates in the purchase offer. Due to time constraints, he could only pay $ 100,000 right away, and A accepted a later payment of the balance. There are only these two documents regarding the stock trading. He faxed the signed sales agreement to A, who returned the fax copy to him both per. fax and per. mail. He did not even send the sales agreement with his signature by mail to A. Shortly after Christmas, he sent $ 100,000 to F1 Bank, Denmark ,. He got the stock certificates after a while.

On August 27, 2001, he paid an amount to Credit Suisse. It covered the outstanding payment regarding the stock trade and $ 100,000 for an option in a new project that B was working on. It did not matter to him personally whether the transaction was completed in 2000 or 2001.

**The views of the parties**

*In* support of its action, the applicant claims that the Court should:

> "...
>
> The ruling of the National Tax Tribunal (Appendix 1) relates to an agreement on the sale of 27,745 shares in H1 Inc. to have been entered into between the plaintiff and mr. UN, USA in 2001.
>
> It is claimed that an agreement on the sale of shares was entered into in 2000.
>
> It is hereby argued that the time of entering into an agreement on the share transfer is decisive for the proceeds of the share transfer to be included in full in the tax assessment for 2000.

2. The following documentation is included regarding the time limit for concluding the agreement

In Appendix 2, which is a fax from the applicant's auditor, statsaut. auditor DJ to Credit Suisse, of 15 November 2000, described that the plaintiff wishes to accept an offer from mr. VN on the transfer of 27,745 shares of 16 2/3 US $ or for a total of 462,416.75 US $ and asks the bank as custodian to assist with this.

In Appendix F, 16 December 2000 per. fax submitted an offer to purchase 27,745 shares in H1 USA Inc. for a purchase price of 16 2/3 US $ per. share or a total of 462,416.75.

The offer is handwritten and accepted by the applicant, which includes a payment term of US $ 100,000 before 31 December 2000 and the balance before December 2001.

Appendix F is faxed to mr. VN with the endorsement of acceptance.

In appendix 7, mr. UN on 17 December 2000 per. fax sent a standard share transfer agreement, in which the payment terms described in Appendix F are inserted. The agreement has been signed in advance by mr. VN. On 17 December, the plaintiff signed the share transfer agreement and returned it by fax to VN.

Pr. mail sent the plaintiff a copy with his original signature to mr. VN.

This copy is by mr. VN submitted for use in the trial. The original copy is attached as a verification of the submitted appendix 7 for the use of the court.

In appendix 4 is a documentation of a / account payment on 28 December 2000 from mr. VN US $ 100,000.00 corresponding to DKK 800,580 to the plaintiff's account in F1 Bank, Denmark ,.

Appendix 10 contains an internal transfer instruction in Credit Suisse on the transfer of 27,745 shares to mr. VN.

Appendix 5 is a deposit documentation of 29 August 2001 of the balance.

The deposit amount is US $ 100,000.00 higher than the balance in the share transfer agreement.

This amount is the second balance, which is explained in an option agreement of 1 May 2001 in another business relationship between the plaintiff's spouse, B, and mr. VN.

It is claimed that there is full evidence that the share transfer agreement was bindingly concluded on 17 December 2000, and was fulfilled by payments on 28 December 2000 and 27 August 2001 in accordance with the agreement.

3. It is argued that the relevant content of Annex G is only how the payment made on 27 August (value 29 August) 2001 is distributed among different accounts.

4. It is argued that the presentation of the accounts, cf. the accounting documents presented in the case have been prepared in full accordance with the date of the share transfer agreement on 17 December 2000.

... "

In support of its action, the *defendant relies on the following in its action document*

"...

It is generally asserted that the National Tax Court has rightly considered the 27,745 pieces. shares in H1 USA Inc. for sold in 2001 and not in 2000.

According to the case - law, the burden of proving that a final and binding agreement was reached on the transfer of the shareholding in question in 2000 lies with the applicant. That burden of proof must be regarded as aggravated, given that the applicant had a share loss carryforward which would be lost if it were not used in 2000, see Annex 6, page 9.

It is alleged that the applicant did not prove that the shares were sold in 2000.

It is hereby asserted that

| | |
|---|---|
| to | there was no final and binding agreement with VN's offer and the applicant's handwritten endorsement, Annex F, and |
| | |
| to | nor is it documented that the applicant's handwritten endorsement, Annex F, was received by the UN in 2000. |

Furthermore, it has not been established that a final and binding agreement was reached later before the end of 2000, noting that

| | |
|---|---|
| to | the agreement presented as Annex 7 does not constitute the necessary documentation for this, |
| | |
| to | it has not been established that the payment to the applicant on 28 December 2000, Annex 4, relates to the share trading in question, |
| | |
| to | Credit Suisse, where the shares were in custody, has stated that the shares were sold on 27 August 2001, cf. Appendix G, |
| | |
| to | an amount corresponding to the amount in VN's offer, Annex 3 and Annex F, was paid on 27 August 2001, cf. Annex G and Annex 5, |
| | |
| to | it is not established that the amount of $ 462,416.75 paid in August 2001, as claimed by the applicant, was in part related to another balance between the UN and the applicant, |
| | |

| | |
|---|---|
| to | the applicant's receivables from the UN, according to the 2000 accounts, Annex 6, and 2001, Annex A, amounted to the same amount, and |
| | |
| to | changing explanations have been given. |
| ... " | |

**The Court's reasoning and decision**

It is assumed that in the income year 2001 A did not receive a pension, as stated in the annual accounts.

It is agreed by A and B and VN that the conclusion of the agreement on the transfer of 27,745 shares in H1 USA Inc. happened in the manner and at the time specified in the purchase offer and the sales agreement.

It is assumed that VN paid in $ 100,000, corresponding to DKK 800,580, to an A account in F1 Bank, Denmark, as stipulated in the acceptance and sale agreement.

The explanations about the time of the conclusion of the agreement are not in any other way supported, e.g. by documentation for sending faxes, just as A and VN do not have conflicting interests in relation to the determination of the time of conclusion of the agreement.

On the basis of the internal instructions from Credit Suisse and VN's explanation, it is proven that Credit Suisse sent the share certificates to VN at the end of February.

It is further assumed that on May 1, 2001, B and VN entered into an option contract with payment of $ 100,000, and that on August 27, 2001, VN paid $ 462,416.75 into A's account with Credit Suisse.

Against this background, it is considered proven that the agreement to transfer 27,745 shares in H1 USA Inc. between A and VN was concluded in December of the income year 2000 and implemented in accordance with what was agreed between the parties.

The fact that in A's income and assets statement for the income years 2000 and 2001 there is no agreement with what is stated about the share sale and the receivable from VN is not found to be able to lead to a different result.

The costs of the case are set at DKK 107,000. Of this, DKK 4,000 covers the court fee, DKK 80,000 covers costs for legal assistance and DKK 23,000 covers costs for proof.

**T hi is known for right**

The defendant, the Ministry of Taxation, must acknowledge that the Land Tax Court's order of 14 June 2007 is disregarded, so that the plaintiff, As, capital income for the income year 2001 is reduced by DKK 3,776,095.

The Ministry of Taxation must pay DKK 107,000 in legal costs to A.