# Exhibit 66

# Rightful owner - withholding tax on dividends

Fold in the table of contents

The Ministry of Taxation's comment of 13 February 2012 (SKM2012.100.SKAT)

Previous instance: (SKM2010.268.LSR) Order of the National Tax Tribunal of 3 March 2010, 09-01478

| | |
|---|---|
| Date of release | 24 Feb 2012 09:12 |
| Date of judgment / ruling / decision / control signal | 20 Dec 2011 13:00 |
| SKM number | SKM2012.121.ØLR |
| Authority | Eastern High Court |
| Case number | Section 14, B-2152-10 |
| Document type | Dom |
| Overall topics | treasure |
| Topics Topics | Corporate taxation + Foreign income |
| Keywords | Beneficial, owner, taxable, limited |

| Summary | In connection with a private equity fund's takeover of a Danish group, a holding company structure was established, in which the private equity funds established the top Danish holding company by cash contributions. Subsequently, intermediate Luxembourg holding companies were formed by share exchange, and in immediate continuation of this, a significant part of the capital invested in the Danish upper holding company was distributed to the lower Luxembourg holding company. The amount distributed was again lent to the Danish holding company through a convertible loan, which was converted to equity at the end of the year. |

which was converted to equity at the end of the year.

It was stated that the procedure for the creation of the holding company structure was used to avoid capital duty in Luxembourg, as capital duty had been imposed if the capital of the Luxembourg company was "above" deposits. It was further stated that from the outset it was intended to issue the convertible loan, as the interest on the loan would be deductible in Denmark, while the returns were considered tax-free dividends in Luxembourg (the current provision in section 2B of the Corporation Tax Act was not introduced at the time).

SKAT had considered the top Danish holding company to be liable to withhold tax on the dividend amount paid to the lower Luxembourg holding company. The reason for this was, among other things, that the Luxembourg company had no real right to dispose of the dividend amount, as it had been determined in advance that the amount was to be re-lent to the Danish company immediately and that the Luxembourg company was not the rightful owner of the dividend. SKAT had found that the dividend was therefore taxable according to the Corporation Tax Act, section 2, subsection. 1 letter c, as withholding tax could not be considered to be in breach of either the Danish-Luxembourg double taxation agreement or the Parent / Subsidiary Directive.

The High Court agreed with the Ministry of Taxation's view that the concept of rightful owner should as far as possible be interpreted in accordance with the international understanding expressed in, among other things, the comments on the OECD model agreement, just as the High Court agreed that the changes in 2003 comments that can be involved in the interpretation of the concept of rightful owner. The High Court further found that a holding company can only be deprived of status as a rightful owner if the owner / owners exercise control over the company, which is beyond the planning and management at group level, which usually occurs in international groups, and if the company in question is deposited as an intermediary with a view to enabling the owner (s) behind to obtain benefits under a double taxation agreement, which could not be obtained by the owner / owners directly. In the present case, where the dividend paid by the Danish company had not been passed on to the underlying owner (s), but had instead been returned as a loan to the Danish company, the Luxembourg company had to be regarded as the rightful owner in the High Court's opinion. the company was not liable to tax with regard to dividends, cf. section 2 (1) of the Danish Corporation Tax Act. Article 10 (1) (c) and Article 10 (1) 2 of the Double Taxation Agreement with Luxembourg. so that the company was not liable to tax with regard to dividends, cf. section 2 (1) of the Danish Corporation Tax Act. Article 10 (1) (c) and Article 10 (1) 2 of the Double Taxation Agreement with Luxembourg. so that the company was not liable to tax with regard to dividends, cf. section 2 (1) of the Danish Corporation Tax Act. Article 10 (1) (c) and Article 10 (1) 2 of the Double Taxation Agreement with Luxembourg.

| Reference (s) | The Corporation Tax Act § 2, para. 1, letter c (current)<br>Withholding Tax Act § 61, para. 1<br>Withholding Tax Act § 65, para. 5<br>The double taxation agreement between Denmark and Luxembourg art. 10 |
|---|---|
| Reference | Equation Guide 2012-1 DD2 Article 10 |
| Reference | The Legal Guide 2012-1 CD1.2.3.5 |
| Editorial notes | |

**Parties**

Ministry of Taxation
(Chamber Advocate v / lawyer Kim Lundgaard Hansen)

against

H1 S.à.rl (formerly H1.XA / S)
(lawyer Hans Severin Hansen)

**Judged by the district judges**

BO Jespersen, Olaf Tingleff and Katja Høegh.

**The content of the case and the allegations made**

On 15 May 2009, SKAT decided that H1.XA / S was obliged to withhold dividend tax of DKK 1,552,376,000 on dividends of DKK 5,544,200,000 paid to the company's parent company in Luxembourg, H1 S.à.rl, according to the withholding tax act, section 65, subsection 1 and 5, cf. the Corporation Tax Act, section 2, subsection 1, letter, c.

In an order of 3 March 2010, the National Tax Court upheld H1.XA / S's that the dividend is not taxable.

The ruling was brought before the City Court by the Ministry of Taxation on 2 June 2010, claiming that H1.XA / S should be considered obliged to include the dividend tax. By order of 13 July 2010, the City Court referred the case to the Eastern High Court pursuant to section 226 (1) of the Administration of Justice Act. 1.

With effect from 1 January 2010, H1.XA / S merged with its Luxembourg parent company, H1 S.à.rl, with the parent company as the continuing company, and thus also as the defendant in this case.

The Ministry of Taxation has finally filed a claim that H1 S.à.rl must recognize that it is obliged to withhold dividend tax of DKK 1,552,376,000, corresponding to 28% of the dividend of DKK 5,544,200,000, which on 10 May 2005 was decided to be distributed from H1.XA / S to H1 S.à.rl, and that H1 S.à.rl, is liable for the payment of the amount not included, which must be remunerated in accordance with the general rules of tax legislation.

H1 S.à.rl has claimed acquittal.

The Ministry of Taxation's view is that the Luxembourg parent company, H1 S.à.rl, is a "flow-through company", as the underlying owners, who are the ultimate recipients of the dividend, must to some extent be assumed to be resident in non-EU countries without double taxation agreement with Denmark. The consequence of this is, in the opinion of the Ministry of Taxation, that the parent companies are not the "rightful owner" of the dividend received, cf. Article 10 (1). 2, in the double taxation agreement between Denmark and Luxembourg. The Danish subsidiary, H1.XA / S, should therefore have included withholding tax in connection with the payment. As this has not happened, the Ministry of Taxation claims that H1.XA / S, now H1 S.à.rl, is liable for the payment of withholding tax, cf. the withholding tax act, section 69, subsection. 1,

SKAT has filed a number of similar cases against other Danish companies that have distributed dividends tax-free or paid interest to their parent companies domiciled in other EU countries or countries with which Denmark has entered into a double taxation agreement (so-called "beneficial owner" / " rightful owner "cases). This is the first case before the courts.

**Case presentation**

Order of the National Tax Court

It appears from the National Tax Court's ruling of 3 March 2010:

"...

Case information

In May / June 2005, a number of private equity funds under K1 and K2, respectively, acquired the then listed company, H2.1 A / S, via the following ownership structure:

| K1 | | K2 |
|----|----|----|
| | | |

| | KH S.à.rl | |
|----|----|----|
| | ¦ | |

| | | |
|---|---|---|
| | H1 S.à.rl | |
| | ⋮ | |
| | H1.X (The Company) | |
| | ⋮ | |
| | H2 A ∕ S | |
| | ⋮ | |
| | H2.1 A ∕ S | |

Regarding the private equity funds, it is stated that these are shareholder groups in the form of

4 Limited K3, established in Delaware

2 Limited K4, established on Guernsey
2 Limited K5 established in Germany and
1 Limited K6 established on Bermuda.

According to the representative, the immediate investors in the various private equity funds are several hundred institutional investors, including pension funds, banks, investment associations and companies, other private equity funds ("fund of funds"), a number of companies and hundreds of private individuals.

All four holding companies have the sole activity of owning and financing their subsidiary.

On 29 March 2005, H2 A ∕ S submitted a voluntary public tender offer to the shareholders of H2.1 A ∕ S for the purchase of the shares at a price of 470. H2 A ∕ S was to function as a holding company for H2.1 A ∕ S. H2 A ∕ S has not had any activity since its establishment on 11 March 2005.

On 28 March 2005, H2 A ∕ S signed the credit facility agreements required for the acquisition of H2.1 A ∕ S. There were three loan packages with loan limits of up to DKK 21.2 billion.

DKK:

1. Senior Facilities,
2. Subordinated High Yield Bridging Loan Facility, and
3.

PIK Bridging Loan Facility.

According to all three loan agreements, it was a condition that investors deposited DKK 7,693 billion. DKK, and the amount should have been paid the day before acceptance of the purchase of H2.1 A ∕ S.

The voluntary offer expired on 3 May 2005, and on 9 May 2005 the company announced that all conditions had been met or waived, and that the tender offer would be implemented as the company had obtained a commitment from shareholders corresponding to 91.55 per cent. of the company's share capital. On 13 May 2005, H2 A ∕ S made a mandatory public tender offer for the remaining shares in H2.1 A ∕ S, which expired on 10 June 2005. After the expiry of this, H2 A ∕ S owned 98.30 per cent. of the share capital in H2.1 A ∕ S.

On 4 May 2005, H1.XA ∕ S (the Company) was founded by K1.1. In connection with the foundation, H2 A ∕ S was contributed in kind, so that H2 A ∕ S became a wholly owned subsidiary of the Company.

A / S was contributed in kind, so that H2 A / S became a wholly owned subsidiary of the Company. On the same day, K1.1 sold shares in the Company to K1.2 and K2 in the ratio agreed by the three shareholder groups, namely 45.3% to K1.2 and 45% to K2. K1.1 retained 9.7%.

On May 9, 2005, the share capital of the Company was increased by a nominal DKK 99.1 million. DKK for cash deposits of a total of DKK 7.702 billion. DKK. The new shares were subscribed for by the three private equity funds K1.1, K1.2 and K2 in relation to their previous ownership. The company also joined the third loan package on 9 May 2005, namely the PIK Bridging Loan Facility Agreement as a borrower. The company withdrew DKK 750 million. DKK on the loan, which the Company further lent to H2 A / S on similar loan terms according to a loan document dated 11 May 2005.

Also on 9 May 2005, K1.1, K1.2 and K2 inter alia all their shares in the Company in KH S.à.rl against consideration in shares in KH S.à.rl, On the same day KH S.à.rl deposited all assets and liabilities, including all shares in the Company, in H1 S.à. rl against consideration in shares in H1 S.à.rl On the same day, the capital in KH S.à.rl was increased by a nominal DKK 1,510,839,400.

On 10 May 2005, an annual report was submitted for the Company's first financial year for the period 4 - 9 May 2005. On the same day, the Annual General Meeting of the Company was held, where it was decided to pay a dividend of DKK 5,544.2 million. DKK to the parent company, H1 S.à.rl

Also on May 10, 2005, H1 S.à.rl granted two loans to the Company - a convertible loan of DKK 5.5 billion. DKK and a non-convertible loan of 37.2 mill. DKK.

Account statements have been submitted from the H1 S.à.rl account in Danske Bank, from which it appears that the company's account on 10 May 2005 was credited with an amount of DKK 5,544.2 million. DKK, and the same day subsequently, two amounts of 37.2 mill. DKK and 5.5 mill. DKK. It appears that the transfers have taken place to and from the Company. Account statements have also been submitted from the Company's account in Danske Bank, from which the same transfers appear.

Also on 10 May 2005, the Company made an increase in the share capital of H2 A / S by nom. 99 million DKK by cash payment of 7,692,993,000 DKK.

At 31 December 2005, the convertible loan amounted to DKK 5.5 billion. DKK with accrued interest totaling DKK 359,027,778 converted into shares in the Company.

In addition to interest of DKK 359,027,778 on the convertible loan, interest was accrued on the loan of DKK 37.2 million. DKK of a total of DKK 2,428,333, so that interest on DKK 361,456,111 was accrued on the two loans together.

Regarding the bank loans, the Company's representative has stated that the loans were raised by H2 A / S in accordance with the Senior Facilities Agreement. These loans were originally secured by the 1st priority mortgage in the shares in H2.1 A / S and the mortgage in H2 A / S 'bank accounts.

Part of the loans under the Senior Facilities Agreement were later transferred to H2.1.1 A / S (subsidiary of H2.1 A / S) and its subsidiaries. These loans were secured by mortgages on H2.1 A / S 'trademarks, etc., as well as mortgages on shares, receivables, bank accounts and certain other assets belonging to H2.1.1 A / S and a number of its subsidiaries. The shares in H2.1.1 A / S are not pledged.

The loans in accordance with the Subordinated High Yield Bridging Loan Facility Agreement were raised by H1.XA / S (the Company) and were secured by a 2nd priority mortgage in the shares in H2.1 A / S.

The loan under the Subordinated PIK Bridging Facility Agreement was also raised by the Company and was structurally and contractually subordinated in relation to the loans under the Subordinated High Yield Bridging Loan Facility Agreement and the Senior Facility Agreement, and no collateral was provided for these loans.

It is stated about the Luxembourg companies that they have a registered address in Luxembourg, that they do not have employees, that the daily "administration and accounting" is handled by a company in the K2 group, and that they are managed by a Board of Managers consisting of 2 Class A

Managers (appointed by the K2 funds) and 2 Class B managers (appointed by the K1 funds) who are identical in the two companies.

The company's representative has stated that for practical reasons, K2's investments in Europe are used for practical reasons. This means that a new holding company is established with each new acquisition. The same is usually the case for K1's investments.

To carry out the day-to-day administration of these various holding companies, K2 has established a so-called silent partnership. The purpose of this silent partnership is to establish a cost-effective joint

administration of K2's European investments. Silent partnership - which in 2005 had approx. 10 participants - led by an executive partner, K2.1 S.à.rl, who has the authority to enter into agreements on e.g. rental of premises, office equipment, employment, service, etc. The agreements are entered into in their own name, but internally the individual silent partners are obliged to do so. Silent partners divide the year's expenses among themselves in relation to the number of participants.

Both H1 S.à.rl and KH S.à.rl have entered as silent partners in connection with the acquisition of H2.1 A / S.

The companies thus do not themselves have employees to handle the day-to-day administration, as this is handled by the employees of K2.2 S.à.rl. The management company, which has today been replaced by another, K2.3 S.à.rl, employs some few people, and the company's tasks include in the storage and maintenance of statutory shareholder registers, minutes of the Board of Directors and general meetings, invoicing, bookkeeping, preparation of accounts, holding of meetings and general meetings, contact with authorities, etc.

In 2005, the companies each expensed DKK 23,240 and DKK 2,628 regarding "staff costs", which amounts form part of the companies' payment to the management company in question. The total cost of overheads incurred through silent partnership amounted to EUR 10,943 per company and the remainder of these expenses are included in the item "External charges". These external expenses otherwise consist of expenses for lawyers, notarial expenses, etc., which only relate to the investments of these companies.

The companies hold approx. three board meetings and one general meeting per year.

SKAT's decision

The company should have included dividend tax on dividends to the parent company of DKK 1,552,376,000.

It follows from the Corporation Tax Act § 2, paragraph. 1, letter c, that dividends from Danish companies paid to foreign companies are subject to limited tax liability in this country unless such taxation is to be waived in accordance with the EU Parent / Subsidiary Directive, Directive 90/435 EEC or a double taxation agreement. Neither the Directive nor the Danish / Luxembourg DBO, Executive Order No. 95 of 23 September 1982 of the Double Taxation Agreement of 17 November 1980, precludes Denmark from taxing the dividend amount, as H1 S.à.rl, Luxembourg, cannot be considered a "beneficial owner". "of the dividend amount.

The Danish / Luxembourg DBO, Executive Order no. 95 of 23 September 1982 of the double taxation agreement of 17 November 1980.

The above-mentioned DBO between Denmark and Luxembourg must be interpreted in the light of the comments on the OECD's model agreement. In the comments on the model agreement, the question of the understanding of the term "beneficial owner" is translated into: "rightful owner" is now dealt with in particular in points 12, 12.1 and 12.2, to Article 10. which states:

"...

| 12. | The requirement of rightful ownership was inserted in art 10, para. To clarify the meaning of the words "paid to a resident" as used in paragraph 2 of this Article. 1. It is hereby clarified that the source State is not obliged to waive its taxing right to dividend income simply because the income was paid immediately to a person resident in a State with which the source State has entered into an |

|  | agreement. The term rightful owner is not used in a narrow technical sense, but must be seen in the context and in the light of the agreement's intention and purpose, including avoiding double taxation and preventing tax evasion and avoidance. |
|--|--|
|  |  |

| 12.1 | When an income is paid to a person who is a resident of a Contracting State and who acts in his capacity as agent or intermediary, it will not be in accordance with the intention and purpose of the agreement for the source State to grant relief or tax exemption solely on the basis of the immediate income recipient's status as a resident of the other Contracting State. In this situation, the immediate |
|--|--|

| | income recipient is a person resident in the other State, but no double taxation arises as a result, since the income recipient is not considered to be the owner of the income for tax purposes in the State in which he is resident. It would also not be in line with the intention and purpose of the agreement, if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State other than as an agent or intermediary merely acts as a "conduit" for another person who purely actually receives that income. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties. other than as an agent or intermediary, simply acts as a "conduit" for another person who is actually receiving that income. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties. other than as an agent or intermediary, simply acts as a "conduit" for another person who is actually receiving that income. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties. |
|---|---|
| | |
| 12.2 | Subject to the other terms of the article, the limitation on the taxing right of the source State shall continue to exist when an agent or intermediary, resident in a Contracting State or in a third State, is deposited between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. . (The model text was amended in 1995 to clarify this point, which is in line with the views of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations. |

... "

The comments state that the DBO does not in itself cut off / limit source state taxation of dividends unless the rightful owner of the dividends is a resident of the other Contracting State. Decisive for determining "the rightful owner" is, according to the comments, whether the formal interest recipient merely acts as a "conduit" for another person who actually receives the income in question.

The comments on the Model Convention must be understood as meaning that it is not in itself decisive that the dividend amounts have not been immediately passed on to the underlying owners, as the decisive factor is the formal beneficiary's lack of power to dispose of the amounts paid, as the underlying owners completely determines how to deal with amounts received. This interpretation is also

denying owners completely determines how to deal with amounts received. This interpretation is also confirmed by the report of the Committee on Fiscal Affairs mentioned in the comments.

It is not the view that holding company structures should never be respected so that a dividend or interest-receiving holding company cannot rely on a DBO entered into with the source country for the purpose of exempting or limiting source country taxation.

However, a DBO does not cut off source country taxation when the underlying owners - who are not themselves resident in a country with which a DBO has been entered into - have disposed of the amounts in advance or automatically, or it must otherwise be assumed that the holding company has not any practical option to dispose of otherwise than determined by the owners.

As an example of a country refusing to use a DBO based on the OECD's model agreement, reference can be made to a decision of the Swiss Supreme Court which is mentioned and referenced in the answer to question 7 to the Parliament's tax committee of 21 November 2006 regarding L 30. In the case a Swiss company was denied collective bargaining benefits, as the court found it decisive that the Danish company was allegedly a mailbox company and had no business reasons - apart from the tax ones - to be established in Denmark. The Danish holding company was not considered the rightful owner of the income.

In summary, H1 S.à.rl is not considered a beneficial owner as the company has no activities and as the company has no independent right to dispose of the dividends. As H1 S.à.rl is only deposited as an intermediate holding company, which does not really have the authority to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, the Danish / Luxembourg DBO is not considered to cut off Denmark from implement a source country taxation of the dividend amounts. On the contrary, there is no commercial purpose for the contribution of the intermediate holding company, which is therefore seen as having no other purpose than to seek to avoid Danish withholding tax (or obtain other tax benefits).

EU law

The case law of the European Court of Justice is that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from e.g. Parent-Subsidiary Directive - when it is assumed that the establishment of a holding company in another Member State "aims to avoid withholding tax on payments to non-European companies if such a construction serves no commercial purpose", cf. -Commission interpretation of "Purely artificial arrangements" published in OJ 2008 C 116/13.

This interpretation is supported by the case law of the European Court of Justice, cf. Case C-196/04, Saml. 2006, p. 17995 and Case C-255/02, Saml. 2006, pp. 1-1609).

EU law can therefore not to a greater extent than the DBOs based on the Model Agreement be considered to prevent Denmark from implementing a withholding tax on interest and dividends when the rightful owners of the amounts in question are persons domiciled outside the EU.

In summary, it is the view that H1 S.à.rl is not a beneficial owner as the company has no activities and as the company has no independent right to dispose of the dividend amounts. As H1 S.à.rl, Luxembourg is only deposited as an intermediate holding company, which does not in fact have the power to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, EU law - including EU directives - not to prevent Denmark from implementing a source state taxation. On the contrary, there is no commercial purpose for the contribution of the intermediate holding company, which is therefore seen as having no other purpose than to seek to avoid Danish withholding tax (or obtain other tax benefits).

Lack of independent disposal right in H1 S.à.rl

The distribution and the simultaneous re-lending of almost the entire amount distributed, which took place on 10 May 2005, is considered to constitute a cash flow determined in advance by the underlying owners, so that H1 S.à.rl in relation to these transactions can be claimed that have been a pure "administrator" or a pure "tool" of the dispositions of the underlying owners.

The company's representative has stated that it was originally assumed that the investors' deposits of DKK 7,693 million. DKK should have been deposited in the Luxembourg companies and then downstreamed via H1.XA / S to H2 A / S. In this connection, it was planned that H1 S.à.rl would partly provide the funds in H1.XA / S by issuing a subordinated convertible loan of DKK 5.5 billion. DKK and an ordinary loan of 37.2 mill. DKK.

However, investors chose instead to inject capital directly into H1.XA / S and only then establish the Luxembourg part of the group structure through successive share exchanges. The reason why investors chose to deposit the cash amount of DKK 7,702 billion. DKK directly in H1.XA / S instead of via

vestors chose to deposit the cash amount of DKK 7,762 billion. DKK directly in H1.xA 7 3 instead of via the Luxembourg companies was, according to the representative, that a capital injection to the Luxembourg companies would have triggered a very significant and for the achievement of the desired capital structure completely unnecessary capital injection tax in Luxembourg.

Therefore, in accordance with the information provided, it must be stated that it was decided in advance by the owners behind it (the "investors"), exactly how to deal with the amount distributed to H1 S.à on 10 May 2005. rl There is also no indication that at any time a decision has been taken by the Luxembourg company on the re-lending, even though all decisions taken at "board meetings" have allegedly been forwarded.

In addition, the original loan documents state in several places that this intra-group borrowing maneuver has been planned from the outset. Eg. no distinction is made between whether the private equity funds' own financing of at least DKK 7,693,000,000 is invested as share capital or as subordinated shareholder loans. This is stated in the Loan Document PIK Bridging Loan Agreement, page 107.

The company's claim and arguments

The company's representative has filed a claim that the company's withholding obligation regarding dividends to the parent company be abolished.

In support of the claim, it is generally argued that neither H1 S.à.rl nor the underlying owners (the ultimate investors in the private equity funds) are subject to limited tax liability in Denmark of the dividend in question to H1 S.à.rl, cf. the Corporation Tax Act. § 2 pcs. 1 (c) in conjunction with Article 10 of the Double Taxation Agreement between Denmark and Luxembourg and the Parent-Subsidiary Directive (90/435 / EEC).

It is hereby submitted that H1 S.à.rl is the beneficial owner of the dividends received within the meaning of the double taxation agreement.

It is further argued that H1 S.à.rl has an unconditional right to tax exemption for the dividends pursuant to the Parent-Subsidiary Directive.

In the alternative, it is argued that SKAT's decision is an expression of a tightening of a fixed administrative practice with retroactive effect, and that such can not legally be implemented without appropriate notice.

The Corporation Tax Act, section 2, subsection 1, letter c

The rules on foreign companies' limited tax liability on dividends distributed from Danish companies are set out in section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

The limited tax liability does not include dividends received by a parent company that owns at least 20% (2005) of the share capital of a subsidiary for a continuous period of at least 1 year, within which period the dividend distribution date must be. These conditions, which correspond to the conditions that must be met in order for a Danish parent company to receive tax-free dividends, are met in the present case.

In addition, it is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of the Parent / Subsidiary Directive or in a double taxation agreement. Thus, if only the taxation of dividends is to be relaxed under one of these legal provisions, there is no limited tax liability.

The double taxation agreement between Denmark and Luxembourg

The Danish-Luxembourg double taxation agreement of 17 November 1980 contains in Article 10 the following provision on the distribution of the right to tax dividends:

"...

| 1. | Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State. |
| --- | --- |
| 2. | However, such dividends may also be taxed in the Contracting State in which the company naving the divi |

| | | Contracting State in which the company paying the divi-dends is domiciled and in accordance with the law of that State, but the tax imposed may not, if the recipient is the beneficial owner of the dividends: |
|---|---|---|
| | | |
| - | a) | 5 pct. of the gross amount of the dividend if the rightful owner is a company (other than a part-nership and a limited partnership) that directly owns at least 25 per cent. of the capital of the company paying the dividend; |
| - | b) | 15 pct. that the gross amount that the dividend in all other cases. |

... "

The provision corresponds to Article 10 of the 1977 OECD Model Convention.

The term "beneficial owner" is neither defined in the Danish-Luxembourg double taxation agreement nor in the model agreement. In the OECD's comments on the 1977 Model Convention, point 12, it is stated about the concept:

> "...
>
> According to para. For the purposes of paragraph 2, the limitation of taxation in the source State shall not apply in cases where an intermediary, such as an agent or a specially designated person, is de-posited between the payee and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to make this clearer are free to do so during bilateral negotiations.
>
> ... "

Since H1 S.à.rl is neither the "agent" nor the "nominee" of the ultimate owners, it is clear from the 1977 comments that H1 S.à.rl is the "rightful owner".

While Article 10 of the current Model Agreement essentially corresponds to the provision in the 1977 version, the comments on the beneficial owner concept have been significantly expanded over the years. Point 12 of the comments relied on by SKAT was given its current content in the 2003 audit.

In Danish tax law practice, it is assumed that the OECD's comments on the model agreement can be included in the interpretation of specific double taxation agreements. The starting point is that the in-terpretation must be based on the version of the model agreement with comments that was valid at the time of the conclusion of the specific agreement. If new comments are an expression of a change compared to previous versions - and not just a clarification - the new comments to the model agree-ment can not be used as a basis.

It is therefore an independent question whether the extended comments from 2003 are an expres-sion of a change or a clarification. However, as the new comments do not support SKAT's view in the present case, the question is not pursued further here.

"Flow companies"

Point 12 of the comments relied on by SKAT was expanded in the revision in 2003. New in relation to previous versions of the comments is the remark that the term "rightful owner" is not used in a narrow technical sense, but must be seen in connection with and in in light of the intent and purpose of the agreement, including avoiding double taxation and preventing tax evasion and avoidance.

This is further elaborated in point 12.1 in that, firstly, it would not be in accordance with the intention and purpose of the agreement if the source country were to provide relief by payment to an agent or intermediary ("agent or nominiie"), as he is not the owner of income and thus not taxed in its country of domicile, which is why there is no double taxation. This corresponds to the commentary on the

of domicile, which is why there is no double taxation. This corresponds to the commentary on the 1977 model agreement.

Secondly, it is stated about "conduit Companies"

> "...
>
> It would also not be in line with the intent and purpose of the agreement for the source State to grant relief or exemption from tax in cases where a person resident in a Contracting State, other than as an agent or intermediary, merely acts as a "conduit" for another person who actually receives that income. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator,
>
> ... "

In the present case, H1 S.à.rl has not redistributed the dividends received to the underlying owners. On the contrary, H1 S.à.rl has retained this dividend. The company thus used the amount distributed for a loan to H1.XA / S and even later in 2005 converted the receivable into share capital. The amount that H1 S.à.rl received in dividends was thus reinvested in H1.XA / S and continues to form part of the equity in H1 S.à.rl In fact, at no time since the acquisition of H2.1 A / S in 2005 distributed dividends to the underlying owners. H1 S.à.rl has thus not functioned as a conduit.

It is explicitly stated in the comments that it is a necessary element of the flow consideration that there is "another person who actually receives the income in question" ("another person who in fact receives the benefit of the income concerned").

The fact that the dividend is required to be further channeled to the underlying owners is also presumably stated in paragraph 22 of the comments, which specifically mentions the situation where an intermediate foreign holding company, according to its practice, fails to pay its profits in the form of dividends to the underlying owners, (and the company otherwise enjoys a favorable tax treatment in the country concerned). The comments recommend bilateral agreement on special exemptions from Article 10 in this situation, which clearly shows that the intermediate holding company is presumed to be the beneficial owner.

From the report of the Committee on Fiscal Affairs section IA 2 appears

> "...
>
> This report deals with the most important situation of this kind, where a company situated in a treaty country is acting as a conduit for channeling income economically accruing to a person in another State who is thereby able to take advantage "improperly" of the benefits provided by a tax treaty.
>
> ... "

As stated in the term "conduit for channeling income", it is a prerequisite that the amount is passed on to the person who is claimed to be the beneficial owner of the income. Thus, when the report in the following mentions a conduit company, it is assumed that this forwards the amount to the beneficial owner. This also applies to the following statement in the report, to which point 12.1 of the comments, as reproduced above, refers directly:

> "...
>
> The provisions would, however, also apply to other cases where a person enters into contracts or takes over obligations under which he has a similar function to those of a nominee or an agent. Thus a conduit company can normally not be regarded as the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary or an administrator acting on account of the interested parties (most likely the shareholders of the conduit company). In practice, however, it will usually be difficult for the country of source to show that the conduit company is not the beneficial owner. The fact that its main function is to hold assets or rights is not itself



> pany is not the beneficial owner. The fact that its main function is to hold assets or rights is not itself sufficient to categorize it as a mere intermediary. Although this may indicate that further examination is necessary.
>
> ... "

Thus, neither in the comments nor in the report of the Committee on Fiscal Affairs is there any basis for assuming that it is not decisive whether the dividend amounts have been passed on to the underlying owners. The point is, after all, that the dividends must have benefited the beneficial owner.

The Ministry of Taxation is of the same opinion. In this connection, reference is made to SKM2008.728.DEP (The Ministry of Taxation's comments on a request from FSR), where the Ministry on p. :

> "...
>
> The Ministry of Taxation finds it difficult to see how in the example mentioned it can be demonstrated that the Cayman Island company is a flow-through company, as - in contrast to the example mentioned in appendix 26 to L 213 - no cash flow is actually carried through Cayman Island the company. "

SKAT's view that it is not in itself decisive that the dividend amounts have not been immediately passed on to the underlying owners is thus incorrect. For this reason alone, H1 S.à.rl must be regarded as the rightful owner of the amount distributed.

Availability of the dividend

SKAT's main reason for not considering H1 S.à.rl to be the rightful owner of the dividend in question is that the company - in SKAT's view - has lacked the power to dispose of the dividend itself.

The first comment on this is that it is quite true that the comments on the model agreement in section 12.1 have adopted the Committee on Fiscal Affairs' conclusion, according to which

> "...
>
> a "flow-through company" can not normally be considered the rightful owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting; on behalf of other parties.
>
> ... "

The scope of the right of disposal is thus one of the elements that can be included in the assessment of whether a flow-through company is the rightful owner of the income, but H1 S.à.rl is precisely not a flow-through company.

The point in the comments is thus that when the dividend-receiving company has further channeled the dividend received to the underlying owners, - in assessing whether the company is the rightful owner - emphasis can be placed on whether this is a result of the underlying owners having restricted the company's disposal of the dividend. The decision of the underlying owners that the dividend received should remain in the intermediate holding company does not make the underlying owners the rightful owners of the dividend.

SKAT has thus overlooked that the lack of right of disposal over the dividend must be related to the further channeling of the dividend to the underlying owners.

H1 S.à.rl, which owns all the shares in H1.XA / S, has at a general meeting of H1.XA / S on 10 May 2005 decided on a distribution of an amount of approx. 5.5 billion DKK, and H1 S.à.rl has on the same day decided to lend an almost equivalent amount to H1.XA / S. H1 S.à.rl has thus received the full benefit of the amount distributed, which to this day continues to be included in the company's equity. Conversely, the owners behind it have not enjoyed the distribution at all.

It also follows that any creditors of H1 S.à.rl may seek satisfaction in the value represented by the distribution.

It can be readily assumed that neither the decision to vote for the distribution of a dividend of DKK 5.5 billion. DKK or whether to lend the amount to H1.XA / S are spontaneous management decisions in H1 S.à.rl All major decisions in any group - e.g. on acquisitions of companies, major distributions, establishment of financing structure, etc. - is taken in the first instance by the top management of the group. Thereafter, the decisions are implemented by the relevant corporate bodies of the respective companies. Neither the individual companies as such nor the individual management members are

companies. Neither the individual companies as such nor the individual management members are, as a starting point, obliged to implement the planned decisions, but refusal to do so can of course lead to the members in question being replaced in accordance with the rules of the Companies Act. It cannot be the case that what

It is difficult - if not impossible - to point to an intermediate holding company that SKAT will be able to accept as the rightful owner of a dividend. Whether this dividend is to be used by the company itself - e.g. for the purchase of a company - or must be re-channeled to the underlying owners, SKAT's view thus leads to the holding company not being the rightful owner.

Autonomous or internal interpretation - the principle of the right income recipient

The term "beneficial owner" is taken over from the common law legal tradition (primarily the UK and USA), which operates with a distinction between economic and legal ownership, where beneficial owner relates to economic ownership.

In civil law countries (including Denmark) a similar distinction between economic and legal owner-ship is not used. In Danish tax law, the total property right is considered, as a general rule, to be lo-cated with the same person. In determining who is the owner in the tax sense, the starting point is an assessment of who in the civil law sense has the main emphasis on the usual ownership powers.

It has been debated in the literature - nationally and internationally - whether the term "beneficial owner" should be interpreted autonomously (internationally), ie. without the involvement of internal law, or whether the term - at least in case of doubt - must be interpreted in accordance with internal law, in accordance with Article 3 (1). 2, in the OECD's model agreement and the Danish-Luxembourg agreement.

If it is to be interpreted in accordance with internal law, the interpretation that beneficial owner / rightful owner will be internal Danish tax law, which must be used as a basis. As these terms have not been used in internal Danish tax law, it must be assumed that the Danish courts will apply the court-created principle of the correct income recipient.

Jakob Bundgaard and Niels Winther-Sørensen conclude in the article "Rightful owner of international group financing" in SR-SKAT 2007.395 after a review of the Supreme Court's practice:

> "...
>
> On the basis of the mentioned Danish case law on internal law interpretation of concepts from double taxation agreements, it must probably be assumed that the Danish courts will be inclined to at least to some extent interpret the beneficial owner concept in accordance with internal Danish tax law. Or in other words, that the Danish courts will be inclined to consider the company which, according to a Danish tax law assessment, is considered the rightful recipient of income, to also be a beneficial owner. "

The same result appears in Aage Michelsen in International Tax Law, 3rd edition, 2003, p. 426:

> "...
>
> Most Danish double taxation agreements contain provisions in art. 10-12 on beneficial owner as a condition for the restrictions in the source country taxation of dividends, interest and royalties. As mentioned in the discussion, the corresponding provisions in the OECD Agreement hardly have any significant function, as most intermediaries, observing that the necessary legal formalities will be able to fulfill the requirement of being the rightful owner without difficulty. The provisions will only affect actual pro forma cases. And in that case, they are superfluous, as the same result can be achieved here by applying general principles of law.
>
> ... "

The Minister of Taxation is of the same opinion, cf. the Minister of Taxation's answer of 6 November 2006 to question 5 474:

> "...
>
> The principle of the correct income recipient must thus be used to determine who "receives" the inter-est. The term "rightful recipient of income" must be considered to be very similar to the term "benefi-cial owner" used in the double taxation agreements. In the double taxation treaties, withholding tax shall be waived or reduced only if the beneficial owner of the dividends is a resident of the other State. "
>
> ... "

The question then is what the principle of the correct income recipient in Danish tax law is about in relation to dividend income.

It is a clear starting point in Danish tax law that dividends are taxed on the taxable person who, in civil law terms, owns the shares in the dividend-distributing company. If the right recipient of the dividend is to be regarded as someone other than the owner of the shares, this in practice requires a very special justification.

In the present case, it can be readily established that H1 S.à.rl is the rightful recipient of the dividends distributed. The fact that the dividend is used immediately after the distribution for a loan to H1.XA / S does not change this. This would also apply if H1 S.à.rl had distributed the amount to KH S.à.rl, who had distributed it to the owners behind it.

Thus, there are no special reasons why H1 S.à.rl, which is the sole owner of the shares in H1.XA / S, should not be the rightful income recipient under Danish law - and thus also the beneficial owner under the double taxation agreement - of the yield in question.

No abuse provision in the double taxation agreement

Many countries have included in their respective double taxation treaties specific abuse provisions to counter the use of conduit companies.

Such abuse provisions do not exist in the Danish-Luxembourg double taxation agreement.

The comments on Article 1 of the Model Agreement contain in paragraphs 11-20 a number of proposals for such abusive provisions that the countries may, if desired, include in their agreements.

These draft misconduct provisions were already contained in the above-mentioned report of the Committee on Fiscal Affairs, "Double Taxation Conventions and the Use of Conduit Companies", dated 27 November 1986, and this report is indeed mentioned in paragraph 11 of the comments.

The different provisions use different methods, which are named respectively:

- "the look through approach"
- "the subject-to-tax approach"
- "the channel approach"
- "the exclusion approach".

The "look through approach" (transparency method) means that a dividend-receiving company must not be entitled to collective bargaining benefits if it is owned or controlled by persons who are not domiciled in the same state as the company.

The "subject-to-tax approach" means that collective benefits in the source state are only granted if the income in question is subject to taxation in the state of residence (subsidiary tax law).

"The channel approach" aims in particular to exclude "stepping-stone" events.

The "exclusion approach" is to exclude particular types of companies from the scope of the agreement.

The fact that the comments contain proposals for abuse provisions aimed specifically at flow-through companies, and a number of countries have included such provisions in their agreements, must be based on the premise that a flow-through company in general will not be able to be denied agreement benefits on the grounds that it is not a beneficial owner.

Similar considerations are stated that Philip Baker in the "Progress Report of the Subcommittee on Improper Use of Tax Treaties: Beneficial Ownership", dated October 17, 2008. It is stated here in paragraph 14 on pp. 9-10:

"...
I also take the view that the beneficial ownership concept is a narrow provision designed to counter only certain specific examples of treaty shopping: this is supported by the reference in the Commentaries to the OECD and UN Models to nominees and agents (and in the OECD Model to a conduit having very narrow powers which render it a mere fiduciary or administrator acting on account of another). I also take this view based on the advice found in the Commentaries to the OECD and UN Models that Contracting States may include more specific anti-shopping provisions. Finally, I base this view also on the practice of a number of States to include more elaborate and detailed anti-shopping

view also on the practice of a number of states to include more elaborate and detailed anti-shopping provisions (for example, separate Limitation on Benefit Articles): if the beneficial ownership concept was a broad general anti-treat-shopping measure,

... "

On the basis of the above, it is argued that the provision on beneficial owner cannot be used as a general abuse provision, and that denial of collective bargaining benefits on this ground can only take place in completely exceptional cases.

It has been mentioned above that such a case does not exist in the present case. As will be seen below, there is no treaty shopping in the present case.

Furthermore, it is noted that the reasoning used by SKAT for not considering H1 S.à.rl as beneficial owner actually works in the same way as a "look through" provision.

International case law

There are only a handful of foreign judgments that deal with the understanding of the concept of beneficial owner in the sense of the model agreement.

In Dutch Supreme Court case law, there are two judgments from the Hoge Raad.

In the first judgment of 1994, a person resident in England received dividends from a Dutch company. The owner of the shares in the company was a company domiciled in Luxembourg. Although the recipient of the dividend was not the owner of the shares, the Hoge Raad considered him to be the beneficial owner. Crucial for the Hoge Raad was that the recipient of the dividend could dispose freely of dividend coupons and of the dividend paid. The judgment is an expression of the fact that the Hoge Raad to a large extent emphasized who was legally entitled to dividends.

In the second judgment of 2001, a stock trader bought an option the day before the distribution of dividends. The purchase of the option was justified in order to make a profit and was not made in order to avoid limited tax liability. Hoge Raad found that the stock trader had to be considered a beneficial owner.

In March 2006, the English Court of Appeal ruled in the so-called G7 case. The subject-matter of the case was a civil dispute concerning whether the G7, which had issued corporate bonds on the international market, could demand that the bonds be repurchased early. Under the agreed terms, this could happen if there were significant changes in Indonesian law, so that interest payments from Indonesia were subject to a withholding tax of more than 10%. However, this right to repurchase the bonds did not apply if the issuer could obviously avoid this effect by taking "reasonable measures". In order to avoid the Indonesian withholding tax of 20% on interest payments, the bonds had originally been issued by a wholly owned subsidiary in Mauritius, thereby reducing the Indonesian withholding tax on interest payments under the double taxation agreement between Indonesia and Mauritius to 10%. In 2005, the double taxation agreement between Indonesia and Mauritius was repealed, and as a result, the Indonesian withholding tax on interest rates rose to 20%. The question then was whether the increased withholding tax on interest could be avoided by depositing a Dutch company (SPV), as the Indonesian withholding tax on interest could thereby be reduced with reference to the double taxation agreement between Indonesia and the Netherlands. G7 argued against this that the Dutch SPV would not be considered the beneficial owner of the interest payments. The Court of Appeal followed G7's argument and found

That is stated in paragraph 44 of the judgment

"...

In practical terms it is impossible to conceive of any circumstances in which either the

iss uer or G8 could derive any "direct benefit" from the interest payable by the Parent Guarantor except by funding its liability to the Principal Paying Agent or iss uer respectively. Such an exception can hardly be described as the "full privilege" needed to qualify as the beneficial owner, rather the position of the iss uer and G8 equates to that of an "administrator of the income". "

The ruling is thus about a so-called "back-to-back" loan, where no income would be created in the Dutch SPV.

As is apparent, the facts of this case are far from the present case, where the dividend is to be distrib-

uted and where the dividend has remained in the recipient company.

On 20 December 2006, the French Conseil d'Etat ruled in the so-called Bank of Scotland case.

The case was about a very special situation where the civil law and the economic ownership for a dividend were divided. Thus, a US parent company had sold to the Bank of Scotland (a UK company) the right to receive pre-determined dividends for three years arising from voiceless preference shares in its French subsidiary. The payment to the US parent company from the bank corresponded to three years' net dividends (before withholding tax). The US parent company was also the sole owner of the ordinary shares in the French subsidiary under this so-called "ususfruct" agreement. The question in the case was whether the Bank of Scotland was entitled to a tax reduction and avoir fiscal under the French-English Double Taxation Convention, which depended on whether the Bank of Scotland was the beneficial owner of the dividends.

The judgment is thus almost an expression of the application of a consideration of reality.

As can be seen, the facts of this case are also miles away from the present case.

In its decision in the present case, SKAT referred to a single foreign judgment, namely a judgment of 28 November 2005 of the Schweizerische Bundesgericht.

SKAT has misunderstood the case. The case concerned the Danish-Swiss double taxation agreement from 1973, which, like the 1963 version of the OECD model agreement, does not contain a beneficial owner concept in Articles 10-12. The case is therefore not about the understanding of the term "beneficial owner" within the meaning of the agreement.

The Swiss tax authorities would not recognize that, according to the Danish-Swiss double taxation agreement, tax-free dividends could be distributed from a Swiss company to a Danish holding company. The Danish holding company was owned by a Guernsey company, which in turn was owned by a company in Bermuda. The Swiss Supreme Court ruled that there was a general abuse clause at the collective agreement level, regardless of the fact that the specific agreement did not contain a provision on beneficial owner or a special abuse clause. In this context, the Court referred to the OECD's comments on the Model Agreement, in particular the transparency clause in paragraph 13 of Article 1, which is one of the abuse clauses that countries may choose to include in their bilateral agreements.

It is widely believed that the verdict goes too far. It is thus stated in Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395:

> "...
>
> The Swiss judgment has in fact interpreted a "look through" provision similar to the proposal in the OECD's comments on Art. However, the OECD's comments on such a provision are merely a proposal for a wording which may be used should the Contracting States wish to insert such a provision. Thus, it is not "merely" a question of the Bundesgericht interpreting an older double taxation treaty in the light of recent OECD comments. The interpretation of double taxation agreements must be based on what the parties have written down in the agreement itself, and in our opinion the Bundesgericht has gone too far in interpreting such a look-through provision in the Danish-Swiss double taxation agreement.
>
> ... "

The Swiss judgment stands in stark contrast to the Canadian judgment in the G1 case, which is discussed immediately below.

Furthermore, it should be noted that the facts of the Swiss case are far from the facts of the present case and that there was probably treaty shopping in this case.

The most recent international ruling is the Canadian Court of Appeals' ruling in the G1 case. The verdict was handed down on 26 February 2009. The case concerned a Canadian company (G1), which paid dividends to an intermediate holding company in the Netherlands (G1 Holding). G1 Holding subsequently redistributed the dividend to two companies in Sweden (G2) and England (G3), respectively, which owned 51% and 49% of the shares in the holding company, respectively. G2 and G3 had entered into a shareholder agreement, according to which 50% of the profits in G1 Holding were to be distributed to the shareholders, so that the majority of the dividend would necessarily end up with G2 and G3. G1 Holding was a pure holding company and had neither employees nor offices in the Netherlands.

The Federal Court of Appeal found - like the lower court, The Canadian Tax Court - that G1 Holding was the beneficial owner of the dividend. The court hereby, among other things, emphasized that G1

was the beneficial owner of the dividend". The Court hereby, among other things, emphasized that G1 Holding was not a party to the shareholders 'agreement between G2 and G3, and that neither G2 nor G3 could therefore take legal action against G1 Holding if the company did not follow the dividend policy adopted in the shareholders' agreement. In paragraphs 13 and 14, the Court of First Instance endorsed the Court's understanding of the concept of beneficial owner, as expressed in paragraph 100 of the judgment under appeal, which reads as follows:

"...

100.

In my view the "beneficial owner" of dividends is the person who receives the dividends for his or her own use and enjoyment and assumes the risk and control of the dividend he or she received. The person who is beneficial owner of the dividend is the person who enjoys and assumes all the attributes of ownership. In short the dividend is for the owner's own benefit and this person is not accountable to anyone for how he or she deals with the dividend income ... When corporate entities are concerned, one does not pierce the corporate veil unless the corporation is a conduit for another person and has absolutely no discretion as to the use or application of funds put through it as conduit, or has agreed to act on someone else's behalf pursuant to that person 's instructions without any right to do other than what that person instructs it, for example, a stockbroker who is the registered owner of the shares it holds for clients. This is not the relationship between G1 Holding and its shareholders.

... "

In paragraph 15, the court disposes of the tax authorities' consideration of transparency, according to which the decisive factor should be who can ultimately benefit from the dividend:

"...

15.

Counsel for the Crown has invited the Court to determine that "beneficial owner", "beneficiare effectiveif", "mean the person who can, in fact, ultimately benefit from the dividend". That proposed definition does not appear anywhere in the OECD documents and the very use of the word "can" opens up a myriad of possibilities which would jeopardize the relative degree of certainty and stability that a tax treaty seeks to achieve. The Crown, it seems to me, is asking the Court to adopt a pejorative view of holding companies which neither Canadian domestic law, the international community nor the Canadian government though the process of objection, have adopted.

... "

In paragraph 16, the Court then examines the facts of the case, which the lower court found to be decisive for G1 Holding's beneficial owner of the dividend, and which the Court of Appeal agrees in its entirety:

"...

| 16. | The Judge found that |
|-----|---------------------|
|     |                     |

| a) | the relationship between G1 Holding and its shareholders is not one of agency, or mandate nor one where the property is in the name of a nominee (par. 100); |
| b) | the corporate veil should not be pierced because G1 Holding is not "a conduit for another person", cannot be said to have |

| | |
|---|---|
| | is not "a conduit for another person", cannot be said to have "absolutely no discretion as to the use or application of funds put through it as a conduit" and has not "agreed to act on someone else's pursuant to that person's instructions with-out any right to do other than what that person instructs it, for example a stockbroker who is the registered owner of the shares it holds for clients "(par. 100); |
| c) | there is no evidence that G1 Holding was a conduit for G2 and G3 and there was no predetermined or automatic flow of funds to G2 and G3 (par. 102); |
| d) | G1 Holding was a statutory entity carrying on business oper-ations and corporate activity in accordance with Dutch law under which it was constituted (par. 103); |
| e) | G1 Holding was not a party to the Shareholders Agreement (par. 103); |
| f) | neither G3 nor G2 could take action against G1 Holding for failure to follow the dividend policy described in the Shareholders' Agreement (par. 103): |
| g) | G1 Holding's Deed of Incorporation did not obligate it to pay any dividend to its shareholders (par. 104); |
| h) | when G1 Holding decides to pay dividends, it must pay the dividends in accordance with Dutch law (par. 104); |
| in) | G1 Holding was the registered owner of G1 shares, paid for the shares and owned the shares for itself; when dividends are received by G1 Holding in respect of shares it owns, the dividends are the property of G1 Holding and are available to its creditors, if any, until such time as the management board declares a dividend and the dividend is approved by the shareholders (par. 105). " |

... "

As is apparent, the facts highlighted by the court in support of G1 Holding's beneficial owner are cir-cumstances which characterize an ordinary holding company which has no functions other than be-ing a holding company. The judgment thus rejects - in a situation where there has actually been a flow of dividends to the ultimate owners - that it should have any significance that the ultimate own-

ers have decided in advance that dividends must be distributed through the companies, and that the holding company has no other activity and physical framework than those resulting from being a pure holding company.

The Canadian tax authorities have stated that the verdict will not be appealed to the Canadian Supreme Court.

The views expressed by SKAT in the present case have thus not been established in the Canadian courts.

In the present case, the dividend has not even been distributed to the owners behind it.

As can be seen, SKAT's decision in the present case goes far beyond any of the above-mentioned international judgments. SKAT has thus not considered H1 S.à.rl to be a beneficial owner, regardless of the fact that this company has retained the dividend received, and this continues to be included in the company's equity. It can thus be concluded that no support can be obtained in international case law for SKAT's interpretation of beneficial owner. On the contrary, international case law supports the view that H1 S.à.rl is the beneficial owner of the dividends received.

Activity of the Luxembourg companies

One of SKAT's two main reasons why H1 S.à.rl is not a beneficial owner is that the company has no activities.

The physical framework and the physical activity of any company will, of course, be adapted to the nature of the business which the company in question is to carry out. H1 S.à.rl, whose sole purpose is to own and finance the Company, has exactly the activity that a pure holding company usually has. Such a company will have a limited activity. A general meeting and quite a few board meetings a year must be held to make the decisions that the holding company must make. There is therefore no need for an independent office or for permanent employees. The day-to-day administration is instead handled - cost-effectively - by an administration company in the K2 Group.

The activity that is in H1 S.à.rl - and KH S.à.rl - thus corresponds completely to the activity that is in the hundreds of Danish and foreign - including Luxembourg - holding companies, which the Danish tax authorities according to established practice has considered the rightful owners of dividends from subsidiaries.

Thus, there is not a single example that the Danish tax authorities have disputed that a Danish holding company should be the rightful owner of dividends from foreign subsidiaries, just as, as mentioned above, there are no other examples that the Danish tax authorities have disputed, that a foreign holding company is the rightful owner of dividends from Danish subsidiaries.

It is generally argued that it does not disqualify a company from being a beneficial owner, that it only operates as a holding company, and that it therefore has neither an independent office nor its own employees, cf. also the report from the Committee on Fiscal Affairs and the Minister of Taxation, cf. below. This conclusion has most recently been confirmed by the judgment in the G1 case.

Do not treaty shopping

It is SKAT's opinion that there is an abuse of the Danish-Luxembourg double taxation agreement.

This is - for several reasons - not correct. First, it is not part of the private equity funds' business model that dividends must be distributed to the ultimate investors at some point. The model, on the other hand, means that investors only receive their return when the fund is wound up - and at that time as a capital gain (sale or liquidation), which is only taxed in the investors' respective countries of residence. The provisions on dividend taxation in the agreement have therefore not been decisive for the choice of domicile country for the holding companies. This is also confirmed by the fact that at no time since the private equity funds' acquisition of H2.1 A / S in 2005 has a distribution originating from the H2.1 Group been made to the private equity funds - and thus to the ultimate investors.

Second, the use of a Luxembourg intermediary holding company for the distribution of dividends does not generally entail special tax advantages. Thus, Luxembourg also has rules on dividend tax on dividends to tax havens, and Luxembourg's double taxation treaties are not much different from those of other EU countries.

Thirdly, it is very difficult - if not impossible - for private equity funds with hundreds of investors from many different countries to undertake treaty shopping.

It is thus a fact that there is no treaty shopping and that the provisions on dividend taxation in the Danish-Luxembourg double taxation agreement have not been decisive for the choice of Luxembourg.

The private equity funds are tax-transparent entities with hundreds of investors who are primarily domiciled in the Nordic countries, including Denmark, the EU and the United States. Of course, for practical reasons, so many investors have to make their investments through one or more holding companies. Both K1 and K2 have for a number of years made their investments through Luxembourg holding companies and have a good knowledge of the company law, regulatory and financial conditions in Luxembourg. In addition, Luxembourg is known for having a politically stable system and is a member of the EU. It is therefore only natural that Luxembourg should have been used as the seat of the top holding companies.

In addition, there is the advantage of Luxembourg that it is quick to get tax rulings, e.g. concerning interest rate spreads, and that it is possible - or as far as Denmark is concerned, so-called hybrid financing could be used, as has also been the case in the present case.

It should be noted that, according to the case law of the European Court of Justice on freedom of establishment, it is a perfectly legitimate commercial justification for establishment in another EU country that the country in question has particularly favorable tax rules.

In any case, the capital funds' choice of domicile country for the holding companies has nothing to do with treaty shopping. Thus, the absolutely crucial precondition for dealing at all with the question of whether H1 S.à.rl is the beneficial owner of the dividend in question is not present.

Parent / Subsidiary Directive

The Parent / Subsidiary Directive, 90/435 / EEC, introduced a common tax system for parent companies and subsidiaries from different Member States. The purpose of the directive is i.a. to exempt withholding tax and other distributions of profits that subsidiaries pay to their parent companies.

Directive as amended by Council Directive 2003/123 / EC. Reference is made to Article 1 of the Directive on the scope, Article 3 on the definition of parent companies and subsidiaries and Article 5, which stipulates that withholding tax may not be levied on dividends.

It follows from those provisions that a Luxembourg holding company which satisfies the capital requirement of 20% (2005) and the ownership requirement of a maximum of two years which each Member State may have introduced has an unconditional right to be exempt from withholding tax on dividends. from the subsidiary.

In contrast to the Interest / Royalties Directive (2003/49 / EC), the Parent / Subsidiary Directive does not require the parent company to be the beneficial owner of the dividends received. On the other hand, it is explicitly stated in Article 1 (1). 2, that the Directive does not preclude the application of national provisions or conventions which are necessary to prevent fraud and abuse. Thus, rules can be introduced in national law to combat abuse, but these rules must in themselves be compatible with EU law, including the treaty-guaranteed freedoms, as laid down in the case law of the European Court of Justice.

As a standard of Community law, it is for the European Court of Justice alone to interpret the Directive within the meaning of Article 234 of the EC Treaty.

SKAT has confused the issue of beneficial owner and the issue of abuse. On the basis of the case law of the European Court of Justice on abuse, SKAT has concluded that H1 S.à.rl is the beneficial owner.

No beneficial owner requirement

SKAT's concluding section regarding the parent / subsidiary directive essentially consists of a reference to SKAT's justification that the company cannot invoke the double taxation agreement. The main reason for refusing H1 S.à.rl directive protection is therefore that the company is not a beneficial owner.

However, the Parent-Subsidiary Directive does not require the parent company to be a beneficial owner.

As H1 S.à.rl meets the capital requirement and ownership time requirements in the Parent / Subsidiary Directive, the company has - as a starting point - an unconditional right to be exempt from withholding tax on the dividend from H1.XA / S.

Abuse regulations - the principle of the right income recipient

As stated in Article 1 (1) 2, the Directive does not preclude the application of internal provisions or conventions which are necessary to prevent fraud and abuse. It follows that abuse can only be counteracted if there is a legal basis for this in domestic law.

Cases of abuse can therefore not be counteracted solely by a reference to Article 1 (1). 2.

In Danish law, there are no specific legal provisions on abuse of the directive. On the other hand, the court-created practice of correct income earners and considerations of reality may apply to the extent that this practice can be assumed to remain within the framework of Article 1 (1) of the Directive. 2, as this provision will be interpreted by the Court of Justice.

Jakob Bundgaard and Niels Winther-Sørensen are in SR-SKAT 2007.508 in accordance with this:

"...

The abuse provision in art. 5 [Art. Of the Parent / Subsidiary Directive, 1 piece, 2] may lead to the ben-

The abuse provision in art. 5 [Art. Of the Parent / Subsidiary Directive. 1 piece. 2] may lead to the benefits of the Directive being denied, but it is a condition that this is authorized in domestic law. Such an internal legal basis does not necessarily have to be expressed in a national legal provision, but may also be contained in general domestic law principles of abuse. It must also be assumed that Art. 5 not only includes actual written abuse rules, but also unwritten circumvention / abuse clauses. In Danish law, the court-created practice of who is the rightful recipient of income, and concrete reality assessments can therefore be used as a basis, where such can be assumed to remain within the framework of the nature of the directive. 5, ...

... "

The Danish tax authorities thus have two instruments available against cases of abuse: the principle of the correct income recipient and considerations of reality.

As stated above, H1 S.à.rl is the correct income recipient of the distributed dividend.

Thus, there is no basis for denying H1 S.à.rl exemption from dividend tax.

SKAT has pointed out, inter alia, that there is nothing to prevent companies established in another Member State from invoking EU law when it must be assumed that the establishment of a holding company in another Member State is intended to: avoid withholding tax on payments to non-European enterprises if such a construction serves no commercial purpose, cf. the European Commission's interpretation of "Purely artificial arrangements" published in OJ 2008, C 116/13.

This stems from a Commission Communication of 10 December 2007 on "The application of measures to combat abuses in direct taxation - in the EU and in relation to third countries".

The Communication sets out the Commission's proposal on the extent to which national rules to combat abuse can go without infringing the Treaty freedoms, and this analysis has been carried out on the basis of a number of court decisions, in particular C-195/04. The Commission has concluded on page 3:

"...

In addition, in its case - law on direct taxation, the Court has held that the need to prevent tax evasion or abuse may constitute an overriding reason in the public interest which may justify a restriction on fundamental freedoms. However, the concept of tax evasion is limited to "pure constructions the purpose of which is to circumvent the application of the law of the Member State concerned". To be legal, national tax rules must be proportionate and specifically aimed at excluding purely artificial arrangements.

... "

The whole communication thus presupposes the existence of national rules on the fight against abuse, and the question is what content the Member States can give these rules without violating EU rules.

SKAT seems to presuppose that the notice is based on the case law of the European Court of Justice in itself providing the necessary basis for being able to intervene in cases of abuse. This is not correct. Thus, when SKAT writes, "that the case law of the European Court of Justice is that there is nothing to prevent companies established in another Member State from invoking EU law", it must at least presuppose the existence of a national rule of law with the content in question. SKAT has not referred to such a rule.

The quotation included by SKAT from the Commission's communication has been taken out of context in the communication. The full text of the message, p. 9, is as follows:

"...

The Corporate Tax Directives apply only to companies incorporated in the Member States and their overall purpose is to create conditions within the Community that are similar to the conditions of an internal market, by removing tax barriers to cross-border restructuring and to the payment of dividends, interest and royalties. . It therefore does not appear that their scope includes e.g. relaxation of arrangements aimed at avoiding withholding tax on payments to non-European enterprises if such a construction serves no commercial purpose. In this context, it should be noted that such avoidance constructions are best prevented by a, if not uniform, then at least well-coordinated use of measures

constructions are best prevented by a, if not uniform, then at least well-coordinated use of measures to combat tax evasion.

... "

The first is the quotation that SKAT has included in the decision. The next quote is the Commission's proposal on how to deal with such cases of abuse, namely by introducing "measures" (ie national legal rules) to combat tax evasion.

The conclusion is therefore that Article 1 (1) of the Directive 2 is not an abuse rule that can be applied to the European Court of Justice, but rather an authorization for the Member States to introduce or maintain national abuse rules.

In Denmark, it is the court-created practice of the correct income recipient and considerations of reality that may come into play, and this does not lead to H1 S.à.rl being denied tax exemption on the dividend.

There is no basis for referring questions to the Court of Justice for a preliminary ruling because the directive is clear and leaves no doubt as to interpretation. Conversely, if the Landskatteret - contrary to the wording of the Directive - refuses to grant H1 S.à.rl a tax exemption on the dividend, this cannot be done without referring questions to the Court of Justice for a preliminary ruling.

Aggressive change of practice with retroactive effect

In the event that SKAT may be upheld in that the underlying owners (the investors in the private equity funds) are subject to limited tax liability on the dividend in question of approx. 5.5 billion It is argued that SKAT's decision is an expression of a tightening of practice with retroactive effect, and that such a tightening of practice can not be legally implemented without SKAT having previously notified the new views, which SKAT will consider crucial for this new practice, cf. UfR 1983.8 H.

As stated above, the present case is the first - and so far only - case in which the tax authorities have refused tax exemption on dividends to a parent company in a DBO country on the grounds that the parent company is not the beneficial owner of the dividends.

This has even happened with such a broad justification that it must be assumed to affect hundreds of dividend distributions made from Danish subsidiaries to intermediate holding companies in DBO countries. Although the present case is the result of a special control effort against 7 Danish groups that have been acquired as private equity funds, the problem is by no means unique to private equity funds.

This is also confirmed by the Minister of Taxation in the answer to question 87 to L 213 (2006/07).

"...

Question 87

Can the Minister confirm that the issue raised in question 75 on the taxation of dividends to flow-through companies not only concerns private equity funds, but is a general problem that has been relevant for a number of years?

Answer: It can be confirmed.

... "

The Minister of Taxation also has in his answer to question 10 to L 30 (2006/07) on the extent to which and how SKAT controls whether a throughput holding company must be approved as the right income recipient of a dividend received, e.g. stated the following:

"...

Danish companies that decide or decide to distribute dividends have a duty to provide the tax authorities with information about this, regardless of whether there is a duty to withhold or not.

It is part of the tax assessment to ensure that the conditions for not including dividend tax are met, including whether a foreign company is the rightful owner of the dividend.

... "

Nevertheless, the Minister of Taxation has several times had to state that there are no examples of dividend taxation being carried out on distributions to flow-through companies, cf. the Minister's answer to question 6 to L 30 (2006/07):

> "I can not provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies."

Thus, although SKAT has over the years been fully aware of the issue, SKAT has not previously found reason to refuse exemption from dividend tax. The mentioned ministerial responses - and a number of other ministerial responses - show that there has been a focus on the issue in connection with the intervention of private equity funds in recent years.

It is therefore natural to raise the question of whether the statements of the Minister of Taxation do not contain a warning about a change in practice. First, it should be noted that the statements of the Minister of Taxation are after May 2005, when the dividend distribution was made. In addition, however, the Minister of Taxation in all these answers - in accordance with the prevailing view in theory - has stated that there are "very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company", cf. thus the Minister's answer to questions 86 to L 213 (2006/07):

> "...
>
> However, a flow-through company (holding company) cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled and the starting point is clearly that a holding company is entitled to contractual protection.
>
> There are thus very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company and as stated in the answer to question 6 regarding Bill L 30, there are also no examples of Danish tax authorities refusing to recognize a foreign holding company and thus it was considered a nullity.
>
> ... "

Thus, the companies did not have the slightest reason to believe that a dividend such as that at issue in the main proceedings could be refused tax exemption, and it is clear that H1 S.à.rl would not have made that distribution if it had been slightest doubt that the dividend was exempt.

In the light of the foregoing, it is therefore argued that there is a tightening up of a fixed administrative practice which should have been notified and that this changed practice cannot therefore be applied in the present case.

SKAT's statement

SKAT has ratified the decision upheld.

There is a limited tax liability to Denmark of the dividend in question pursuant to section 2 (1) of the Danish Corporation Tax Act. 1, letter c, and this taxation shall not be waived either pursuant to the double taxation agreement between Denmark and Luxembourg or pursuant to the Parent / Subsidiary Directive.

Withholding tax can be implemented in Denmark regardless of the double taxation agreement with Luxembourg

The double taxation agreement of 17 November 1980 between Denmark and Luxembourg, cf. Executive Order no. 95 of 23 September 1982, stipulates that dividends paid from a company domiciled in Denmark to a recipient domiciled in Luxembourg may not be subject to withholding tax in Denmark, exceeding 5% of the gross amount of the dividend if the recipient is the "rightful owner of the dividend" and directly owns at least 25% of the capital of the company paying the dividend, in accordance with Article 10 (1). Pursuant to the internal Danish rules, withholding tax in Denmark is waived altogether, cf. section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

The starting point is therefore that according to the double taxation agreement, it is not possible to consider dividends paid to a parent company in Luxembourg to be covered by the limited tax liability in accordance with section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

As stated above, however, according to the wording of the double taxation agreement, it is a condition for the cut-off that Denmark's right to tax dividends as a source state that the Luxembourg recipient of the dividend is its "rightful owner".

Therefore, in accordance with the wording of the Corporation Tax Act, section 2, subsection 1, letter c,

assesses whether the double taxation agreement cuts withholding tax because the Luxembourg (formal) dividend recipient is also a "rightful owner". According to the wording of the provision, it is therefore not decisive whether another / others under internal Danish law should be considered taxable (e) of the dividend amount, but rather whether the Luxembourg company meets the requirements to be a "rightful owner" according to a correct interpretation of this particular agreement concept.

The term "beneficial owner" has been used in the OECD Model Convention and its comments since the revision of the Model Convention in 1977. The comments on the term "beneficial owner" have been gradually clarified, but there is no basis for this. to claim that there have been material changes in relation to what is meant by the term, which is also used by Winther-Sørensen and Bundgaard, SR-SKAT 2007, 5. 400.

In the comments on the Model Convention, the question of the understanding of the term "rightful owner" is now dealt with in particular in paragraphs 12, 12.1 and 12.2 of Article 10.

When the qualified term "rightful owner" / "beneficial owner" is used in the double taxation agreements rather than just "owner" / "owner", this is a clarification that the formal ownership is not decisive in relation to the double taxation agreements.

In line with the above recital, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs, which is directly referred to in point 12.1 of the comments, concludes. in fine that an "intermediary" can not be considered a beneficial owner when it "actually has very narrow powers which, in relation to the income in question, make it a" nullity "or administrator acting on behalf of other parties ". Thus, although the report specifically deals with the cases where there is an actual throughput, there is no basis for claiming that it is the actual throughput that determines whether the Contracting States are obliged to waive withholding tax.

A natural linguistic understanding of the Model Convention and the comments thereon thus imply that emphasis must be placed on the scope of the formal amount recipient's real powers in relation to deciding how to dispose of amounts received.

It is also clear from point 12.1. in the comments to the Model Convention, that the cases where there is pure flow - and where it can thus be demonstrated that the amount is immediately repaid to e.g. the underlying owner - is just an example that the formal beneficiary should not be considered the rightful owner. It is in fact "also" contrary to the purpose and intention behind the rules of the Model Convention to grant relief in these situations.

Thus, when the formal powers of the formal payee to decide how to dispose of received amounts are very narrow - or as non-existent here, cf. below - the access to invoke the double taxation agreement can thus be cut off. This means that a dividend amount that the underlying owner (s) has decided in advance to direct to where they want it, without the intermediate company having any real opportunity to influence this decision, does not have the intermediate company as "rightful owner".

The same view is expressed by Klaus Vogel in "Klaus Vogel on Double Taxation Conventions", 3rd ed., P. 563, point 10 in fine.

The concept of "rightful owner" is only sparsely addressed in international case law. However, there are three cases from the British Court of Appeal, the French Conseil d'Etat and the Canadian Federal Court of Appeal, respectively, which deal with the qualification of the "rightful owner".

In the Bank of Scotland case (referred to above), the French Conseil d'Etat found that the US parent company, which had disposed of the dividend and directed it to the bank to which the loan was to be repaid, was considered the rightful owner.

The G7s case (referred to above) was decided by the British Court of Appeal, which ruled on the concept of "beneficial ownership" in paragraph 42:

> "...
>
> the concept of beneficial ownership is incompatible with that of the formal owner who does not have the full privilege to directly benefit from the income.
>
> ... "

Subsequently, the British Court of Appeal ruled that the Dutch company could not be considered a "rightful owner" in relation to the interest payments from G7. Thus, even if the Dutch company would

not be legally obliged to the G7 to repay the interest income, it was sufficient that in practice the in-come was already disposed of in such a way that it would in fact never be subject to the Dutch company's disposal.

The term "beneficial owner" was also addressed in the judgment of the Canadian Federal Court of Appeals of 26 February 2009 in the G1 case (referred to above). In the judgment, it was apparently given decisive weight that the holding company was not a party to the shareholder agreement en-tered into between the two company shareholders and that they could not take legal action ("take ac-tion") against the holding company if it did not comply with the dividend policy in the shareholder agreement. The judgment thus seems to assume that the formal beneficiary is the "rightful owner" unless the beneficiary is legally obliged to dispose of in a particular respect. Thus, as in the G7 case, it was not sufficient that there was no practical probability that the dividend would not be paid further. In SKAT's view, this requirement has no support in the Model Agreement, the comments thereon or elsewhere. On the contrary, the concept of "beneficial owner" is based on a "substance over form" way of thinking "and it is not compatible with this way of thinking that in determining that the concept requires a legal obligation to repay to the person considered" beneficial owner " .

Regarding the G1 case, it should also be noted that (paragraphs 8-11 of the judgment under appeal) there were reportedly good reasons for the establishment of the chosen holding company structure, which was to form the basis for lasting activities and was expected to involve activities other than the ownership of the Canadian company, and that the Court of Appeal expressly held that the cash flows in question had not been determined in advance ("predetermined", cf. paragraph 16 of the judgment of the Court of Appeal with reference to paragraph 102 of the judgment under appeal). It seems diffi-cult to point to transactions that can be characterized as such tax evasion, which must be included in the assessment of whether someone other than the formal owner should be considered the rightful owner.

The fact that the dividend had been disposed of in advance means that H1 S.à.rl could not exercise an owner's powers over the dividend. The formal amount recipient's lack of access to dispose of the dividend must be of decisive importance, regardless of whether the underlying owners have chan-neled the dividend on to themselves, or whether they have used their access to dispose of the divi-dend in another way, cf. The Bank of Scotland case mentioned above where the amount was chan-neled to a bank in a third country.

The Minister of Taxation's comment on L-202 of 22 April 2009 also supports the view that no condi-tion can be set that the amount received has in fact been passed on to the underlying owner (s). The Minister of Taxation had been asked to comment on an example where all the shares in a Danish op-erating company (DK) were owned by a holding company in Luxembourg (Lux), which in turn was wholly owned by a company in Panama (PA). In the example, the company in Luxembourg received a dividend which was used to repay debt in an external bank. In this connection, the Minister of Taxation noted the following:

> "...
> It is not possible on the basis of the information in the example to confirm or deny that Lux is consid-ered a "beneficial owner". It is noted that this does not preclude PA from being considered a "benefi-cial owner", that Lux does not actually distribute the dividend, but instead uses the dividend to repay debts to an external bank. "

If the dividend is further channeled to the underlying owners, this will of course be a factor that sup-ports the fact that the immediate dividend-receiving company has had very narrow powers in relation to the dividend. On the other hand, it cannot be set as a condition that the immediate dividend-receiv-ing company is not the "rightful owner".

The company's representative has referred to the ministerial answer printed in SKM2008.728.DEP. In SKAT's view, it is only natural that the Ministry merely states that in the example described, there is no cash flow via the Cayman company at all - neither out of nor into Denmark - which could give rise to considerations as to whether the company is a pure flow-through company. This is because the as-

sessment of whether e.g. the dividend-receiving company is the rightful owner that the dividend is made on the basis of information about the company's real right of disposal over the specific divi-dend amount and the purpose (tax avoidance?) of the company receiving the amount. Thus, when it is only a hypothetical and not an actual cash flow, it is not possible to judge whether the company on Cayman is a flow-through company. The status of the company will depend on the factual informa-tion about the cash flow in question.

The statement in the Ministry's comment can therefore not be taken as income that actual flow to one or more underlying owner (s) is a condition for the formal recipient of dividends not to be considered

or more underlying owner (s) is a condition for the formal recipient of dividends not to be considered a "rightful owner" within the meaning of the double taxation agreements.

SKAT argues that the dividend-receiving company, H1 S.à.rl, has had such narrow powers in relation to the dividend that this company cannot be qualified as a "rightful owner" in relation to this. The underlying owners or their representatives had decided in advance on the implementation of the circular arrangement, and H1 S.à.rl was obliged to re-lend the distributed dividend to H1.XA / S, which re-lending was also made on the same date as the dividend distribution. Thus, the dividend had already been disposed of in such a way that it was never really subject to the actual disposal of the formal beneficiary.

It is sufficient that the lack of control over the dividend is related to the further channeling of the dividend.

The return of the capital to the dividend-distributing company was in relation to the convertible loan of DKK 5.5 billion. finally at the conversion to shares. As a whole, H1 S.à.rl has thus not been provided with any capital which the company has at any time actually disposed of.

The interest on both loans has been continuously credited to the principal.

As stated in the comments on Article 10, point 12.1, the concept of "rightful owner" must be interpreted in the light of and in accordance with the purpose of double taxation agreements, which includes the consideration of tax evasion and avoidance, see also point 7 in the comments on Article 1.

Thus, in determining whether the Luxembourg recipient of dividends, H1 S.à.rl, is the rightful owner, it will also be relevant whether the transaction had a real commercial purpose or whether it was intended to exploit benefits provided for in the double taxation agreement.

The arrangement with the distribution and re-lending on the same day did not take place as part of an ordinary commercial transaction, but on the contrary was made without any commercial justification.

This is emphasized by

| to | the recipient company was in fact obliged to re-channel the amount, |
|----|---------------------------------------------------------------------|
| to | the re-channeling took place on the same day as the dividend was received, |
| to | the dividend was not taxed in the recipient state, |
| to | the companies involved had no operating activity other than ownership and financing of group companies, and |
| to | the companies involved had neither office facilities available nor employees, as well |

| to | the circular arrangement with distribution and at the same time re-lending was even established even before the establishment of the luxembourgish holding companies. |
|----|---------------------------------------------------------------------|

The purpose of the arrangement has instead been to utilize the double taxation agreement (and Community law) partly to establish a right of deduction (for interest expenses) without thereby tria-

gering withholding tax in Denmark or taxation abroad, partly to avoid payment of capital duty in Luxembourg.

It would therefore be incompatible with the intention and purpose of the double taxation agreement to ease withholding tax in this situation. In this connection, reference may be made to point 9.4 in the comments on Article 1, which states:

> "...
>
> Whichever of the two views is taken, there is agreement that states are not obligated to grant benefits under a double taxation agreement by participating in events that involve abuse of the provisions of the agreement.
>
> ... "

Thus, under the Danish-Luxembourg double taxation agreement, Denmark is not obliged to refrain from imposing it in section 2 (1) of the Danish Corporation Tax Act. 1, letter c, provided withholding tax on dividends in a situation such as the present.

To the extent that the rightful owner (s) is domiciled in a country with which Denmark has entered into a double taxation agreement, it is recognized in SKAT's decision that it must refrain from imposing withholding tax pursuant to section 2 (1) of the Corporation Tax Act. 1, letter c. It is of course still possible for the company to avoid the withholding tax claim raised by proving that the conditions for not imposing withholding tax are present.

EU law does not preclude the implementation of a withholding tax in Denmark

It follows from Article 5 of the Parent-Subsidiary Directive that the profits which a subsidiary distributes to its parent company are exempt from withholding tax. The starting point is thus that withholding tax cannot be levied on dividend distributions to companies domiciled in another Member State when the parent company meets the capital requirement and the ownership time requirement in the Directive.

However, this starting point may be deviated from. It is thus stated in Article 1 (1) of the Directive. 2, that the Directive does not preclude the application of internal provisions or conventions which are necessary to prevent fraud and abuse. The European Court of Justice has recognized early in its case law that in certain cases Member States have the right to take measures to combat abuses of EU law. In Sag 33/74, Saml. 1974, p. 1299), the Court thus established a doctrine that a Member State has the right to:

> "...
>
> take measures to prevent the freedom guaranteed by Article 59 [now 49 EC] from being exploited by a service provider whose business is wholly or primarily directed at the territory of that State with a view to evading the professional rules which would apply to him; , if he was resident in the territory of that State, such a situation could be determined under the chapter on the right of establishment and not the chapter on the freedom to provide services.
>
> ... "

Case C-255/02, Saml. 2006, pp. 1-1609) concerned a British company which was refused access to deduct input VAT in respect of certain transactions (VAT carousel fraud) which, according to the United Kingdom authorities, were carried out solely for the purpose of obtaining a tax advantage and which did not have a self-employed business purpose. In this connection, the Court clarified the principle of abuse of law under EU law, in accordance with paragraph 69 of the judgment, which states:

> "...
>
> Thus, the scope of Community law cannot be extended to cover the unlawful transactions of traders, ie. transactions which have not taken place as part of ordinary commercial transactions, but which have only had the unlawful purpose of obtaining benefits provided for in Community law (see, to that effect, Case 125/76 Case 125/76 1593, paragraph 21, and of 3.3.1993, Case C-8/92, Case I, £ 779, paragraph 21, and G4, paragraph 51).
>
> ... "

The case concerned the VAT area, but it is clear from the judgment that the principle of prohibition of abuse applies both in the area of taxes and for taxes, cf. paragraph 70. The doctrine from C-255/02 is later repeated in case law, cf. for example paragraph 32 of the judgment of 7 June 2007 in C-178/05 concerning the Capital injunction (59/335).

Furthermore, in line with its rulings on circumvention of company law rules, the Court ruled that tax-able persons may carry out tax planning by choosing a corporate structure that reduces their tax liability as much as possible. Subsequently, however, in paragraphs 74 to 75, the Court set out a "two-stage test" which found that VAT abuses had been

> "...
>
> firstly, requires that the transactions in question, even if the conditions formally laid down in the relevant provisions of the Sixth Directive and in the national legislation implementing the Directive are complied with, would entail a tax advantage which it would run counter to the purpose of these provisions to grant.
>
> Secondly, it must also be clear from an overall series of objective circumstances that the main purpose of the transactions in question is to obtain a tax advantage. As the Advocate General observes in point 89 of his Opinion, the prohibition of abuse loses its relevance when there may be a justification for the transactions in question other than merely obtaining tax advantages.
>
> ... "

There are thus two cumulative conditions, an objective (contrary to the purpose of the rule) and a subjective condition (intention to obtain a tax advantage).

The judgment further stated that the assessment of malpractice must be carried out by the national court using national rules of evidence, provided, however, that the national court must not limit the scope and effect of EU law.

Case C-196/04, Saml. 2006, pp. 1-7995) concerned the question of whether the UK CFC legislation was compatible with the freedom of establishment. In the present case, the legislation was applied in relation to a British parent company which had established subsidiaries in Ireland solely for the purpose of benefiting from the lower level of taxation in Ireland.

The Court initially held, with reference to the G5 and G6 judgments, that the fact that a company establishes subsidiaries in other Member States solely for the purpose of benefiting from more favorable tax legislation does not in itself constitute an abuse of freedom of establishment. The Court then found that UK CFC law constituted an obstacle to freedom of establishment. The UK Government justified this obstacle by stating that the legislation was intended to combat a special form of tax evasion in the form of artificial transfer of profits from the resident company to the foreign subsidiary subject to a lower level of taxation. In that regard, the Court stated (paragraphs 50 to 51) that

> "...
>
> the mere fact that a resident company establishes a secondary establishment, such as a subsidiary, in another Member State cannot form the basis of a general presumption of tax evasion and serve as a justification for a measure; which violates a fundamental freedom guaranteed by the Treaty ...
>
> On the other hand, a national measure restricting the freedom of establishment may be justified when it specifically targets purely artificial arrangements the purpose of which is to circumvent the legislation of the Member State in question.
>
> ... "

In its judgment, the Court further held that the assessment of the existence of a "purely artificial arrangement" must include both a subjective factor (the intention to obtain a tax advantage) and an objective factor (the purpose of freedom of establishment).

Furthermore, the Court clarified that the concept of "purely artificial arrangements" includes conduct which is not based on any "economic reality". The Court held (paragraph 67) that the concept - economic reality - must be defined on the basis of objective factors which can be verified by a third party, including "the degree of physical existence in terms of premises, staff and equipment". On the other hand, the fact that the subsidiary's activities could just as well have been carried out by a domestic company is not a sufficient basis for establishing a purely artificial arrangement (paragraph 69).

The concept of abuse of law in the field of tax law is also illustrated by case C-321/05, Saml. 2007, pp. 1-5795).

The case raised (according to the European Court of Justice) the question of whether a completed share exchange was exempt from disposal tax under the Directive. The Court ruled (paragraph 38) that Article 11 of the Directive, which allows Member States to preclude citizens from relying on the Directive when a provision "as the main purpose or as one of the main purposes has tax evasion or avoidance" reflects "the general principle of prohibition in Community law against judicial abuse ".

In that regard, the Court referred to its judgments in C-255/02 and C-196/04, although the Court did not reiterate the considerations of abuse of law set out in those judgments, but merely found that the scope of EU law could not be extended. to cover "unlawful transactions" which have not taken place in the course of "ordinary commercial transactions". However, there is hardly any difference in reality in this.

Following the ruling, the Ministry of Taxation responded in the affirmative in the national case. However, this decision must be seen in the light of the fact that the National Tax Court had previously found that the lack of explicit incorporation of Article 11 of the Merger Tax Directive meant that citizens could invoke the Directive's provisions on the right to carry out corporate restructuring tax-free, even when tax evasion / avoidance was a main purpose of the transaction, cf. the National Tax Court's ruling published in TfS 1999.491. Precisely because this order had been published - and its result had already been used in previous cases as binding on the Ministry - it was the assessment in the specific case that there was no basis for a continuation of the national trial,

Reference is made to the Communication from the European Commission published in OJ 2008 C 116/13. The Commission's interpretation of the case law of the European Court of Justice is also that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from e.g. the Parent / Subsidiary Directive - when it must be assumed that it is an arrangement aimed at avoiding tax payment and the construction does not serve any commercial purpose.

As explained above, the transactions which give rise to the issue in the present case are precisely characterized by the fact that they serve no commercial purpose, but only intend to obtain tax advantages, including by exploiting the rules of parent / Subsidiary Directive to avoid withholding tax. EU law can thus not to a greater extent than the double taxation agreement be considered to prevent Denmark from implementing a withholding tax on interest and dividends on the grounds that the formal beneficiary - the Luxembourg company - has no powers to dispose of the distributed amount and therefore not the rightful owner.

In this context, it must be emphasized that it is not a precondition for cutting off the right to rely on the Directive that it is demonstrated that the very creation of a Luxembourg holding company is an artificial arrangement without economic reality, as under EU law an assessment of whether specific transactions have such a real commercial content that they - in relation to the exploitation of EU law - must be accepted by the Member States.

SKAT does not consider that it is a condition for non-relaxation pursuant to the Parent / Subsidiary Directive that a specific legal basis has been implemented to enforce Article 1 (1) of the Directive. 2, cf. thus also the C-321/05 judgment and the Ministry of Taxation's above-mentioned comment thereon.

Although the Ministry of Taxation chose to respond in the affirmative in the C-321/05 case before the Eastern High Court, this was due, as mentioned in the commentary, solely to the fact that in relation to the provision in the Merger Tax Directive a ruling had not been brought before the courts. according to which Article 11 of the Merger Tax Directive could not be enforced by the authorities before the introduction of the licensing institution. There is no basis for extending this ruling concerning the previously applicable merger tax rules to apply to the issue of enforcement of the abuse clause in the Parent / Subsidiary Directive.

In addition, in SKAT's view, there is in any case a clear legal basis for enforcing Article 1 (1) of the Directive. 2:

> "...
>
> The Corporation Tax Act, section 2, subsection 1, letter c, 3rd sentence, stipulates
>
> It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435 / EEC on a common tax system for parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the State of residence. .
>
> "

This sentence was inserted by Act No. 282 of 25 April 2001, as the amendment was intended to reintroduce the withholding tax on dividends. In the original bill (L 99 2000/01), the provision was proposed to be worded as follows:

> "...
>
> It is a condition that the parent company is domiciled in a state that is a member of the EU, in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2. in Directive 90/435 / EEC.
>
> ... "

During the consideration of this proposal, however, the Minister of Taxation tabled an amendment (corresponding to the final wording of the provision), justifying this as follows:

> "...
>
> It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent / Subsidiary Directive, or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the double taxation agreement with the Faroe Islands. Greenland or the other state in question.
>
> ... "

Both the wording and the preparatory work thus unequivocally show that withholding tax must be implemented, unless such taxation is contrary to EU law and / or the DBOs.

In any case, a clear legal basis has been provided for SKAT to implement a withholding tax, unless it must be concluded that under the Parent / Subsidiary Directive it is mandatory to waive withholding tax, which is precisely not the case in the provisions of Article 1 (1). 2, mentioned cases.

No sharpening of practice

In the alternative, the company has argued that SKAT's decision is an expression of a tightening of practice with retroactive effect, and that such can not be legally implemented without appropriate notice.

In addition, it is noted that this is a set of rules of a completely new nature, and that a case must therefore be the first.

Next, it is noted that it is the company's responsibility to prove that this is a change in a fixed administrative practice, cf., for example, the Supreme Court's judgments in SKM2009.95.HR and TfS 2000.148.

It is not an expression of established administrative practice that SKAT has not previously found reason to refuse exemption from dividend tax. A possible (erroneous) lack of tax intervention and correction can not constitute practice and can not create any administrative practice binding on SKAT not to impose withholding tax on dividends.

From the Minister of Taxation's answer to question 10 to L 30 (2006/07) appears

> "...
>
> It is part of the tax assessment to ensure that the conditions for not including dividend tax are met, including whether a foreign company is the rightful owner of the dividend.
>
> ... "

If a fixed practice existed, according to which withholding tax was never imposed on dividend distributions, there would be no reason to include in the tax assessment process whether to ensure that a foreign company is the rightful owner of the dividends. Incidentally, there is no evidence to regard the ministerial response as a warning of a change in practice.

SKAT thus disputes that there should be a practice of not imposing withholding tax on dividends to parent companies in EU Member States and or DBO countries when the parent company is not the "rightful owner" of the dividend.

The company's comments on SKAT's statement

Regarding the statement by SKAT that the word "also" in section 12.1 of the comments should show that the cases where there is throughput are merely an example (among many) that the formal beneficiary should not be considered the rightful owner, it is noted that it is clear from the context that point 12.1 lists 3 situations where a recipient of dividends is not a "rightful owner", namely if he is (1) agent, (2) intermediary or (3) conduit for another person who actually receives that income. In the latter situation, the throughput unit is further required to have "very narrow powers which, in relation to the income in question, make it a" nullity "or administrator acting on behalf of other parties".

Regarding SKAT's reference to the Minister of Taxation's comment on L 202 of 22 April 2009, in which the Minister of Taxation states, "that it does not exclude that PA [the ultimate parent company, inserted here] is considered a" beneficial owner ", that LUX [the intermediate holding company, inserted here] does not actually distribute the dividend, but instead uses the dividend to repay debt to an external bank ", it is noted that the company's representative does not agree with this statement. The dividend-receiving company has also in this situation disposed for the benefit of itself. Incidentally, the Minister's statement was published at a time when SKAT had decided to pursue the present case and a number of other similar cases, and the statement therefore has the character of a party submission.

Incidentally, the statement stands in stark contrast to the Minister's reply in SKM2008.728.DEP , where the Minister had "difficulty in seeing how in the mentioned example it can be demonstrated that the Cayman Island company is a flow-through company that … not purely in fact, a cash flow is carried through the Cayman Island Company ".

SKAT has also referred to the Bank of Scotland case, the G7 case and the G1 case. However, there is also no support for SKAT in these judgments.

First, all three judgments are about situations where there is actual throughput to the underlying owners. (In the Bank of Scotland case, this happened with the payment of the sale price / loan to the US parent company).

Second, in all three cases, there was treaty shopping. The underlying owners had thus directed the dividends or interest through an intermediate company in order to obtain a collective agreement that would otherwise not be achievable.

Regarding the G1 case, SKAT has assumed that the decision deviates fundamentally from the present case because the G1 case did not involve pre-determined dispositions. SKAT has overlooked here that an agreement had been made between the underlying owners (in the shareholders' agreement) on the distribution of 80% of the profit.

In a situation

| where | there has actually been a flow of dividends to the ultimate owners, |
|---|---|
| where | the ultimate owners have decided in advance that dividends will be distributed through the companies, and |
| where | the holding company has no other activity and physical framework than those resulting from being a pure holding company, the Canadian Federal Court of Appeal in the G1 case has therefore not found support that the Dutch holding company in question should not be the "beneficial owner" of dividends from the Canadian subsidiary. |

An assessment of the present case - where there has been no actual throughput, but where the dividend has on the contrary benefited the dividend recipient, and where there is no treaty shopping - leads all the more to the same result, namely that there is no basis for not considering the formal recipient of the dividend as its "rightful owner".

SKAT has stated that H1 S.à.rl was obliged to re-lend the amount distributed to H1.XA / S, and that H1 S.à.rl thus had such narrow powers in relation to the dividend that the company cannot be qualified as rightful owner in relation to this.

It should be noted that the fact that these dispositions - like any other major disposition in a group - were planned by the management of H1 S.à.rl before they were implemented, does not mean that the company's management could not have disposed differently , and it is disputed that the re - lending to the dividend - distributing company was not in any way a decision in which the management of the company was involved.

H1 S.à.rl disposed of the amount distributed by lending it to H1.XA / S, and H1 S.à.rl has thus enjoyed the full benefit of the amount distributed.

With regard to the Parent-Subsidiary Directive, SKAT has referred to "the general principle of Community law prohibiting misuse of rights".

It should be noted that there is no artificial arrangement whose purpose is to circumvent EU law. Thus, the underlying owners have not established H1 S.à.rl for the purpose of obtaining unintended benefits under the Parent-Subsidiary Directive, and the tax advantage arising from the different tax treatment of convertible loans between the two countries is in any case a result of different national tax laws that have nothing to do with EU law. The measures taken are precisely not intended to avoid withholding tax on payments to non-European companies through abuse of the Parent-Subsidiary Directive. Firstly, there has been no redistribution to non-European companies, and secondly, there is no question of treaty shopping.

SKAT has further argued that the general abuse rules of EU law can apply, regardless of the fact that no legal basis for this has been provided in Danish law.

With regard to SKAT's reference to Case C-321/05, it should be noted that the judgment expressly states that the application of general abusive provisions in directives of Community law presupposes that such abusive provisions have a legal basis in national law. Reference is made to paragraphs 37-48 of the judgment - below.

"...

46 In the main proceedings, as the Advocate General observes in point 63 of his Opinion, it is for the national court to determine whether there is a general provision or principle in Danish law which provides for a prohibition on misuse of laws or other provisions on tax evasion. or tax evasion which may be interpreted in accordance with Article 11 (2). 1 (a) of Directive 90/434 and thus justify that the exchange of shares in question is taxed ...

47 In such a case, it is for the national court to determine whether the conditions for the application of

those national provisions are satisfied in the main proceedings.

48 In the light of the foregoing, the answer to the question referred must be that, in circumstances such as those at issue in the main proceedings, dividends such as those paid must not be included in the calculation of the "cash compensatory amount" referred to in Article 2 (d) of Directive 90/434, and an exchange of shares such as that at issue in the main proceedings therefore constitutes an "exchange of shares" within the meaning of Article 2 (d) of that directive.

Consequently, Article 8 (1) Article 11 (1) of Directive 90/434 precludes, in principle, the taxation of such an exchange of shares, unless national legislation on misuse, tax evasion or avoidance can be interpreted in accordance with Article 11 (1) of that directive. 1 (a) and thereby justify that the exchange is taxed.

..."

The European Court of Justice has expressly ruled that only internal Danish legislation on misuse of taxes, tax evasion or tax evasion can justify a deviation from the directive's tax exemption provisions. These legal provisions do not have to consist of legislation, but can also be unwritten legal principles.

The result is further supported by the fact that Article 1 (1) of the Parent-Subsidiary Directive 2 - contrary to Article 11 (2) of the Merger Tax Directive 1, letter a - directly refers to "internal provisions" on fraud and abuse.

SKAT has also referred to the Ministry of Taxation's comment on the C-321/05 judgment in SKM2007.843.DEP , in which the Ministry has explained why the Ministry subsequently responded in the affirmative in the national case. However, it does not rely on the outcome of the national case, but on the judgment of the European Court of Justice, according to which the application of abuse rules requires a legal basis in national law.

The conclusion is therefore that Article 1 (1) of the Parent-Subsidiary Directive 2 is not a substantive abuse rule, but rather an authorization for Member States to introduce or maintain national abuse rules. In Denmark, it is the court-created practice of the correct income recipient and considerations of reality that may come into play, and it is undisputed that this practice does not lead to H1 S.à.rl being denied tax exemption on the dividend.

To the statement by SKAT that there is in any case authority to enforce Article 1 (1) of the Directive. 2, in the Corporation Tax Act § 2, para. 1, letter c, 3rd sentence, it is noted that neither the mere reference to the Parent / Subsidiary Directive in the Corporation Tax Act § 2, para. 1, letter c, 3rd sentence, or the motive remarks provide any support for such a position. The reference to the Parent / Subsidiary Directive simply means that SKAT can apply internal abuse rules. SKAT's line of argumentation is circular because SKAT presupposes the result for which SKAT argues.

Reference is made to the Opinion of the Advocate General in the proceedings before the Court of Justice, C-352/08 - in particular pkt. 38, 47, 59, 62 and 69. The Advocate General stated, first, that Article 11 of Directive 90/434 / EEC provides exhaustively for the conditions under which it is possible to refuse to apply the tax advantages provided for in that directive and that: presupposes national law, and that the provision's reference to "tax evasion" applies only to the evasion of taxes covered by the benefits of that Directive.

SKAT has denied that there is a tightening of practice.

In this connection, it is noted that the provision in the Corporation Tax Act, section 2, subsection 1, letter c, on limited tax liability of dividends was thus introduced by Act No. 370 of 13 November 1968, which entered into force on 1 January 1970 (in connection with the introduction of the withholding tax). Denmark has thus had rules on foreign companies' limited tax liability to Denmark on dividends for 40 years - only interrupted by a short period of 2 1/2 years from 1999 - 2001.

Law No 1026 of 23 December 1998 thus abolished the general limited tax liability on dividends in parent / subsidiary relationships (25% ownership) with effect from the income year 1999, and reintroduced it in Law No 282 of 25 April 2001 ( in cases where the taxation of the dividend is not to be

waived or reduced in accordance with the provisions of the Parent / Subsidiary Directive or in accordance with a double taxation agreement). The latter change in law had effect on dividends paid from 1 July 2001.

The Parent / Subsidiary Directive was implemented in Danish law by Act no. 219 of 1 April 1992 in section 2 (1) of the Corporation Tax Act. 5, so that dividend tax would no longer be included in the distribution of dividends to parent companies within the EU.

It follows that for almost 20 years it has had a direct bearing on the question of limited tax liability,

whether it is a dividend-receiving parent company (within the EU), and since 2001, whether it is a dividend-receiving parent company in a contracting country.

In addition, however, the interpretation that the concept of "rightful owner" over the years has had significance in relation to all the double taxation agreements where this concept is included as a condition for obtaining relief. The concept of "rightful owner" was introduced in the 1977 model agreement.

It is not credible that the fact that (only a large number) cases of limited tax liability have been raised only now, in which the facts are quite similar to the facts in previous income years, should be an indication that the previous tax assessment has been deficient.

It is argued that SKAT's interpretation of what is meant by "rightful owner" has changed, just as SKAT has changed its perception of when a foreign company is entitled to tax exemption under the Parent / Subsidiary Directive.

As an example of this, it can be mentioned that SKAT's now defended interpretation differs from the Minister of Taxation's answer of 6 November 2006 to question S 474, according to which the term "rightful income recipient" must be regarded as very similar to the term "beneficial owner".

As another example,

that SKAT neglects the Minister's answer in SKM2008.728.DEP , according to which actual throughput is required.

Freedoms of the EC Treaty

Just for the sake of all cases, it should be noted that the taxation of dividends also entails a violation of the freedoms of the EC Treaty, because the taxation involved involves the application of a more extensive abuse rule to a holding company in another Member State than the abuse rules that can be applied to Danish holding companies.

SKAT's (justified) failure to apply internal abuse rules - considerations of reality and the principle of the correct income recipient - in the case thus shows that SKAT (correctly) would not have imposed dividend tax if H1 S.à.rl had instead been a Danish holding company. Thus, it would have been more advantageous to establish a Danish holding company than a Luxembourg holding company. Thus, there is an obvious restriction which cannot be justified by overriding reasons in the public interest.

*The National Tax Court's remarks and reasoning*

On 10 May 2005, the company distributed a dividend of DKK 5,544.2 million. DKK to the parent company, H1 S.à.rl Of which DKK 5,537.2 million. DKK on the same day lent back to the Company, which on the same day made an increase in the share capital in H2 A / S by paying in approx. 7,693 million DKK. H2 A / S has used the amount to purchase H2.1 A / S. At 31 December 2005, DKK 5,500 million DKK of the loan to the Company converted to share capital in the Company.

According to the withholding tax act, section 65, subsection 1, companies must include dividend tax in connection with the adoption or decision on the payment of dividends. According to the provision's paragraph. 5, however, no dividend tax shall be included in dividends that a company domiciled abroad receives from a company domiciled in this country when the dividend in question is not covered by the tax liability, cf. . 1, letter c.

According to the current Corporation Tax Act, section 2, subsection 1, letter c, companies domiciled abroad are, as a rule, subject to limited tax liability on dividends, cf. However, this does not apply to dividends received by a company that owns at least 20% of the share capital (as far as 2005 is concerned) in the dividend-giving company for a continuous period of at least 1 year, within which period the dividend distribution date must be, cf. and 3rd point. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435 / EEC on a common taxation system for parent companies and subsidiaries of different Member States or under a double taxation agreement with the State of residence, cf. pkt.

3 members of the court - including the presiding judge - note

According to the double taxation agreement between Denmark and Luxembourg of 17 November 1980, Article 10, para. 2, dividends may be taxed in the source State. However, if the recipient is the legal owner of the dividend and is a company that directly owns at least 25% of the capital of the distributing company, the tax imposed may not exceed 5% of the gross amount of the dividend.

The provision corresponds to Article 10 of the OECD Model Convention.

The commentary to Article 10 point 12 of the Model Agreement states, among other things, that the term rightful owner is not used in a narrow technical sense, but must be seen in the context and in the

light of the agreement's intent and purpose, including avoiding double taxation and preventing tax evasion and avoidance. Section 12.1 of the commentary states that an agent or intermediary cannot be considered a rightful owner and that a person acting otherwise than as an agent or intermediary merely acts as a "conduit" for another person who is in fact receives the income in question, can also not be considered the rightful owner. Reference is made to the report of the Committee on Fiscal Affairs, which states that a "flow-through company" cannot normally be considered the rightful owner if it, although it is the formal owner, it actually has very narrow powers, which, in relation to the income in question, makes it a "nullity" or administrator acting on behalf of other parties. Paragraph 22 of the commentary recommends agreeing on special exceptions in the event that the beneficial owner of dividends from the source State is a company of the other Contracting State owned by shareholders domiciled outside that State and where the company does not pay out profits in the form of dividends and enjoys a favorable tax treatment.

As a result, dividend recipients who are agents, intermediaries and "flow-through companies" are not considered the rightful owners of the dividends. In the case of "flow-through companies", however, it is a condition that the company has very narrow powers which, in relation to the dividend, make it a "nullity" or administrator. The fact that a recipient of dividends has very narrow powers in relation to the dividend cannot in itself mean that it is not the rightful owner.

As stated above, it is assumed that H1 S.à.rl received the dividend in question on 10 May 2005.

As H1 S.à.rl has not re-channeled the dividend in question to its parent company, KH S.à.rl or its shareholders, but has instead used the dividend for lending to the Company, from which it has been used for a capital increase in H2 A / S, who has finally used the amount for the purchase of H2.1 A / S, H1 S.à.rl can not in relation to this dividend be considered a "flow-through company". In those circumstances, H1 S.à.rl is considered the rightful owner of the dividend.

As a result, the restriction in Article 10 (1) of the Double Taxation Convention applies. 2, according to which Denmark as a source country can only tax 5% of the dividend.

As the taxation of the dividend must thereafter be reduced in accordance with the double taxation agreement, it follows from section 2 (1) of the Danish Corporation Tax Act. 1, letter c, that the dividend is not covered by the limited tax liability.

Under Article 90 of Directive 90/435 / EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, dividends which a subsidiary distributes to its parent company are exempt from withholding tax.

Article 1 (1) of the Directive 2 appears

"This Directive shall not preclude the application of any internal provisions or conventions which are necessary to prevent fraud and abuse."

It follows that the benefits of the Directive may be denied on the basis of the provisions of national law on the prevention of fraud and abuse. There are no legal provisions in Danish law for this purpose, but legal authority to prevent fraud and abuse follows from case law.

Since H1 S.à.rl is considered to be the rightful recipient of the dividend, and since, on the basis of reality, the dispositions made cannot be infringed, it is not considered in Danish law to be a legal basis for denying the companies the benefits that follow from the directive. Reference can be made to the judgments of the Supreme Court of 30 October 2003 and 7 December 2006 published in SKM2003.482.HR and SKM2006.749.HR , respectively, as well as to the judgment of the European Court of Justice in case C-321/05 and the Ministry of Taxation's comment published in SKM2007.843.DEP .

Consequently, pursuant to Article 5 of the Directive, dividends must be exempt from withholding tax.

As the taxation of the dividend hereafter must also be waived in accordance with Directive 90/435 / EEC, it follows - also for this reason - section 2, subsection 1 of the Corporation Tax Act. 1, letter c, that the dividend is not covered by the limited tax liability.

These members of the court find that the Company has hereafter not been obliged to withhold dividend tax on the dividend, cf. the withholding tax act, section 65, subsection. 5.

A lawyer notes

As far as the double taxation agreement is concerned, the comments on the Model Convention must be understood as meaning that it is not in itself decisive that the dividend amounts have not been immediately transferred to the underlying owners, as the decisive factor is the formal recipient's lack of power to dispose of the dividend. H1 S.à.rl is not considered a beneficial owner, as the company has

no independent right to dispose of the dividend amounts. As H1 S.à.rl is thus only deposited as an intermediate holding company, which in fact has no authority to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, the Danish / Luxembourg DBO is not considered to cut off Denmark from to implement a source country taxation of the dividend amounts.

As far as the Directive is concerned, it is not considered a condition for failure to facilitate under the Parent-Subsidiary Directive that a specific legal basis has been implemented nationally to enforce Article 1 (1) of the Directive. 2. It must be assumed that this is an arrangement whose main purpose is to avoid paying taxes and the construction does not serve any commercial purpose, the construction is considered to be infringed in accordance with the general principles of EU law that EU law does not may be invoked for the purpose of committing fraud or abuse.

This court member then finds that the Company should have withheld dividend tax on the dividend, cf. the withholding tax act, section 65, subsection. 5.

A decision is made by a majority of votes, and SKAT's decision is amended accordingly.

The changed tax calculation will appear in a revised annual statement, which will later be printed out by the tax authorities.

... "

Additional information about the transactions

A notarized document dated 28 April 2005 states the formation of the Luxembourg holding company for H1 S.à.rl, KH S.à.rl (then KH.X Holding S.à.rl (the "supreme" of the two Luxembourg holding companies shown in the illustration in the Land Tax Court's ruling above page 5)) among other things:

"The above named persons in the capacity in which they act, have declared their intention to constitute by the present deed a limited liability company and to draw up the Articles of Association of it as follows:

...

Article 4.-

The company shall have as its business purpose the holding of participations, in any form whatsoever, in Luxembourg and foreign companies, the acquisition by purchase, subscription, or in any other manner as well as the transfer by sale, exchange or otherwise of stock, bonds, debentures, notes and other securities of any kind, the possession, the administration, the development and the management of its portfolio.

The company may participate in the establishment and development of any financial, industrial or commercial enterprises and may render any assistance by way of loan, guarantees or otherwise to subsidiaries or affiliated companies.

The company may borrow in any form.

In general, it may take any controlling and supervisory measures and carry out any financial, movable or immovable, commercial and industrial operation which it may deem useful in the accomplishment and development of its purpose.

...

Article 7.-

The capital of the company is fixed at one million Danish Krone (DKK 1,000,000.-) divided into five thousand (5,000) parts of two hundred Danish Krone (DKK 200.-) each.

...

Article 10.-

The company is administered by a board of managers consisting of at least four managers at any time. The managers are appointed by the general meeting of participants for an undetermined period. The participants K2.4, LP, K2.5 Offshore, LP, K2.7 GmbH & Co Beteiligungs KG, K2.6 Employee Fund, LP, K2.8 LP, K2.9 Ltd, K2.10, LP., K2 .11 Offshore Fund, LP and K2.12 GmbH & Co KG and any member of the K2 Group of companies that may replace any one or all such entities as investor in the company or become an additional investor in the company from time to time ( together hereinafter referred to as the "K2 Investors") acting though an investor designated by such K2 Investors shall have the right to present a list of proposed managers for two seats on the board to managers. The

managers appointed on proposal by the K2 Investors shall be referred to as Class A managers. The participants K1.1 Limited and K1.2 Limited and any member of the K1 Group of companies that may replace any one or all such entities as investor in the company or become an additional investor in the company from time to time (together hereinafter referred to as the "K1 Investors") acting though an investor designated by the K1 Investors shall also have the right to present a list of proposed managers for two seats on the board of managers. The managers appointed on proposal by the K1 Investors shall be referred to as Class B Managers.

The general meeting of participants has the power to remove managers at any time without giving reasons.

The board of managers is invested with the broadest powers to perform all acts necessary or useful to the accomplishment of the corporate purpose of the company, except those expressly reserved by law to the general meeting. The board of managers represents the company as against third parties and any litigation involving the corporation either as plaintiff or as defendant, will be handled in the name of the company by the board of managers.

In order to be valid, resolutions of the board of managers must be taken by vote of a simple majority of managers in office at any time including at least one Class A manager and one Class B manager.

Written resolutions signed by all the managers will be as valid and effective as if passed at a meeting duly convened and held. Such signatures may appear on a single document or multiple copies hereof and may be evidenced by letter, telefax or similar communication.

The company will be bound by the joint signatures of a Class A and a Class B manager.

Special and limited powers may be delegated by the board of managers for determined matters to one or more agents, either participants or not.

...

Title V.-Financial Year - Profits - Reserves

Article 12.-

The financial year of the company starts on the first of January and ends on the last day of December of each year.

...

Article 15.-

...

Subscription

The statues having thus been established, the appearing parties subscribe the whole capital as follows:

| | | |
|---|---|---|
| K2.4, LP, prenamed | 512 | |
| K2.5 Offshore, LP, prenamed | 186 | |
| K2.6 GmbH & Co Beteiligungs KS, prenamed | 21 | |
| K2.7 Employee Fund, LP prenamed | 163 | |
| K2.8 LP, prenamed | 18 | |

| | | |
|---|---|---|
| K2.9 Ltd, prenamed | 245 | |
| K2.10, LP, prenamed | 710 | |
| K2.12 Offshore Fund, LP, prenamed | 367 | |
| K2.12 GmbH & Co KG, prenamed | 28 | |
| K1.1 Limited, prenamed | 485 | |
| K1.2 Limited, prenamed | 2,265 | |
| Total | 5,000 | parts |

...

Extraordinary General Meeting

After the Articles of Association have thus been drawn up, the above named participants have imme-diately proceeded to hold an extraordinary general meeting. Having first verified that is was regularly constituted, they passed the following resolutions:

| 1) | The registered office of the company is fixed at Luxembourg |
|---|---|
| 2) | Have been elected managers (gérants) of the company for an undetermined period: |
| - | Mr. VD, Vice President, born in Lebanon, on 28 September 19 .., residing at ..., United Kingdom (Class A manager); |
| - | Mr. SL, Attorney-at-law, born in Luxembourg,, on 28 April 19 .., professionally residing at ..., Luxembourg (Class A manager); |
| - | Mr. JD, Consultant, born in United Kingdom, on I October 19 .., residing at ..., Guernsey (Class B manager); |
| - | Mr. NK, partner, born in Norway on 9 November 19 .., residing at ..., Denmark (Class B manager). |

... "

According to a transcript from the Luxembourg Registre de Commerce et des Societes, the company was founded on 28 April 2005 with a capital of DKK 1,537,489,600.

The articles of association of H1 S.à.rl (then KH.X S.à.rl (the "bottom" of the two Luxembourg holding companies shown in the illustration in the Landskatteretten's ruling above page 5)) per. 9 May 2005 contains, inter alia, the following provisions:

"...

Article 2.

The denomination of the company is "KH.X S.à.rl".

...

Article 4.

The company shall have as its business purpose the holding of participations, in any form whatso-

The company shall have as its business purpose the holding of participations, in any form whatso-
ever, in Luxembourg and foreign companies, the acquisition by purchase, subscription, or in any other
manner as well as the transfer by sale, exchange or otherwise of stock, bonds, debentures, notes and
other securities of any kind, the possession, the administration, the development and the manage-
ment of its portfolio.

The company may participate in the establishment and development of any financial, industrial or
commercial enterprises and may render any assistance by way of loan, guarantees or otherwise to
subsidiaries or affiliated companies.

The Company may borrow in any form.

In general, it may take any controlling and supervisory measures and carry out any financial, movable
or immovable, commercial and industrial operation which it may deem useful in the accomplishment
and development of its purpose.

...

Article 7.-

The capital of the company is fixed at 1,511,018,200, - DKK (one billion five hundred eleven million
eighteen thousand two hundred Danish Krone) divided into 7,555,091 (seven million five hundred fifty
five thousand ninety one) parts of 200, - DKK (two hundred Danish Krone) each.

...

Article 10.-

The company is administered by a board of managers consisting of at least four managers at any
time. The managers are appointed by the general meeting of participants for an undetermined pe-
riod. The participants K2.4, LP, K2.5 Offshore, LP, K2.6 GmbH & Co. Beteiligungs KG, K2.7 Employee
Fund, LP, K2.8 LP, K2.9 Ltd., K2.10, LP, K2.11 Offshore Fund, LP and K2.12 GmbH & Co KG and any
member of the K2 group of companies that may replace any one or all such entities as investor in the
company or become an additional investor in the company from time to time (together hereinafter re-
ferred to as the "K2 Investors") acting though an investor designated by such K2 Investors shall have
the right to present a list of proposed managers for two seats on the board of managers. The man-
agers pointed to proposal by the K2 Investors shall be referred to as Class A managers. The partici-
pants K1.1 Limited and K1.2 Limited and any member of the K1 group of companies that may replace
any one or all such entities as investor in the company or become an additional investor in the com-
pany from time to time (together hereinafter referred to as the "K1 Investors") acting though an in-
vestor designated by the K1 Investors shall also have the right to present a list of proposed managers
for two seats on the board of managers. The managers appointed on proposal by the K1 Investors
shall be referred to as Class B managers.

The general meeting of participants has the power to remove managers at any time without given
reasons.

The board of managers is invested with the broadest powers to perform all acts necessary or useful
to the accomplishment of the corporate purpose of the company, except those expressly reserved by
law to the general meeting. The board of managers represents the company as against third parties
and any litigation involving the corporation wither as plaintiff or as defendant, will be handled in the
name of the company by the board of managers.

In order to be valid, resolutions of the board of managers must be taken by vote of a simple majority
of managers in office at any time including at least one

Class A manager and one Class B manager. Written resolutions signed by all the managers will be as
valid and effective as if passed at a meeting duly convened and held. Such signatures may appear on
a single document or multiple copies thereof and may be evidenced by letter, telefax or similar
communication.

The company will be bound by the joint signatures of a Class A and a Class B manager.

Special and limited powers may be delegated by the board of managers for determined matters to
one or more agents, either participants or not.

...

Article 12.-

The financial year of the company starts on the first of January and ends on the last day of December
of each year.

... "

According to a transcript from the Luxembourg Registre de Commerce et des Societes, the company was founded on 28 April 2005 with a capital of DKK 1,511,018,200.

Minutes of a board meeting on 9 May 2005 in KH I S.à.rl state, among other things:

"...

| Resolutions | |
|---|---|
| | |
| ... | |
| | |
| 8. | Resolved to approve the Convertible Subordinated Financing Instrument to be dated on or about May 10, 2005 between the Company as Lender and KH.X Denmark Holding A / S, as defined above, as Borrower pursuant to which the Lender will contribute to the Borrower a loan in the amount of DKK 5,500,000,000 at par value on the terms and conditions set out therein. |
| | |
| 9. | Resolved to approve the Loan Agreement for an amount of DKK 37,200,000 to be dated on or about May 10, 2005 between the Company as Lender and KH.X Denmark Holding A / S, as defined above, at Borrower on the terms and conditions set out therein, |
| | |
| 10. | Resolved to approve the<br><br>iss uance of a power attorney, substantially in the form set out in Schedule 1, to represent the Company at an extraordinary general meeting of KH.X Denmark Holding A / S, as defined above, resolving to approve the iss uance by KH.X Denmark Holding A / S of the Convertible Subordinated Financing Instrument, as defined in point 6 of this agenda. |
| | |
| ... | |
| | |

| | |
|---|---|
| 14. | Resolved to authorize any of the Company's Managers and any of KP and DL (each an "Authorized Signatory"), acting individually, (i) to sign, execute and deliver any agreement, document, certificate or notice in connection with the fore-going resolutions, and (ii) to do and perform, or cause or au-thorize to be done and performed, any and all such other acts, deeds and things and to make, execute and deliver, or cause to be made, executed and delivered in the name and behalf of the Company any and all such other agreements, undertakings, powers of attorney, documents, consents, fill-ings or instruments with such terms and provisions as any Authorized Signatory may approve, as such may deem nec-essary or appropriate to effect the documents contemplated by the foregoing resolutions,to fulfill the obligations of the Company in connection therewith, or otherwise to carry out the purpose and intent of the foregoing resolutions, the exe-cution, delivery or performance thereof or the taking of any such action to be conclusive evidence of such approval and authority. |

... "

KP and DL are partners in the K1 private equity funds.

KP authorized by proxy on 6 May 2005 on behalf of H1 S.à.rl lawyer NS or a substitute appointed by him to represent and vote on behalf of the company at the forthcoming general meeting of H1.XA / S (then KH.X Denmark Holding A / S (the "supreme" Danish holding company shown in the illustration in the National Tax Tribunal's ruling above page 5)).

On 10 May 2005, the Board of Directors of H1.XA / S approved the annual accounts, cf. the minutes of the date in question at 8.20 held a board meeting item 2. According to item 3, the board also decided to pay DKK 5,544,200,000 in dividends for the financial year. An amount of DKK 2,058,581,250 was transferred as a profit.

At a further board meeting the same day at At 10.15, the Board of Directors decided, cf. the minutes of this meeting item 2, to raise a loan of DKK 5,500,000,000 against the issuance of a convertible debenture to the company's sole shareholder, H1 S.à.rl, and to make a capital increase attached to it. H1 S.à.rl then signed the convertible debenture by endorsing the minutes.

Of the loan document of 10 May 2005 on the convertible loan of DKK 5.5 billion. It appears that the loan, which according to point 2.5, bore interest in 2005 with an annual interest rate of 10%, is subor-dinated to:

| |
|---|
| "... |

| | |
|---|---|
| 7.1 | The Loan Amount and any accrued and unpaid Interest shall, with respect to payment rights, redemption and rights of liquidation, bankruptcy and d |
| | iss olution, rank subordinate to all other present and future obligations (creditors) of the Borrower whether secured or unsecured except if similar Instruments are iss ued in the future, in which case, the Loan Amount and any accrued |

| | |
|---|---|
| | future, in which case, the Loan Amount and any accrued and unpaid interest will rank pari passu with similar instruments. |
| | |
| 7.2. | "Subordination Agreement" means the subordination agreement dated on or about the date of this Instrument between the Borrower, the Lender and Citibank International pie. The terms of this Instrument are subject to the terms of the Subordination Agreement, and the terms of the Subordination Agreement shall prevail to the extent that they conflict with this Instrument. |

... "

The non-convertible loan of DKK 37.2 million DKK, cf. the loan document of 10 May 2005 on this, was subordinated in the same way. The interest rate on this loan was also 10% pa in 2005, cf. item 2.

According to H1 S.à.rl, the subordination of the bank loans taken out is the reason why the interest payment had to be "rolled up", so that interest would only be paid on the sale of the acquired company or as happened with the convertible loan of 5, 5 billion DKK by a conversion of loans and accrued interest to shares. The company has stated that this is a fairly common approach to intra-group loans as present due to the banks' requirements for priority for their lending.

Regarding the investors' influence on the transactions made, it is stated in lawyer Hans Severin Hansen's letter to the National Tax Court of 1 July 2009:

"It can be readily assumed that neither the decision to vote for the distribution of a dividend of DKK 5.5 billion nor to lend the amount to H1.XA / S are spontaneous management decisions in H1 S.à.rl"

According to the minutes of a board meeting of H1 S.à.rl on 15 December 2005, the board of directors decided:

| "... |
|---|

| 1 | The Managers approve the conversion of DKK 5,859,027,778 of debt, comprising (1) DKK 5,500,000,000, corresponding to the total loan amount, and (2) DKK 359,027,778 of interest of the loan amount, owed by H1.XA / S to the Company to shares in H1.XA / S with effect from 31 December 2005. |
|---|---|
| | |
| 2. | The managers authorize each of the managers and KP, acting alone, to sign all necessary documents in connection with the exercise of the company's right of conversion. " |

... "

The convertible loan from H1 S.à.rl to H1.XA / S of DKK 5.5 billion. DKK and the accrued interest was accordingly on 31 December 2005 converted into shares (equity). At that time, interest had been accrued on this loan of DKK 359,027,778. On the non-convertible loan of DKK 37.2 million. At the same time, interest of DKK 2,428,333 had been accrued. In total, interest of DKK 361,456,111 had been accrued.

In KH S.à.rl's annual accounts per. At 31 December 2005, shares in the subsidiary, H1 S.à.rl, were listed in note 3 as "Financial Assets", to a value of DKK 8,066,027,573. It is further stated that in the financial year 2005 H1 S.à.rl had a profit of DKK 360,326,323.

financial year 2005 H1 S.à.rl had a profit of DKK 360,326,323.

In the annual accounts for H1 S.à.rl per. At 31 December 2005, note 3 "Financial Assets" mentions the shares in the subsidiary, H1.XA / S, to a value of DKK 8,017,609,028. Regarding the loan to the subsidiary, it is stated that the interest rate is 10%. The interest received is entered in the accounts under receivables. Of the company's profit of DKK 360,326,323 in the financial year 2005, according to the accounts, tax of DKK 730,718 has been paid. According to the information, this is tax on the interest income of the loan of DKK 37.2 million. kr.

Of the annual accounts for H1 S.à.rl per. At 31 December 2006, it appears that the loan to H1.XA / S and accrued interest of DKK 3,870,365 on 11 May 2006 was converted into share capital.

Regarding the background for H1.XA / S being established first and for the arrangement with capital contributions in this company before the formation of the two Luxembourg holding companies as well as dividend payments and loans, H1 S.à.rl has stated that capital contributions in a Luxembourg company would have triggered a claim for payment of a capital duty of 2% of 7.7 billion. DKK, ie approx. 154 million kr., in Luxembourg. This could be avoided by founding the Danish company first, depositing the capital in this company, distributing part of the capital to the Luxembourg company and first then making the loan of DKK 5.5 billion. DKK from the Luxembourg company to the Danish company.

SKAT's presentation letter

SKAT has prepared two notes of 29 August 2008.

The first note "Loan arrangement of DKK 5.5372 billion established in connection with private equity funds' purchase of the majority shareholding in H2.1 A / S on 10 May 2005" states, among other things:

> "...
>
> 5. SKAT's considerations
>
> ...
>
> SKAT examines the content of the two loan arrangements at resp. 5.5 billion DKK and 37.2 mill. DKK, including whether there is a basis for calculating interest on these very atypical loans, whether the interest calculation should be reset in the circumstances and / or whether the loan arrangements can be regarded as pure tax arrangements whose sole purpose is to generate a tax deduction for so-called tax utilization without business content .
>
> ...
>
> 9.1. SKAT's preliminary justification and summary result
>
> ...
>
> On the basis of the assessment thus available, SKAT finds that the construction is not commercially justified, but that it can only be considered to have been carried out for tax reasons with the sole purpose of forming and calculating an interest deduction in the event of a tax utilization. "

The second note of 29 August 2008 "Considerations on limited tax liability" states, among other things:

> "b. Limited tax liability - withholding tax on dividends
>
> In connection with SKAT's deliberations on limited tax liability, a decision must be made on any obligation for H1.XA / S to include withholding tax on dividends, etc. to the rightful owners if these are not the companies in Luxembourg.
>
> For the purpose of these considerations, SKAT must request information regarding shareholder relations / ownership relations with the companies in Luxembourg, partly per. May 10, 2005, partly pr. 31 December 2005, cf. below under pkt. b.1. and b.2. "

A number of questions are then listed for H1.XA / S.

Both notes were sent as a letter of presentation to H1.XA / S on 29 August 2008.

As a lawyer for H1.XA / S, lawyer Hans Severin Hansen objected in the letter of 2 January 2009 to the increases proposed according to SKAT's letter of presentation.

The two decisions on interest tax and interest deductions

By order of 1 November 2010, the National Tax Court amended a decision made by SKAT, according to which H1.XA / S had been deemed to be liable to withhold with regard to interest tax of DKK 108,436,833 for interest paid to H1 S.à.rl With reference to the order of 3 March 2010, to which this

100,400,000 for interest paid to H1 S.à.rl with reference to the order of 3 March 2010, to which this case relates, the National Tax Court stated:

> "Since the interest in question after the debt conversions has also not been re-channeled to H1 S.à.rl's parent company or its shareholders, H1 S.à.rl is also not considered a" flow-through company "in relation to the interest. H1 S.à.rl is hereby considered also for the rightful owner of the interest, cf. Article 11 (1) of the double taxation agreement.
>
> Henceforth, and since the concept of rightful owner within the meaning of the directive must be understood here in the same way as in the double taxation agreement, H1 S.à.rl is covered by both the collective agreement and the directive's benefits on the abolition of interest tax, cf. 1, letter d.
>
> The company has thus not been obliged to withhold withholding tax on the interest, cf. section 65 D of the Withholding Tax Act. "

This decision has been appealed to the City Court and then referred to the Eastern High Court.

The preparation is not yet complete.

By a decision of 15 May 2009, SKAT reduced the deduction declared by H1.XA / S for interest expenses of DKK 361,456,111 on the two intra-group loans to DKK 217,958,035. H1 S.à.rl has appealed the decision to the National Tax Court. In an office statement of 28 October 2011, it is proposed to change SKAT's decision so that deductions are assessed in accordance with the tax return.

The subsequent tax treatment of the merger between H1.XA / S and H1 S.à.rl

Prior to the implementation of the merger in 2010 between H1.XA / S and H1 S.à.rl, H1.XA / S asked the Tax Council for a binding advance notice on, among other things:

> "Can the Tax Council ... confirm that the described cross-border merger can be implemented as a tax-free merger covered by section 15 (4) of the Merger Tax Act, with the effect that no taxation is triggered at company or shareholder level?
>
> ... "

In the Tax Council's binding reply of 21 September 2010, the Tax Council confirmed that the cross-border merger could be carried out tax-free pursuant to section 15 (1) of the Merger Tax Act. 4. At the same time, however, the Tax Council stated that the merger could give rise to distribution taxation pursuant to section 16 A, subsection 1 of the Tax Assessment Act. 3, no. 1, letter a. According to the prior notice, whether there could be such taxation depended on whether H1 S.à.rl could receive tax-free dividends from H1.XA / S pursuant to section 2 (1) of the Corporation Tax Act. 1, letter c, and this depended on whether the dividend taxation could be waived or reduced in accordance with the Parent / Subsidiary Directive or the double taxation agreement between Denmark and Luxembourg. In other words, the question was whether H1 S.à.rl could be regarded as the rightful owner of the assumed distribution from H1.XA / S, since the company,

Subsequently, H1.XA / S asked the following questions to the Tax Council

> "Can the Tax Council confirm that H1 S.à.rl under the double taxation agreement between Denmark and Luxembourg is considered the rightful owner of the dividend which in the opinion of the Tax Council is considered distributed in connection with the cross-border merger, which is intended to be tax-free under the rules of the Merger Tax Act between H1. XA / S as the contributing company and H1 S.à.rl as the receiving company, and that there is thus no basis for distribution taxation in Denmark of the dividend in question. "

The question was, cf. the Tax Council's binding answer of 16 November 2010 answered with a "Yes"

The Tax Council hereby agreed with SKAT's recommendation as sound

> "...
>
> In SKAT's view, it is thus a basic precondition for the imposition of withholding tax on dividends distributed to a parent company in a DBO country, and which has limited or even non-existent (real) powers to dispose of the dividend amount, that it can concretely it is demonstrated or probable that the transaction has the purpose or consequence of tax evasion or avoidance (or "abuse").
>
> It is not currently possible to assess whether the Luxembourg Continuing Company will have any real power to dispose of the amount that may be considered to be distributed as liquidation proceeds

from the implementation of the planned vertical merger.

However, on the basis of a concrete assessment of the information regarding the proposed transac-
tion, SKAT finds that an implementation of the vertical merger will not constitute such an abuse (or
such a tax evasion-evasion) that the conditions for implementing a taxation of liquidation proceeds
as dividends pursuant to the Corporation Tax Act, section 2, subsection 1, letter c, is met.

... "

By order of 12 February 2011, the National Tax Court upheld H1.XA / S's complaint against the first
answer from the Tax Council and changed the answer to a "Yes.".

The legal basis

The double taxation agreement with Luxembourg and the double taxation agreements

The double taxation agreement with Luxembourg of 17 November 1980, cf. Executive Order no. 95 of
23 September 1982, contains, inter alia, the following provisions.

"...

Article 3

General definitions

PCS. 1. ...

PCS. 2. For the purposes of this Agreement in a Contracting State,

unless the context otherwise requires, any term not defined therein shall be accorded the meaning
which it has under the laws of that State concerning the taxes to which the Convention applies.

...

Article 10

Yield

PCS. Dividends paid by a company which is a resident of a Contracting State to a resident of the other
Contracting State may be taxed in that other State.

PCS. However, such dividends may also be taxed in the Contracting State in which the company pay-
ing the dividends is domiciled and under the law of that State, but the tax imposed may not, if the re-
cipient is the beneficial owner of the dividends, exceed:

| a) | 5 pct. of the gross amount of the dividend if the rightful owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 per cent. of the capital of the company paying the dividend; |
|---|---|
| b) | 15 pct. that the gross amount that the dividend in all other cases. |

... "

The provisions correspond to Article 3 (1). 2 and Article 10 of the 1977 OECD Model Convention.

In the comments on Article 10, para. 2 of the 1977 model agreement states:

"...

| 12. | Under paragraph 2, the limitation of tax in the State of source is not available when an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. States which wish to make this more explicit are free to do so during bilateral negotiations. |
|---|---|

... "

Point 10 mentions in the section "Abuse of the agreement" that some of these situations are dealt with in the agreement by e.g. to introduce the concept of rightful owner in Articles 10, 11 and 12, which are also mentioned in the comments on Article 10. It is further stated that it may be expedient for the Contracting States to reach agreement in bilateral negotiations that a tax relief does not apply application in certain cases, or to reach an agreement that the application of national laws against tax evasion is not affected by the agreement. Paragraph 22 of Article 10 also refers to the possibility of concluding special derogations from Article 10 (2) in bilateral negotiations. 2, in cases where the capital of a company which is domiciled in a Member State and thus benefits from tax loss / reduction under the provision,

A report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the OECD's Committee on Fiscal Affairs, which was noted by the OECD Council on 27 November 1986, states, inter alia:

"...

| | I. The problem stated |
|---|---|
| | |
| | A. General |
| | |
| 1. | In its commentary on Article 1 of the 1977 OECD Model convention, the Committee on Fiscal Affairs expressed its concern about improper use of tax conventions (see paragraph 9) by a person (whether or not a resident of a Contracting State), acting though a legal entity created in State with the main or sole purpose of obtaining treaty benefits which would not be available directly to such person. |
| 2. | This report deals with the most important situation of this kind, where a company situated in a treaty country is acting as a conduit for channeling income economically accruing to a person in another State who is thereby able to take advantage "improperly" of the benefits provided by a tax treaty. This situation is often referred to as "treaty shopping". |
| | |
| | ... |
| | |

H. Search for solutions

| | |
|---|---|
| 11 | The existence of "conduit Companies" has long been perceived to be a problem in treaty negotiations. It may also become a problem in the application of exiting treaties if the treaty partners were not aware of the existence of "conduit companies" when negotiating the treaty or if it only becomes a problem subsequently (eg by reason of changes in domestic laws or by the emergence of new tax avoidance schemes, as in the case of "stepping-stone strategies"). |
| | |
| 12. | In seeking a response to this problem this report considers |
| | |
| | a) | Certain provisions of existing OECD Model Convention and their implications for conduit companies (Part II); |
| | b) | Specific provisions currently found in bilateral treaties (Part III) and; |
| | c) | The problems of applying existing tax treaties (Part IV). On the basis of these studies the report sets out suggestions for future action (Part V). |

| |
|---|
| II. The 1977 OECD Model Convention: General approach and specific provision |
| |

| |
|---|
| ... |
| |

B. Anti-avoidance provisions

…

|  | b) | Article 10 to 12 of the OECD Model deny the limitation of tax in the State of source on dividends, interest and royalties if the conduit company is not its "beneficial owner" … The commentaries mention the case of a nominee or agent. The provision would, however, also apply to other cases where a person enters into contracts or takes over obligations under which he has a similar function to those of a nominee or an agent. Thus a conduit company can normally not be regarded as the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary or an administrator acting on account of the interested parties (most likely the shareholders of the conduit company). In practice, however, it will usually be difficult for the country of source to show that the conduit company is not the beneficial owner. The fact that its main function is to hold assets or rights is not itself sufficient to categorize it as a mere intermediary, although this may indicate that further examination is necessary. |

…

| 16. | Opinions may differ as to whether the absence of an overall solution to the conduit problem was at the time a serious flaw in the 1977 OEDC Model. It was understood, as pointed out in the OECD Commentaries, that Member countries were free to insert adequate solutions in their bilateral treaties. However, the problem has become more acute over recent years and calls for further study. |

Improvements seem advisable in several respects:

a) The OECD should set out policies regarding con-
duit companies in more detail in order to prevent
improper use of tax treaties. Consequently the
Commentaries should in some way (eg in a sum-
marized form or by citing this report) take into ac-
count the conclusions reached by the Committee
on Fiscal Affairs in Part III below;

b) Recently new strategies seem to have been de-
veloped for the use of conduit companies based
in many countries. The OECD Model or its
Commentaries should accordingly offer solutions
to this problem taken into account the considera-
tions under Part IV;

c) The provisions mentioned in paragraph 14 above
and / or the Commentaries should be revised in
order to solve any existing difficulties and doubts.

These problems will be considered in any revision of the
OECD Model.

III. Bilateral treaties: Problems for negotiations

...

B. Specific provisions relating to conduit companies

| 21. | An important method for finding adequate solutions to problems caused by conduit companies is the insertion of specific clauses dealing with this special situation. In this section, several specific approaches are discussed under the headings -general description ", scope and limitations" and "evaluation". These are: |
|---|---|
| | |
| | 1. | The "look-through" approach ... |
| | 2. | The exclusion approach ... |
| | 3. | The subject-to-tax approach ... |
| | 4. | The channel approach ... |
| | 5. | Bona fide provisions ... |
| | |
| Examples of such provisions used in certain tax treaties between Member are set out in Annex II | |
| | |
| ... | |
| | |
| 5. Bona Fide Provisions. | |
| | |

| 42. | The solutions described above are of a general nature. In connection with them, it will be necessary to provide spe-cific provisions to ensure that treaty benefits will be granted in bona fide cases. Such provisions could have the following wording: |
|---|---|

...

## IV. Application of existing treaties

### A. General Considerations

43.    Existing conventions may have clauses with safeguards against the improper use of their provisions. Where no such provisions exist, treaty benefits will have to be granted under the principle of "pacta sunt servanda" even if considered to be improper.

...

45.    A special difficulty increasingly encountered by tax author-ities under existing conventions is the use of highly artifi-cial arrangements called "stepping-stone" devices.

...

Improper use of tax conventions in such cases may be counteracted by changing one of these basic conditions. It is, however, evident that this may require a change of policies which could affect bona fide economic activities.

This might also lead to complicated rules, highly burdensome to tax administrations. It may therefore be preferable to counteract such highly complex arrangements by recourse to the principle of "substance over form".

... "

Section II of the report on bilateral agreements provides in section B for each of the proposed solution proposals a general description of the possible solution, proposals for the formulation of a clause in bilateral agreements implementing the solution, and an assessment of the advantages and disadvantages of the solution. method.

In the comments on Article 10, para. 2 of the OECD Model Agreement from 2003 states:

"...

| 12. | The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source has concluded a convention. The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance. |
| --- | --- |
|  |  |

| 12.1 | Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income |
| --- | --- |

| | |
|---|---|
| | in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons the report form Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies" concludes that a conduit company can not normally be regarded as the beneficial owner, if, though the formal owner, it has, as a practical matter , very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties. |
| | |
| | |
| 12.2 | Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all Member countries). States which wish to make this more explicit are free to do so during bilateral negotiations. |

... "

Under the comments on "Relationship to previous versions" in paragraph 35, it is stated that changes to the provisions of the model agreement and changes in the comments are not relevant in the interpretation or application of previously concluded agreements when the provisions of the original agreement differ in substance from the amended articles. . It is further stated that other changes or additions to the comments are normally applicable to the interpretation and application of agreements entered into before the changes or additions were made. The reason given for this is that the comments reflect an agreement between the OECD member countries on the correct interpretation of the existing provisions and their application in each situation.

Paragraph 22 of the 2003 commentary on Article 10 corresponds to the corresponding paragraph 22 of the 1977 commentary.

The Authorization Act

By Act No. 945 of 23 November 1994, Act No. 74 of 31 March 1953 on the conclusion of agreements with foreign states for the avoidance of double taxation, etc. repealed.

Point 1 of the general remarks in the bill (No. 3 of 6 October 1994) states that the purpose of the bill was to ensure the Folketing's control over the conclusion of double taxation agreements. Point 2 "Background to double taxation agreements" states:

"A double taxation agreement, on the other hand, cannot increase taxation in relation to the general tax legislation. Parliamentary approval of double taxation agreements by law must not lead to changes in this. A Danish agreement can still not form the basis for Danish taxation in cases where there is no legal basis for taxation. "

Directive 90/435 / EEC

Council Directive 90/435 / EEC of 23 July 1990 on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States ("Parent / Subsidiary Directive"), as amended by Council Directive 2003/123 / EEC of 22 December 2003 the following provisions:

| " ... |
|---|

| Article 1 | |
|---|---|
| | |
| ... | |
| | |
| 2. | This Directive does not preclude the application of internal provisions and conventions which are necessary to prevent fraud and abuse. |
| | |
| | |
| Article 5 | |
| | |
| 1. | The profits that a subsidiary distributes to its parent company are exempt from withholding tax. |

... "

Danish rules - withholding tax on dividends and interest

By the Act no. 1026 of 23 December 1998 amended by the Corporation Tax Act, section 2, subsection 1, letter c, the hitherto applicable limited tax liability of dividends from Danish subsidiaries to foreign parent companies with an ownership interest of more than 25% was abolished.

By Act No. Act No. 282 of 25 April 2001, section 2, subsection 1, letter c, again amended so that the tax exemption was limited to the cases where the parent company is domiciled in the EU, or a state with which Denmark has a double taxation agreement.

In the originally submitted bill (no. 99 of 10 November 2000), the Corporation Tax Act, section 2, subsection 1, letter c, 3rd sentence, proposed worded as follows:

| "It is a condition that the parent company is domiciled in a state that is a member of the EU, a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2. in Directive 90/435 / EEC, " |
|---|

It is stated in the general remarks in the bill on economic and business consequences, among other things:

> "A foreign parent company affected by the proposal will probably abandon its Danish subsidiary if the Danish company is only established as part of an international tax structure. Thus, there will be few cases that will be covered by the proposed dividend taxation. Against this background, it is estimated additional revenue from the proposal to be limited.
>
> The purpose of the proposal is not to achieve a revenue gain, but as mentioned to counteract that Denmark is used as part of circumvention of other countries' taxation or that Denmark supports the use of tax havens for tax-free accumulation of capital. "

During the committee discussion, the Minister of Taxation answered, among other things, a question 3 as to why the proposal was expected to lead to limited revenue, as follows, cf. Appendix 24 to the committee report:

> "...
>
> However, the companies will be able to restructure so that the shares in the Danish subsidiary are transferred to a subsidiary in a country to which dividend payments are still exempt from Danish dividend tax. This is advantageous if the dividend from this can be distributed to the actual parent company with a taxation that is lower than the Danish one, possibly completely without taxation.
>
> ... "

During the committee deliberations, Ernst & Young (cf. Appendix 5 to the committee report) first corrected, then on 21 November 2000 Arthur Andersen (cf. Appendix 9 to the committee report) and then on 28 November 2000 the Association of State Authorized Public Accountants (cf. Appendix 21 to the committee report) contact the Tax Committee. They expressed doubts as to whether, under the proposed provision, it was sufficiently clear that a parent company should be covered by the definition of a "company in a Member State" in the Parent / Subsidiary Directive and, correspondingly, that the dividend should be covered by a double taxation agreement. that a parent company domiciled in a state with which Denmark has a double taxation agreement could benefit from the exemption from Danish withholding tax on dividends.

As a result, the Minister of Taxation, cf. the Minister's response regarding the inquiry from the Association of State Authorized Public Accountants to the Tax Committee (Appendix 21 to the committee report), submitted amendments sent to the Tax Committee on 10 January 2001 (Appendix 23 to the committee report) and the Tax Committee's report of 21 March 2001. consideration of the bill a proposal to amend the originally proposed wording of § 2, para. 1, letter c, 3rd sentence, so that the wording was instead:

> "It is a condition that taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435 / EEC or in accordance with a double taxation agreement with the Faroe Islands, Greenland or the State in which the company is domiciled,"

The comments on the amendment state that the purpose of the amendment was to clarify the provision. It states:

> "It is proposed to clarify that it is a condition of the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent / Subsidiary Directive, or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the double taxation agreement with the Faroe Islands. "Greenland or the other State concerned."

In the adopted law, the provision, which is the one applicable to the present transactions, is worded as proposed in the amendment.

During the consideration of Bill No. 119 of 17 December 2003 amending various tax laws (Interest Taxation Directive, Interest / Royalties Directive, group internal loans, eviction taxation, conversion to full-year income, gross taxed persons), the Association of State Authorized Public Accountants addressed a request dated 10 February 2004 to The Tax Committee, in which the association expressed doubts as to whether the interest tax would have the desired effect when not all EU countries had similar legislation. In a reply to the Tax Committee, the Minister of Taxation stated about the inquiry (Appendix 21 to the committee report) among other things:

"It certainly opens up the risk that, for example, a Danish company may seek to circumvent the with-

" It certainly opens up the risk that, for example, a Danish company may seek to circumvent the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another, which is covered by the EU interest rate. / royalty directive or a Danish double taxation agreement, and which does not have withholding tax on interest payments to foreign interest recipients, according to which this company pays the interest on to the company in the low-tax country.

In such cases, however, the Danish tax authorities will, after a concrete assessment of reality, be able to assume that the rightful owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that interest payments are neither covered by the EU interest / royalty directive or the double taxation agreement.

Pursuant to Article 5 (1) of the Interest / Royalties Directive 2, an EU country may refuse to apply the Directive in the case of transactions that have tax evasion, tax evasion or abuse as a significant motive.

The comments on the OECD model for the double taxation agreement also allow a State to refrain from applying an agreement in special cases, cf. the section on abuse of the agreement in the comments on Article 1 of the model. "

During the consideration of Bill No. 116 of 14 December 2005 on the Bill amending the Tax Assessment Act, the Corporation Tax Act and other tax laws (Adjustment of business taxation), the Minister of Taxation commented to the Tax Committee on a request from the Association of State Authorized Public Accountants of 24 February 2006 to introduce withholding tax on interest (Appendix 9). The Minister of Taxation stated:

"...

In this connection, one must be aware that in relation to the Corporation Tax Act § 2, paragraph. 1, letter d, it must be decided on the basis of the principle of the correct income recipient who receives the interest.

The withholding tax on interest is only to be waived under the agreements if the rightful owner of the interest is domiciled in the other state. The same applies to the interest / royalty directive, cf. Article 1 (1) of the directive. The benefits of the Directive may also be refused in the case of transactions which have tax evasion, avoidance or misuse as the main motive or one of the main motives.

If the private equity funds make equity and loan investments via holding companies, it will have to be assessed whether the holding company is the correct income recipient / rightful owner of the interest income. In my opinion, a pure flow-holding company in, for example, Luxembourg can hardly be the rightful income recipient / rightful owner of the interest income. The Swiss Supreme Court has concluded that a pure flow-holding company in Denmark will not be the rightful owner of dividend payments under the Danish-Swiss agreement. "

During the consideration of Bill no. 30 of 4 October 2006 to the Act on the conclusion of a protocol amending the double taxation agreement between Denmark and the United States, the Minister of Taxation stated in a reply to the Tax Committee of 27 November 2006 to the committee's question 5 on the use of flow companies in f .ex. Luxembourg as holding companies for Danish companies acquired by international private equity funds:

"...

The lapse of limited tax liability is conditional on the foreign company in question being the rightful owner of the dividend.

A pure flow-through company that is domiciled abroad, e.g. Luxembourg, will not be the rightful owner of the dividend, in accordance with the comments on Article 10 of the OECD Model Convention (Section 12.1).

... "

On 16 September 2008, the Ministry of Taxation commented on a number of questions posed by the Association of State Authorized Public Accountants regarding Act no. 343 and 344 of 18 April 2007 (published in SKM2008.728.DEP ). Regarding the new rules on tax exemption for grants, the association requested a comment on:

"...

the meaning of the term "flow-through company" in relation to the grant rules and the following situation:

Company A is domiciled in DK, and is owned by company B domiciled in the Cayman Islands. Company B is owned by Company C, domiciled in the United States. Company C also owns the Danish company D.

A grant from A to D will be taxable for D, as B is a resident of the Cayman Islands and therefore cannot receive dividends tax-free from A.

The Ministry of Taxation has stated in Appendix 26 to L 213 that if "the taxpayer can demonstrate that Cayman Island's companies are not beneficial owners of the dividends ..., withholding tax on the dividends will not have to be included".

Can the Ministry of Taxation confirm that D will be tax-free from subsidies from A, if it can also be demonstrated that company B is a flow-through company, provided that other conditions regarding ownership and ownership time are met?

The Ministry of Taxation replied

"The Ministry of Taxation finds it difficult to see how in the above-mentioned example it can be demonstrated that the Cayman Island company is a flow-through company, as - in contrast to the example mentioned in Annex 26 to L 213 - no cash flow is actually carried through Cayman Iceland Company. "

At the time the dispositions in question took place, the interest rates on convertible debentures were the same as those issued in respect of the loan of DKK 5.5 billion. DKK, deductible under Danish law, while the interest proceeds under Luxembourg law were considered dividends that are not taxed. By Act no. 344 of 18 April 2007, section 2 B of the Corporation Tax Act was amended so that if a creditor country considers interest as dividend, the interest is also regarded as dividend under Danish law, and is thus not deductible. The change took effect on interest accrued from 13 December 2006.

**Procedure**

With the following clarifications and supplementary pleas, the Ministry of Taxation and H1 S.à.rl have essentially repeated the pleas before the National Tax Tribunal and have proceeded accordingly.

*The Ministry of Taxation* has further stated before the High Court

Process statement

The Ministry of Taxation has stated before the High Court that regardless of whether the Ministry of Taxation upholds the closed claim - which the parties agree on so far is the correctly calculated tax claim - the final withholding tax claim will have to be reduced to the extent that H1 S.à.rl documents that underlying investors are resident in EU countries and / or countries with which Denmark has entered into a double taxation agreement.

Rightful owner - right income recipient

The Ministry of Taxation has not denied before the High Court that it can be assumed that H1 S.à.rl was a "correct income recipient", as this concept is understood in Danish law. The Ministry of Taxation has also not argued before the High Court that the present holding company structure should not in principle be recognized and respected under company and tax law. It is precisely this fact that justifies that no objection to the event is made on the basis of the principle of the correct income recipient.

According to the Ministry of Taxation, however, it is crucial that H1 S.à.rl is not a "rightful owner". There are two independent concepts, and the content of the concept of rightful owner must in this connection be determined on the basis of an independent international understanding. For that reason alone, determining the scope of the concept of rightful income recipient is irrelevant in this case.

Nor is it argued that the mere fact that, for example, a payee is under the control of its owner is in all cases sufficient to deprive the payee of its rightful owner status. The decisive factor is thus the recipient's real power over the dividend.

Abuse

H1 S.à.rl has acknowledged that the purpose of the "bottom-up" construction is to avoid paying capital duty in Luxembourg. In addition, the construction also has the effect of avoiding the payment of dividend tax, just as a deduction for interest is obtained. The underlying owners have decided on the chosen procedure and have disposed of the dividend by deliberately and in advance having decided that the capital contribution in H1.XA / S should be immediately distributed to H1 S.à.rl and re-lent to H1. XA / S only to meet the said purpose. This implies that the arrangement, which has not taken place as part of a normal commercial transaction and which lacks any commercial justification, can-

place us part of a normal commercial transaction and which lacks any commercial justification, cannot justify tax exemption because H1 S.à.rl is not the rightful owner, cf. Article 10 (1) of the Double Taxation Convention. 2.

The treatment of the dividend distribution in connection with the merger

The fact that the Tax Council in its binding reply of 16 November 2010 confirmed that H1 S.à.rl would be the rightful owner of a possible distribution in connection with the merger is not relevant to the decision in the present case, which concerns the transactions in the circular arrangement, including the dividend distribution, on 10 May 2005. The Ministry of Taxation agrees with the reasoning given by the Tax Council in its binding reply of 16 November 2010, where the Tax Council emphasizes that the merger did not have tax evasion or avoidance as purpose or consequence. There is thus a fundamental difference between the transactions in the present case and the merger that was the subject of the Tax Council's binding answer.

Parent / Subsidiary Directive

As H1 S.à.rl is not the rightful owner, there is "abuse", cf. Article 1 (1) of the Parent-Subsidiary Directive. 2, which justifies the company not being able to invoke the exemption from withholding tax in Article 5 of the Directive. The legal basis for not accepting tax exemption is the Corporation Tax Act, section 2, subsection. 1, letter c, according to which the starting point is that Denmark can claim withholding tax, unless otherwise follows from the parent / subsidiary directive or a double taxation agreement. This follows from the amendment to the original bill for the reintroduction of the limited tax liability on dividends in section 2, subsection 1, letter c.

In Case C-352/08, the Court does not assess whether the merger itself was justified on sound economic grounds and thus - independently of the purpose of obtaining a tax exemption - could be tax-free under the Merger Tax Directive. On the other hand, the Court seems to have assumed that the immediate conditions for the application of the Merger Tax Benefit Schemes were precisely met, see paragraph 20. In this case, the Member State cannot "to compensate" for non-payment of disposal tax in connection with the merger instead impose the taxpayer to pay tax on legal transactions. However, this "compensation consideration" does not apply in the present case. In contrast to the situation in the C-352/08 judgment, the intention of the transactions carried out in the circular arrangement in the present case has thus not merely been to avoid capital duty in Luxembourg and to obtain an interest deduction in Denmark. On the contrary, it is an arrangement which, among other things, has been based on an (expected) utilization of the parent / subsidiary directive's benefits with regard to tax exemption for the dividend distribution itself. The Ministry of Taxation claims in relation to the dividend precisely that H1 S.à.rl was not the "rightful owner" of this. which has, among other things, been based on an (expected) utilization of the parent / subsidiary directive's benefits with regard to tax exemption for the actual dividend distribution. The Ministry of Taxation claims in relation to the dividend precisely that H1 S.à.rl was not the "rightful owner" of this. which has, among other things, been based on an (expected) utilization of the parent / subsidiary directive's benefits with regard to tax exemption for the actual dividend distribution. The Ministry of Taxation claims in relation to the dividend precisely that H1 S.à.rl was not the "rightful owner" of this.

As there is an abuse of the benefit schemes in the Parent / Subsidiary Directive, the withholding tax on the dividend must thus not be waived pursuant to the Directive, cf. section 2 (1) of the Danish Corporation Tax Act. In addition, Article 1 (1) of the Parent-Subsidiary Directive provides: 2, expressly allows Member States to apply "agreements" which are necessary to prevent fraud or abuse. This must necessarily be a reference to the double taxation treaties concluded by the Member States. The application of the concept of rightful owner in the double taxation agreements serves precisely to combat fraud or abuse within the meaning of Article 1 (1) of the Parent-Subsidiary Directive. 2.

There is no evidence that the introduction of the explicit condition of "rightful owner" in Article 1 of the later Interest / Royalties Directive constitutes an independent safeguard rule which is not intended to cover the actual cases of abuse and can therefore not be concluded contrary to the application of this concept in the Interest / Royalties Directive.

Article 1 (1) of the Parent-Subsidiary Directive 2, must thus in summary mean that the directive can be deviated from in a case such as the present, where Article 10 of the Danish-Luxembourg double taxation agreement precisely constitutes a provision stipulated in the collective agreement which, through the requirement that the recipient must be the rightful owner, fights fraud or abuse. It is noted that the EU legal concept "the rightful owner", which explicitly contained in Article 1 of the Interest / Royalties Directive, must be interpreted in accordance with the identical concept in the OECD Model Agreement, cf. Cocot in Case C-397/09, paragraph 66.

The Ministry of Taxation therefore does not agree with the National Tax Tribunal's finding in the order

The Ministry of Taxation therefore does not agree with the National Tax Tribunal's finding in the order brought, according to which there can only be a legal basis to deny the benefits of the directive on the basis of the court - created practice of correct income recipient or on the basis of substantive considerations.

On the contrary, as a result of the clear wording of the Corporation Tax Act, section 2, subsection 1, letter c -jf. on this also what is stated below about the non-retroactive effect of a change in adminis- trative practice - authority to deny the benefits of the directive both on the basis of the court-created practice of the general concept of abuse of EU law, as the rules of EU law must be interpreted in the light of, and on the basis of the abuse provision in Article 1 (1) of the Directive. 2.

The right to free establishment

Dividend taxation will not infringe the right of establishment within the meaning of Article 42 of the EC Treaty in force at the time of the transaction (now Article 49 TFEU).

The Ministry of Taxation does not dispute that a withholding tax pursuant to section 2 (1) of the Corporation Tax Act. 1, letter c, on dividends in cases where the formal beneficiary is not the rightful owner of the dividend is a restriction on the right of establishment, but this restriction is justified in the interests of combating tax abuse, cf. inter alia C-196/04 55. Accordingly, in its press release of 18 March 2010 (request to Germany to amend internal anti-abuse rules), the European Commission also assumed that abuse considerations could justify national tax rules intended to deny exemption from withholding tax, provided that this is achieved through artificial arrangements for this sole purpose.

Since in each individual case the Danish tax authorities make a specific assessment of whether the formal recipient of the amount is also the rightful owner of the income, the Danish legislation must also be regarded as proportionate.

The taxation of the dividend from H1.XA / S to H1 S.à.rl thus does not constitute a violation of the right of establishment.

Not tightening practices retroactively

The general remarks on the "Economic and business consequences of the Bill" to the wording of Act 22 of 25 April 2001, as amended by section 2 (1) of the Corporation Tax Act. 1, letter c, in Bill no. 99 of 10 November 2000 can not be understood as stated by H1 S.à.rl The company thus disregards the change in the provision that took place during the committee consideration of the bill and the com- ments on the amendment, cf. The Tax Committee's report of 21 March 2001. With these preparatory work, it is clear that there is a legal basis in Danish law to override abuse of the directive in cases where the company in an EU country, which is the immediate recipient of the dividend, is not the right- ful owner under a double taxation agreement such as the one concluded between Denmark and Luxembourg.

The fact that the Ministry of Taxation during the preparatory work concerning various tax amendment laws originally expressed the view that cases of abuse such as the present could be disregarded un- der the principle of proper income recipient, can not justify that the Ministry of Taxation in this and the series of parallel cases in which the tax authorities have disregarded the use of double taxation agreements to obtain tax exemption, may invoke the principle of rightful owner. In this connection, it is noted that it follows in particular from Bill no. 119 of 17 December 2003, with which the Interest / Royalties Directive was implemented in Danish law, that the Minister of Taxation, long before these transactions were completed, had assumed that there is authority to impose withholding tax, if the formal beneficiary is not the rightful owner, in accordance with Article 10 (1). 2, in the double taxation agreements, cf. the Minister's comments to the Association of State Authorized Inquiries of 10 February 2004 (reproduced in Appendix 21 to the bill). It follows from the Minister's remarks that the intention - also with these rules - was that withholding tax should only be waived if the recipient was the legal owner of the amount, cf. thus the Minister of Taxation's reply. It follows from the foregoing (only) that it depends on a concrete assessment of the facts available whether the recipient is the rightful owner. that the intention - also with these rules - was that withholding tax should only be waived if the recipient was the legal owner of the amount, cf. thus the Minister of Taxation's reply. It follows from the foregoing (only) that it depends on a concrete assessment of the facts available whether the recipient is the rightful owner. that the intention - also with these rules - was that with- holding tax should only be waived if the recipient was the legal owner of the amount, cf. thus the Minister of Taxation's reply. It follows from the foregoing (only) that it depends on a concrete assess- ment of the facts available whether the recipient is the rightful owner.

A number of subsequent ministerial responses concerning flow-through companies, which the Minister of Taxation has submitted in the period March 2006 - April 2007, also presuppose that there is authority in internal Danish law to implement withholding tax on dividends to the same extent as such taxation can be implemented without contravence the double taxation treaties. Thus, the

such taxation can be implemented without contravenes the double taxation treaties. Thus, the Minister has also assumed that taxation can take place in the flow cases when the formal recipient of the amount is not the rightful owner.

Liability

H1 S.à.rl is liable for the payment of the non-withheld dividend tax amount, cf. section 69 of the Withholding Tax Act, as the company has not proved that H1.XA / S has not shown negligence by not omitting withholding tax. It follows explicitly from the wording of the withholding tax act, section 69, subsection. 1, that the burden of proof that no negligence has been shown rests with the person liable for withholding. What is stated in the Withholding Guidance, section K.2.2, about the burden of proof is the result of a misinterpretation of case law, cf.

The fact that negligence has been shown follows in particular from the following circumstances

| "... |
|------|

| - | H1.XA / S (now H1 S.à.rl) was undoubtedly aware of the circumstances, in particular the circular transaction arrangement, which implies that withholding tax should not be waived either under the double taxation agreement or under the Parent-Subsidiary Directive. |
|---|---|
| | |
| - | The company has, by trying to secure benefits to which neither the parent / subsidiary directive nor the double taxation agreement is intended to have access, and by deliberately participating in an event without any business justification, embarked on a risk that the company has not clarified or sought to clarify. |
| | |
| - | There was no established administrative practice on which the company could base its - alleged - understanding of the legal basis. |

... "

When the person liable for withholding - as here - has been "acquainted with the circumstances that justify the withholding obligation", it already follows from this that the burden of proof that there is no negligence has not been lifted, cf. for example SKM2003.555.HR and SKM2008.613.HR. The Supreme Court has thus consistently imposed liability in these cases. The fact that the person liable for withholding has not had sufficient knowledge of the legal situation is thus not discoloring. A requirement that there must be "reasonable clarity" about the withholding obligation is not supported by either the wording of section 69 of the Withholding Tax Act or the present Supreme Court case law. Even in the event that a requirement of clarity can be presumed to find any support - which is disputed - in what is stated in the Withholding Guide, section K.2.2, such a misleading reproduction of case law cannot in itself be invoked by the person liable to withhold.

The subject matter

In accordance with the submitted process declaration, the final withholding tax claim will probably turn out to be significantly lower than the DKK 1,552,376,000 stated in the claim, as a waiver of the withholding tax claim can be obtained to the extent that it is documented that the underlying investors are resident in the EU countries and / or countries with which Denmark has entered into a double taxation agreement.

*H1 S.à.rl* has additionally argued before the High Court

Not flow company

H1 S.à.rl does not have "very narrow powers which, in relation to the income in question, make it a" nullity "or administrator acting on behalf of other parties". On the contrary, H1 S.à.rl has generally had the same powers as any other holding company in any other group. It is disputed that the mere fact that the owners behind them or their representatives may have taken the overall decision on the implementation of the transactions made in advance may determine that H1 S.à.rl cannot be regarded as the rightful owner of the dividend. . All major decisions in any group - e.g. on acquisitions of companies, major distributions, establishment of financing structure, etc. - is usually taken in the first instance by the top management of the group. Thereafter, the decisions are implemented by the relevant corporate bodies of the respective companies. Neither the individual companies as such nor the individual management members are, as a starting point, obliged to implement the planned decisions, but refusal to do so can of course lead to the members in question being replaced in accordance with the rules of the Companies Act. There is no evidence that the comments to the Model Agreement from 2003 clause 12.1 should be interpreted as meaning that what is a customary decision-making procedure in any group automatically disqualifies the group's subsidiaries from being "rightful owners" of dividends received. The reality is that the Ministry of Taxation's interpretation of section 12.1 of the comments is so restrictive, that it is difficult - if not impossible - to point to an intermediate holding company that the Ministry of Taxation will be able to accept as the rightful owner of a dividend. The only real condition that, in the Ministry of Taxation's view, is imposed to deny a middle management company status as a rightful owner is that it must be possible to prove or make probable that the transaction has tax evasion or avoidance (or "abuse") as purpose or consequence. The Ministry of Taxation's interpretation of the concept of rightful owner must therefore be rejected in its entirety as meaningless. In the opinion of the Ministry of Taxation, what is required to deprive an intermediate holding company of its status as rightful owner is that it must be possible to prove or make probable that the transaction has tax evasion or avoidance (or "abuse") as its purpose or consequence. The Ministry of Taxation's interpretation of the concept of rightful owner must therefore be rejected in its entirety as meaningless. In the opinion of the Ministry of Taxation, what is required to deprive an intermediate holding company of its status as rightful owner is that it must be possible to prove or make probable that the transaction has tax evasion or avoidance (or "abuse") as its purpose or consequence. The Ministry of Taxation's interpretation of the concept of rightful owner must therefore be rejected in its entirety as meaningless.

The Ministry of Taxation's current justification for collecting withholding tax on interest and dividends is the same as that used by SKAT in its original attempt to override the dividend distribution and the loans on the basis of reality. What bothers the tax authorities is - as was also the case originally - the then asymmetric taxation of the interest on the convertible loan. However, this advantage, which is solely due to a different classification of interest rates in Denmark and Luxembourg, has nothing to do with either the double taxation agreement or Community law. The right way to counter this advantage - if there is otherwise a political desire for it - is by introducing an independent protection rule in this regard.

The Ministry of Taxation is trying to use Article 10 (1). 2, as a general abuse provision, even though neither the model agreement nor the agreement with Luxembourg contains one. The Ministry of Taxation tries to interpret the requirement in section 12.1 in the comments to the 2003 Model Agreement that there must be a flow-through where a person in a third country actually receives the income. Neither the theory nor the international practice of the provision is evidence of the Ministry of Taxation's widely expanding interpretation. Thus, it is now generally accepted that the provision of Article 10 is a narrow provision intended solely to address the specific examples of "treaty shopping" mentioned in that provision.

Do not abuse

H1 S.à.rl denies that there is an abuse both with regard to the double taxation agreement and the parent / subsidiary directive. The dispositions made are all part of the establishment of the planned ownership and financing structure in connection with the acquisition of H2.1 A / S. When the holding structure was established "from below", it is because an establishment "from above" would have triggered a capital injection tax in Luxembourg of 154 million. DKK, while the procedure followed did not trigger a capital injection tax. There are two - company law and tax - equivalent approaches, and it would have been financially unsound - and otherwise quite unusual - to establish the Luxembourg holding structure "from above". The transactions at issue in the present case are thus made on fully commercial terms and are commercially well-founded, and they do not in any way constitute an abuse of either the double taxation agreement or the Parent-Subsidiary Directive. In this connection, reference is made to SKM2006.749.HR .

The capital funds' choice of domicile country for the holding companies also has nothing to do with

The capital funds' choice of domicile country for the holding companies also has nothing to do with treaty shopping. First, it is not part of the private equity funds' business model that dividends must be distributed to the ultimate investors at some point. The model, on the other hand, means that investors only receive their return when the fund is wound up - and at that time as a capital gain (sale or liquidation), which is only taxed in the investors' respective countries of residence. The provisions on dividend taxation in the agreement have therefore not been decisive for the choice of domicile country for the holding companies. This is also confirmed by the fact that at no time since the private equity funds' acquisition of H2.1 A / S in 2005 has a distribution originating from the H2.1 Group been made to the private equity funds - and thus to the ultimate investors. Second, the use of a Luxembourg intermediary holding company for the distribution of dividends does not generally entail special tax advantages. Thirdly, it is very difficult - if not impossible - for transparent private equity funds with hundreds of investors from many different countries to undertake treaty shopping.

It is disputed that the fact that H1 S.à.rl has a limited level of activity may affect whether the company is the rightful owner and, inter alia, imply that there is "abuse". H1 S.à.rl, whose sole purpose is to own and finance H1.XA / S, has exactly the - limited - activity that a pure holding company usually has. There is therefore no need for an independent office or for permanent employees. The day-to-day administration is instead handled - cost-effectively - by a silent partnership in the K2 Group.

The treatment of the dividend distribution in connection with the merger

While the case has been pending before the High Court, the Tax Council has decided whether H1 S.à.rl is the rightful owner of a (claimed) dividend distribution from H1.XA / S, cf. the Tax Council's latest binding answer of 16 November 2010, where the tax authorities now H1 S.à.rl considered to be the rightful owner of a (claimed) dividend distribution from H1.XA / S in 2010.

The main reason for the different tax treatment of the two dividend distributions was on 10 May 2005 (where H1 S.à.rl is not considered the rightful owner of the dividend distribution on that day) and in 2010 (where H1 S.à.rl is considered the rightful owner of the dividend distribution by the merger) is claimed by the Ministry of Taxation that there has been no abuse of the double taxation agreement and the parent / subsidiary directive in connection with the distribution in 2010, while this is conversely claimed to be the case with regard to the distribution in 2005. however, there is nothing to suggest that the dividend distribution in 2005 should be treated differently from the distribution in 2010. The Tax Council's decision of 16 November 2010 therefore emphasizes the lack of sustainability of the Ministry of Taxation's arguments in the present case.

The dividend tax must be waived in accordance with the Parent / Subsidiary Directive

H1 S.à.rl has an unconditional right to have the dividend tax waived under the Parent / Subsidiary Directive, which - in contrast to the Interest / Royalties Directive (2003/49 / EC) - does not require the parent company to be the rightful owner of the dividend received. H1 S.à.rl, which meets both the capital requirement and the ownership time requirement in the Parent / Subsidiary Directive, has an unconditional as right to be exempt from withholding tax on the dividend from H1.XA / S. Pursuant to Article 1 (1) 2, rules may be introduced in national law to combat abuse, but these rules must in themselves be compatible with EU law, including the treaty-guaranteed freedoms as laid down in the case law of the Court of Justice and not least the principle of proportionality. Cases of abuse can therefore not be counteracted solely by a reference to Article 1 (1). 2, cf. thus judgment C-321/05, which was the corresponding provision of the Merger Directive. The Danish tax authorities now have two instruments available for abuse cases: the principle of the correct income recipient and considerations of reality. It is now agreed between the parties that H1 S.à.rl is the rightful recipient of the dividends received. There is also no basis for denying directive benefits on the basis of substantive considerations, which the Ministry of Taxation does not (now) claim either. Neither of the two instruments available to the Ministry of Taxation in internal law can thus be used. is the correct income recipient of the dividend received. There is also no basis for denying directive benefits on the basis of substantive considerations, which the Ministry of Taxation does not (now) claim either. Neither of the two instruments available to the Ministry of Taxation in internal law can thus be used. is the correct income re-

cipient of the dividend received. There is also no basis for denying directive benefits on the basis of substantive considerations, which the Ministry of Taxation does not (now) claim either. Neither of the two instruments available to the Ministry of Taxation in internal law can thus be used.

Furthermore, it is disputed that the measures taken in the case were contrary to the concept of misuse of EU law ("purely artificial arrangements"). It is disputed that the concept of rightful owner may be regarded as a provision "necessary to prevent fraud and abuse" in Article 1 (1). 2's sense. In this context, there is no reason to assume that it is an oversight when the directive does not require the recipient of dividends to be the rightful owner. In this context, it is recalled that the rightful owner re-

recipient of dividends to be the rightful owner. In this context, it is recalled that the rightful owner requirement has been included in the Model Agreement since 1977, that the extension of the OECD's comments on this concept emerged in early 2003, that the Interest / Royalties Directive was adopted by the Council on 3 June 2003, and that this Directive contains a rightful owner requirement, and that the Parent-Subsidiary Directive was amended by the Council on 22 December 2003, without the Council finding it necessary to include a provision on the rightful owner. In addition, it is noted that in Denmark it is constitutional law that a double taxation agreement can only ease - and not sharpen - taxation, cf. thus comments on the bill concerning the repeal of the Authorization Act. The interpretation of Article 1 (1) claimed by the Ministry of Taxation 2, violates this principle and must therefore also be rejected for this reason. thus remarks on the bill concerning the repeal of the Authorization Act. The interpretation of Article 1 (1) claimed by the Ministry of Taxation 2, violates this principle and must therefore also be rejected for this reason. thus remarks on the bill concerning the repeal of the Authorization Act. The interpretation of Article 1 (1) claimed by the Ministry of Taxation 2, violates this principle and must therefore also be rejected for this reason.

The Ministry of Taxation's view, according to which the wording of and the preparatory work for the Corporation Tax Act, section 2, subsection 1, letter c, can be understood as meaning that a substantive rule has been implemented in Danish law to the effect that withholding tax can be implemented according to the directive, where this - because H1 S.à.rl is not the "rightful owner" of the dividend - is necessary to prevent fraud or abuse is circular because SKAT presupposes the result that SKAT argues for. Furthermore, it is noted that neither the mere reference to the Parent / Subsidiary Directive in the provision nor the preparatory work for it, including the change in wording relied on by the Ministry of Taxation during the consideration of the bill, provides any support for such a position.

The fact that there has not been and still is a legal basis in Danish law for infringement of an abuse of the directive based on a rightful owner's point of view is also apparent from what is stated below regarding changes in administrative practice.

The fact that the holding structure is established "from below" in order to avoid the payment of capital duty in Luxembourg does not constitute an abuse of law by the Parent-Subsidiary Directive. The same applies to the achievement of an interest deduction right in Denmark without opposing taxation in Luxembourg. Exemption from dividend tax under the Directive cannot be refused in order to counteract asymmetric taxation of interest or to avoid the payment of capital duty The judgment of the Court of Justice in C-352/08.

A denial as alleged by the Ministry of Taxation of the benefits of the directive would be contrary to the principle of proportionality in EU law. The abuse alleged by the Ministry of Taxation is that H1.XA / S has obtained a right to deduct an interest amount of DKK 361,456,111 in Denmark, without this interest amount having been taxed at H1 S.à.rl The value of the interest deduction is 28% of DKK 361,456,111 or DKK 101,207,711. SKAT's reaction to this has been (i) to collect interest tax in accordance with the Corporation Tax Act, section 2, subsection. 1, letter d, with 30% of DKK 361,456,111 or DKK 108,436,833 and (ii) in addition to collecting dividend tax with 28% of DKK 5,544,200,000 or DKK 1,552,376,000. As it appears, compensates only the interest taxation (more than) fully for the alleged abuse. The alleged dividend taxation goes beyond, what is necessary to counter the alleged abuse and is therefore in general contrary to the principle of proportionality, and the Ministry of Taxation can therefore for this reason alone be upheld. The alleged misuse of the law may otherwise not exceed the tax value of the interest on the convertible loan, ie 28% of DKK 359,027,778 or DKK 100,527,777. This view is equally asserted in relation to the refusal of relief under the double taxation agreement. Thus, denial of collective bargaining can not take place to a greater extent than to reset the alleged abuse of law. DKK 778 or DKK 100,527,777. This view is equally asserted in relation to the refusal of relief under the double taxation agreement. Thus, denial of collective bargaining can not take place to a greater extent than to reset the alleged abuse of law. DKK 778 or DKK 100,527,777. This view is equally asserted in relation to the refusal of relief under the double taxation agreement. Thus, denial of collective bargaining can not take place to a greater extent than to reset the alleged abuse of law.

Taxation of the dividend would be contrary to the right of free establishment

Dividend taxation is contrary to the right of establishment under Article 43 of the EC Treaty (now Article 49 TFEU). The discrimination recognized by the Ministry of Taxation may prevent a parent company established in another Member State from exercising its treaty-guaranteed freedom of establishment, as it discourages the establishment of subsidiaries in the Member State that has taken the measure - here Denmark. It follows from the case law of the Court of Justice of the European Union, in Cases C-170/05 and C-379/05 and the judgment of 20 October 2011 in Case C-284/09 Commission v Germany, that the different taxation of a Member State (source country) of dividends to resident and non-resident shareholders entails a restriction on - or discriminatory restriction of - the

freedom of establishment, that these are objectively comparable situations (since the source country has chosen to extend its taxation to non-residents), that different national and treaty measures which do not fully neutralize the different treatment do not remove the restriction that Member States do not - as overriding reasons relating to the public interest - may invoke the need to ensure a balanced distribution of taxing powers, including the principle of territoriality, or a need to ensure the coherence of the tax system and that the restrictions or discrimination in question are therefore contrary to the Treaty. Limited tax liability will thus be a manifest restriction which cannot be justified by overriding reasons in the public interest and which is therefore contrary to Article 43 of the EC Treaty (now Article 49 TFEU).

Aggressive change of practice with retroactive effect

The Ministry of Taxation's interpretation of the concept of rightful owner has changed, just as the Ministry of Taxation has changed its perception of when a foreign company is entitled to tax exemption under the Parent / Subsidiary Directive and the Interest / Royalties Directive. This is the reason why SKAT has simultaneously raised a number of cases concerning withholding of dividend tax and interest tax. The Ministry of Taxation has thus originally interpreted the concept of rightful owner in accordance with the principle of the correct income recipient in Danish tax law, so that the two concepts have been equated. After the "beneficial owner" cases have been raised, the Ministry of Taxation has changed its interpretation so that the rightful owner and rightful income recipient are now claimed to be two very different concepts.

It is irrelevant that, from the end of 2006, the tax authorities have sharpened their rhetoric as to whether an intermediate holding company could be the rightful recipient of income. The crucial thing is that the Ministry of Taxation - even after this time - has maintained the principle of interpretation ("correct income recipient"). The Ministry of Taxation has subsequently had to admit that the Ministry erred as to whether a middle holding company could be the rightful recipient of income, and in the present case has agreed that H1 S.à.rl is the rightful recipient of income. At the same time, the Ministry of Taxation has changed its interpretation of rightful owner. When - as in these cases - there are explicit statements from the Ministry of Taxation on how the legal rules are to be interpreted, and when the tax authorities administer accordingly, it is sufficient evidence of a firm practice that taxpayers can rely on. When this practice is based on the idea that intermediate holding companies must be regarded as "rightful owners" and "rightful recipients of income", it is clear that there are no court decisions documenting this practice. This is confirmed, among other things, by the fact that the Minister of Taxation stated in connection with the introduction of limited tax liability of interest in 2004 in his answer to the Tax Committee's questions 46 and 47 that "there [are] not many corrections to be made by an assessment or audit of the flow companies". For the same reason, in his answer to question 52, the Minister also did not find that flow-through companies constituted a "special risk group", so there was no reason to include the subject in the tax assessment plan. At the end of 2006, the Minister of Taxation stated in a reply to the extent to which and how SKAT checks that the recipient of the dividend is the correct recipient of income that "it is part of the tax assessment to ensure that the conditions for not including dividend tax are met". At the same time, the Minister was able to state that there are no "examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies". In May 2007, the Minister of Taxation was able to confirm that the issue in question "does not only concern private equity funds, but is a general problem that has been relevant for a number of years". The Ministry of Taxation has thus always been aware of the issue, but has not believed that there were grounds for refusing tax exemption. In the present case, there is extensive documentation of the Ministry of Taxation's previous practice. Thus, it is explicitly stated in the preparatory work for the 2001 Act that a holding company - even in the case of actual treaty shopping and actual throughput - is the rightful owner, and the Minister of Taxation has subsequently massively confirmed that the decisive interpretation criterion is whether the holding company is the right recipient. Correspondingly, it appears from SKAT's status note of 20 March 2007 that SKAT has administered in accordance with the Minister of Taxation's announcements. and the Minister of Taxation has subsequently massively confirmed that the decisive interpretation criterion is whether the intermediate holding company is the right recipient of income. Correspondingly, it appears from SKAT's status note of 20 March 2007 that SKAT has administered in

accordance with the Minister of Taxation's announcements. and the Minister of Taxation has subsequently massively confirmed that the decisive interpretation criterion is whether the intermediate holding company is the right recipient of income. Correspondingly, it appears from SKAT's status note of 20 March 2007 that SKAT has administered in accordance with the Minister of Taxation's announcements.

Against this background, it is clear that there is a tightening up of a fixed administrative practice which should have been notified and that this changed practice cannot therefore be applied in the present case.

present case.

H1.XA / S is not liable for any withholding tax pursuant to section 69 of the Withholding Tax Act

In the event that the court had to reach the result that withholding tax should have been withheld regarding the dividend in question, H1.XA / S (and as successor now H1 S.à.rl) is not liable for the non-withheld dividend tax according to the withholding tax act § 69, para. According to SKAT's Guidance on withholding A-tax and AM contributions 2011-2 "it has been shown in case law that it is the customs and tax administration that must prove that the person liable for withholding has acted negligently." The company's understanding of the relevant rules is in line with the administrative practice that the tax authorities have followed uninterruptedly over the years. It is thus the first time ever that SKAT does not recognize a holding company validly registered in another country as the rightful owner of a dividend. Both the National Tax Tribunal's specialist office and the National Tax Tribunal have also ruled in favor of H1.XA / S that there is no obligation to withhold. Given this and the fact that Danish literature is in line with the tax authorities' previous practice, and that there is great uncertainty at international level about how the concept of rightful owner should be interpreted, it is obvious that H1.XA / S has not shown "negligence". H1.XA / S has carried out further investigations with a view to clarifying, among other things, whether the conditions for non-containment were met. The entire purchase process took place with the participation of a large number of advisers, including tax advisers, who did not find that there was the slightest doubt that the dividend was tax-exempt. An inquiry to SKAT would - on the basis of the preparatory work for the provision on limited tax liability in 2001 - undoubtedly have led to the same result. And that would have been the case, even if it had been a case in which there was treaty shopping and throughput to the owners behind it. In the present case, there is neither treaty shopping nor throughput. On the contrary, the dividend has been returned to Denmark. The decisions relied on by the Ministry of Taxation relate to all cases where it is reasonably clear that "negligent" action was taken, and thus cannot prejudge the outcome of this case. In the present case, there is neither treaty shopping nor throughput. On the contrary, the dividend has been returned to Denmark. The decisions relied on by the Ministry of Taxation relate to all cases where it is reasonably clear that "negligent" action was taken, and thus cannot prejudge the outcome of this case. In the present case, there is neither treaty shopping nor throughput. On the contrary, the dividend has been returned to Denmark. The decisions relied on by the Ministry of Taxation relate to all cases where it is reasonably clear that "negligent" action was taken, and thus cannot prejudge the outcome of this case.

**The court's reasoning and result**

"Rightful owner"

The term "beneficial owner" has been used in OECD model agreements since 1977 and is not an otherwise known term in Danish law. In the OECD model agreement from 1977, which is the basis for the double taxation agreement between Denmark and Luxembourg from 1980, and in the model agreement from 2003, "rightful owner" is not further defined. However, in the comments to the agreements, certain guidelines have been given on the understanding of the term. In view of this and the fact that the purpose of the OECD model agreements dictates that a uniform legal application of the OECD model agreements should be sought, the High Court finds that the requirement that the recipient is the rightful owner must, as far as possible, be interpreted in accordance with international understanding.

Judgment of the Court of Appeal of 2 March 2006 in the case of G7 International Finance Ltd. v. JP Morgan Chase Bank NA London Branch. In this context, the subsequent comments from 2003 can be given significance in the interpretation of the concept, provided that the new comments do not in fact imply a changed understanding of Article 10 (1). 2, seen in relation to the original comments on the model agreement from 1977. The High Court finds that the changes in 2003 the comments have the character of clarifications, and thus includes these comments in the interpretation of the concept of rightful owner.

In the introductory comments to the 1977 model agreement, treaty abuse is referred to as the fact that a person disposes through a legal association formed in a state, essentially to obtain benefits under a double taxation agreement that could not be obtained by the person directly. According to the commentaries, some of these abusive situations are counteracted by the introduction of the concept of rightful owner in Article 10, inter alia. counteract abuse. The report of the OECD's Committee on Fiscal Affairs of 1986 and the comments on the Model Agreement of 2003 similarly refer to the possibility of inserting specific provisions in the bilateral agreements with a view to preventing abuse. The three examples where a deposited intermediary can not be considered the rightful owner mentioned in point 12 of the comments to the 1977 model agreement and point 12.1 of the comments to the model agreement from 2003, respectively, have in common that the deposited intermediary is subject to the actual the beneficiary's control and thus, cf. the 2003 comment, is "a more fiduciary or

administrator". When this is compared with the fact that both the comments on the two model agreements and the report from 1986 acknowledge that that the use of the term's rightful owner 'may not affect any form of abuse - which the Contracting States are instead called upon to regulate bilaterally - it cannot be assumed that dividend - holding companies whose management is empowered under company law to dispose of the company and including dividends from underlying subsidiaries should not normally be regarded as rightful owners. This must also apply in cases where one or more intermediate holding companies are deposited in a state with which Denmark has entered into a double taxation agreement, while the underlying owner (s) of the intermediate holding company is domiciled in a third country without a double taxation agreement. In order for such an intermediate holding company not to be considered the rightful owner, the owner must be required to exercise control over the company,

In the present case, there is no need to rule on the question whether H1 S.à.rl exercised control over the investors in question. the examples of abuse mentioned in paragraphs 12 and 12.1 respectively of the 1977 and 2003 comments that the person or company in the State with which the double taxation treaty was concluded must be inserted between the payer and the beneficial owner as an intermediary continuing the tax-free payment to the controlling person in a third country without a double taxation agreement. Against this background, it must be assumed that breach of a contractual limitation in the withholding tax presupposes that that the payment has been carried forward or at least with certainty is intended to be carried on to persons in third countries without a double taxation agreement. This condition is not met in this case. The dividend paid by H1.XA / S has thus not been passed on by H1 S.à.rl, but on the contrary has been returned as a loan to H1.XA / S. According to the information available, no provision has been made for the subsequent continuation of the returned dividend to the underlying investors. As a result, H1 S.à.rl must be regarded as the rightful owner of the dividend received of DKK 5,544,200,000, and is thus not liable to tax with regard to the dividend, cf. section 2 (1) of the Danish Corporation Tax Act. Article 10 (1) (c) and the double taxation agreement with Luxembourg. 2. A liability for H1.XA / S (now H1 S.à.rl

H1 S.à.rl's claim for dismissal is hereby upheld

Legal costs

H1 S.à.rl has stated that it is not VAT registered in Denmark.

Following the outcome of the case, the Ministry of Taxation must pay legal costs to H1 S.à.rl of DKK 6 million. DKK incl. VAT. In determining the case costs, in addition to the subject matter of the case, emphasis has been placed on the principled nature of the case and the many complicated legal issues it has covered, as well as the fact that the main hearing lasted 3 days. It is of some importance in the downward direction that the real value of the case, according to the information, is probably a lot less than the amount stated in the claim.

**T hi is known for right**

H1 S.à.rl acquitted.

In legal costs before the High Court, the Ministry of Taxation must pay DKK 6 million. to H1 S.à.rl

The sentence must be paid within 14 days after the sentencing.

The legal costs bear interest in accordance with section 8 a of the Danish Interest Act.