# Exhibit 80

# Share loans - minimum distribution - extension of maturity

| | |
|---|---|
| Date of release | 03 Feb 2009 13:20 |
| Date of judgment / ruling / decision / control signal | 27 Jan 2009 12:06 |
| SKM number | SKM2009.65.SR |
| Authority | The Tax Council |
| Case number | 08-101341 |
| Document type | Binding answer |
| Overall topics | treasure |
| Topics Topics | Shares and other securities as well as intellectual property rights |
| Keywords | Share loan, ISLA agreement, minimum distribution, extension, term |

| | |
|---|---|
| Summary | The Tax Council confirms that shares lent by an investment association in accordance with the ISLA agreement are not considered divested under tax law, and thus must continue to be regarded as shares owned by the investment association in accordance with section 21 (1) of the Danish Capital Gains Tax Act. 3, no. 1, in deciding whether the investment association fulfills the conditions for having the status of a share-based distributing investment association. |
| | The Tax Council also confirms that payments received by the investment association from the borrower as compensation for non-dividend on shares lent from the investment association to the borrower, cf. section 6.1 of the ISLA agreement, by the investment association must be distributed as share income. |
| | The Tax Council also confirms that securities provided by the borrower as security for the investment association in accordance with the ISLA agreement are not considered for tax purposes to be acquired by the investment association, and thus must not be included in deciding whether the investment association pursuant to section 21 (1) of the Capital Gains Tax Act. 3, fulfills the conditions for having the status of a share-based distributing investment fund. |
| | The Tax Council further confirms that interest received by the investment association on the securities provided by the borrower as security for the investment association under the ISLA agreement shall not be considered taxable by the investment association, and thus shall not be included in the minimum distribution, to the extent the investment association under the ISLA agreement must repay such interest to the borrower. |
| | However, the Tax Council can not confirm that it will not change the answer to questions 1-4 if an agreement is entered into between the investment association and the borrower one or more times to extend a share loan for up to 6 months. |
| Reference(s) | The Capital Gains Tax Act |
| Reference | Equation Guide 2009-1 **SG2.3.3** |

## Questions

1. Please confirm that shares lent by A to B in accordance with the ISLA agreement are not deemed divested under tax law, and thus must continue to be regarded as shares owned by A in accordance with section 21 (1) of the Danish Capital Gains Tax Act. 3, no. 1, in deciding whether A fulfills the conditions for having the status of a share-based distributing investment association.
2. Please confirm that payments received by A from B as compensation for non-dividend on shares lent from A to B, cf. clause 6.1 of the ISLA agreement, by A must be distributed as share income.
3. Please confirm that securities provided by B as security for A in accordance with the ISLA agreement are not considered to be acquired by A for tax purposes, and thus must not be included in the decision on whether A pursuant to section 21 (1) of the Capital Gains Tax Act. 3, fulfills the conditions for having the status of a share-based distributing investment fund.
4. Please confirm that interest received by A on the securities provided by B as security to A in accordance with the ISLA agreement shall not be deemed to have been earned by A for tax purposes, and thus shall not be included in the minimum distribution, to the extent that A in accordance to the ISLA agreement must repay such interest to B.
5. Please confirm that it will not change the answer to questions 1 - 4 if an agreement is reached between A and B one or more times to extend a share loan for up to 6 months.

## Reply

1. See setting and justification.
2. See setting and justification.
3. See setting and justification.
4. See setting and justification.
5. See setting and justification.

## Description of the actual conditions

A has tax law status as a distributing share-based investment association, cf. section 21 of the Capital Gains Tax Act.

A intends to lend shares to B that are listed. B is the top parent company in the B Group, and is, among other things, the parent company of C, which is an investment adviser and custodian bank for A.

A's lending of shares to B will be based on the Global Master Securities Lending Agreement Version May 2000 (hereinafter the "ISLA Agreement"). A copy of the ISLA agreement is attached.

It follows from clause 4.2 of the ISLA agreement that the parties in connection with share lending must ensure that ownership in relation to the shares lent during the loan period is transferred from lender to borrower, and that ownership in relation to securities provided as security for the shares lent is transferred from borrower to lender:

"The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(a) any Securities borrowed pursuant to paragraph 3;

[...]

(c) any Collateral delivered pursuant to paragraph 5;

[...]

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, ... "

It also follows from clause 6.1 of the ISLA agreement that to the extent that dividends are paid on the shares that the lender has lent to the borrower, the borrower is obliged to pay an amount to the lender corresponding to the dividend that the lender would have received if the shares was not lent to the borrower, and that the lender is obliged to pay an amount to the borrower corresponding to the interest on securities pledged as security for the lent shares that the borrower would have received if the securities had not been pledged to the lender:

"Where income is paid in relation to any Loaned Securities or Collateral (other than Cash Collateral) on or by reference to an Income Payment Date Borrower, in the case of Loaned Securities, and Lender, in the case of Collateral, shall, on the date of the payment of such Income, or on such other date as the Parties may from time to time agree, (the "Relevant Payment Date") pay and deliver a sum of money or property equivalent to the type and amount of such Income that , in the case of Loaned Securities, Lender would have been entitled to receive had such Securities not been loaned to Borrower and had been retained by Lender on the Income Payment Date, and, in the case of Collateral,Borrower would have been entitled to receive had such Collateral not been provided to Lender and had been retained by Borrower on the Income Payment Date unless a different sum is agreed between the Parties. "

A will only lend shares to B that are listed on the OMX Nordic Exchange and as security for the lent shares, A will receive listed government bonds from B.

The ISLA agreement leaves it up to the borrower and lender to agree on the duration of each individual share loan. Each share loan will have a maximum duration of 6 months and it is requested when answering questions 1 - 4 that it is assumed that the borrower and lender will agree on the following regarding duration and that no agreement will be entered into to extend the individual share loan:

"No Loan shall have a term exceeding six (6) months"

As explained in more detail under question 5, it is being considered to provide an opportunity to enter into an agreement on the extension of the individual share loans.

**Questioner's possible opinion according to request and comments on case presentation**
*Question 1*

A share-based distributing investment association must, in accordance with section 21 (1) of the Capital Gains Taxation Act, 3, place at least 75% of the association's asset base in the association's administration building and shares covered by the Capital Gains Tax Act.

It is desired with question 1 to confirm that shares lent by A to B are not considered to be taxable and thus in deciding whether A meets the conditions for having status as a share-based distributing investment association, must continue to be considered shares in accordance with section 21 of the Capital Gains Tax Act. , PCS. 3, No. 1.

In the binding advance notice published as TfS 1999,408, the Tax Assessment Council found that lending of shares in accordance with a set of standard terms prepared by the Danish Bankers 'Association and the Danish Stockbrokers' Association should be considered a loan for tax purposes and not a waiver.

In the binding advance notice published as TfS 2001,760 LR ( **SKM2001.360.LR** ), the Tax Assessment Council took a position on a share-based distributing investment association's participation in share lending schemes covered by the standard terms prepared by the Danish Bankers Association and the Stockbrokers' Association. The Tax Assessment Council found that shares that are lent by a share-based distributing investment association are not in relation to section 21 (1) of the Danish Capital Gains Tax Act. 3, lose their character of being shares owned by the investment association within the meaning of the Capital Gains Tax Act.

In the binding advance notice published as TfS 2002,755 LR ( **SKM2002.402.LR** ), the Tax Assessment Council also found that share lending under the ISLA agreement could be equated with lending in accordance with the standard terms that the Tax Assessment Council had for assessment in TfS 1999, 408 LR, and that share lending under the ISLA agreement should therefore be considered a loan for tax purposes and thus not a waiver. The petitioner had stated in the request that the inquiry only covered agreements regarding the lending of listed shares, and that a final expiry date would be set for each individual share loan.

On the basis of the above decisions, it can be concluded that:

listed shares lent in accordance with the standard terms and conditions prepared by the Danish Bankers 'Association and the Danish Stockbrokers' Association shall not be deemed to have been relinquished,

- this also applies in relation to shares lent by a share-based distributing investment association, which among other things means that the shares lent are not in relation to section 21 (1) of the Capital Gains Tax Act. 3, no. 1, loses their character of being shares owned by the investment association, and

- share lending in accordance with the ISLA agreement can be equated with lending in accordance with the standard terms and conditions prepared by the Danish Bankers Association and the Danish Stockbrokers' Association, provided that a final maturity date is set for each individual share lending.

Against this background, it must be concluded that shares lent by A to B in accordance with the ISLA agreement are not considered divested under tax law, and that the lent shares are thus continued in deciding whether A meets the conditions for having status as a share-based distributing investment fund. shall be considered shares in accordance with the Capital Gains Taxation Act, section 21, subsection. 3, No. 1.

*Question 2*

It follows from the Tax Assessment Act, section 16C, subsection 3, nos. 2 and 9, that payments received by a distributing investment association from the borrower for non-dividend on shares lent by the investment association to the borrower are included in the minimum distribution:

"2) Earned dividends pursuant to § 16 A less withholding tax and added refunded dividend tax and disposal sums pursuant to § 16 B as well as the borrower's payment to the lender of his non-dividend on share loans, to the extent that the said income is not covered by no.

[...]

9) Earned dividends pursuant to section 16 A less deducted dividend tax and added back to dividend tax and disposal sums pursuant to section 16 B as well as the borrower's payment to the lender of his non-dividend on share loans, to the extent the said income for taxable persons would be covered by section 4 a , PCS. 1, no. 1 or 2, without being covered by the Personal Income Tax Act, section 4 a, subsection. 2. "

Distributions from a share-based distributing investment association are taxed pursuant to section 4 (1) of the Personal Income Tax Act. 1, no. 4 and § 4a, para. 1, no. 3, with natural persons either as capital income or as share income. It also follows from the connection between the Tax Assessment Act, section 16C, subsection 3, nos. 2 and 9 and section 4a of the Personal Income Tax Act, that the decisive factor for whether the part of the minimum distribution from A that arises

from payments received by A from B as compensation for non-dividend on shares lent from A to B, must be distributed as capital income or share income, is whether the payments to natural persons would be share income. If the payments for natural persons would be share income, they must be distributed by A as share income.

In the binding advance notice published as TfS 2001,146 LR ( **SKM2001.76.LR** ), the Tax Assessment Council decided, among other things, on how dividends received by the borrower on lent shares and payments from the borrower to the lender for reimbursement of this dividend should be taxed. The Tax Assessment Council found that the dividend received by the borrower on the shares lent by the borrower should be taxed as dividend, and that the borrower's reimbursement of the dividend to the lender by the lender should be taxed as personal income.

In our opinion, however, it can be questioned whether the Tax Assessment Council's decision on this point is correct. When the Tax Assessment Council assumes that lending of shares for tax purposes does not constitute a disposal of the shares in question, this all else being equal, it must mean that the lender must still be considered the owner of the lent shares for tax purposes. The Tax Assessment Council's decision must therefore be understood to mean that the Tax Assessment Council, in relation to the question of whether the lender has disposed of the lent shares, considers the lender to be the owner of the lent shares, while the Tax Assessment Council considers the borrower to be the owner of the lent shares. equities. The legal basis for such a split of the concept of ownership in relation to shares seems questionable.

A similar critique of the Tax Assessment Council's decision is presented by Jakob Bundgaard in Skattepolitisk Oversigt, 1-2006, pages 47 - 48:

"… There seems, however, to be a strange construction in this. It is assumed that the lender's shareholder position does not cease with share loans, cf. above. it is assumed that a shareholder position is actually created with the borrower in relation to dividend payments.

[…]

<u>Regardless of the legal basis relied on in support of this result, there appear to be legal problems associated with the outcome.</u> Dividend in accordance with LL § 16 A, presupposes the presence of a shareholder position. The same applies in relation to SL § 4 e. There is thus no question of a dividend, unless the payment is made to a shareholder. As this is not the case, as it appears that the lender must continue to be regarded as a shareholder, the practice is difficult to justify. It seems reasonable to assume that a shareholder in respect of ABL is also a shareholder in respect of LL § 16 A and SL § 4 e … [our emphasis] "

On 6 December 2002 - that is, following the Tax Assessment Council's decision in TfS 2001,146 LR ( **SKM2001.76.LR** ) - the then Minister of Taxation submitted a proposal for a law amending various tax laws (L113), in which it was proposed, among other things, that the income of a distributing investment association from the lending of shares - including the repayment of dividends from the borrower to the investment association - should in future be included in the minimum distribution in accordance with LL § 16C, subsection. 3. The accompanying notes stated, inter alia:

"Lending of securities is often done against the return from the loan being repaid to the lender ... If the repaid return on the loan is a dividend, it must in principle be distributed as a dividend. If the practice therefore develops so that the repaid return can be treated as share income according to the rules of the Personal Income Tax Act, it must be distributed as share income. If practice treats the amount as personal income or capital income, it must be distributed as capital income. "

When the Minister of Taxation in the comments to L 113 leaves open whether the borrower's repayment of dividends on the loans lent to the lender, with the lender must be taxed as share income or personal income or capital income, this seems to be an expression that the Minister of Taxation does not necessarily agree The Tax Assessment Council's decision in TfS 2001,146 LR ( **SKM2001.76.LR** ).

In the binding advance notice published as TfS 2002,755 LR ( **SKM2002.402.LR** ), the Tax Assessment Council was asked to take a position on a situation where a borrower who had not resold the lent shares received a dividend on the lent shares, and at the same time compensated lender for this dividend. The Tax Assessment Council's answer to this question was appealed to the National Tax Court, which changed the Tax Assessment Council's answer on the following grounds, cf. TfS 2004, 152 LSR ( **SKM2004.51.LSR** ):

"In the third situation, the borrower has not resold the shares, but has during the loan period received dividends for which he must compensate the lender. <u>Since the borrower has not become the owner of the shares by virtue of the loan agreement or otherwise, he is not taxable on the dividends. belongs to the lender in accordance with the agreements</u>

entered into. [our emphasis] "

The National Tax Court states directly that the borrower is not liable to tax on dividends on the lent shares, and the National Tax Court has hereby overruled the Tax Assessment Council's previous decision in TfS 2001, 146 LR ( **SKM2001.76.LR** ), according to which the borrower must be taxed on dividends on the shares lent.

The opinion of the National Tax Tribunal must be understood as meaning that a borrower in tax law neither in relation to the issue of disposal nor in relation to the issue of dividends can be considered the owner of the lent shares. It must follow that the lender must be regarded as the owner of the lent shares, both in relation to the issue of divestiture and in relation to the issue of dividends.

When the lender in relation to dividends is to be considered the owner of the shares lent, dividends paid by the company and actually received by the lender (via borrower) at the lender must be taxed as dividends, and thus as share income when the lender is a natural person .

Since the part of the minimum distribution from A that arises from payments received by A from B for non-dividend on shares lent from A to B, must be distributed as share income if the payments for natural persons would be share income, it is therefore our opinion that payments received by A from B for non-dividend on shares lent from A to B, cf. clause 6.1 of the ISLA agreement, by A must be distributed as share income.

*Question 3*

It is desired with question 3 to confirm that securities that B provides as collateral to A in accordance with the ISLA agreement are not considered for tax purposes to be acquired by A, and thus must not be included in the decision of whether A pursuant to section 21 (1) of the Capital Gains Tax Act. 3, fulfills the conditions for having the status of a share-based distributing investment fund.

It does not appear to have been explicitly addressed on the above issues.

If it is assumed that shares lent by A to B in accordance with the ISLA agreement are not considered divested under tax law, cf. question 1, however, in our opinion it must automatically follow that the securities that B provides as security to A, correspondingly nor should tax law be deemed to be disposed of, and thus cannot be considered acquired by A.

*Question 4*

As stated above, the Tax Assessment Council was published in the binding advance notice as TfS 2002.755 LR asked to take a position on a situation where a borrower received a dividend on the lent shares, and at the same time the lender compensated for this dividend. The Tax Assessment Council's answer to this question was appealed to the National Tax Court, which changed the Tax Assessment Council's answer on the following grounds:

"In the third situation, the borrower has not resold the shares, but has during the loan period received dividends for which he must compensate the lender. Since the borrower has not become the owner of the shares by virtue of the loan agreement or otherwise, he is not taxable on the dividends. belongs to the lender in accordance with the agreements entered into. [our emphasis] "

The National Tax Court thus states directly that a borrower who receives dividends on lent shares and is obliged to pass on this dividend to the lender is not liable to tax on the dividend in question.

As a result, it is our opinion that interest received by A on the securities that B provides as security to A in accordance with the ISLA agreement, correspondingly should not be considered earned by A for tax purposes, and thus should not be included in the minimum distribution, in the extent to which A under the ISLA Agreement must repay such interest to B.

*Question 5*

As stated above, each share loan will generally have a maximum duration of 6 months. Provided that it does not affect the answer to questions 1 - 4, however, the intention is to give A and B the opportunity before the expiry of a specific share loan to agree to extend the share loan for a period of up to 6 months. The following wording is intended to be used in this connection:

"No Loan shall have a term exceeding six (6) months. However, prior to the expiry of the term of any Loan the Lender and the Borrower may one or several times agree to extend the term for such Loan for a period of up to six (6) months. "

The above wording does not change the fact that each share loan can, as a starting point, have a maximum duration of 6 months. However, the wording allows A and B after the conclusion of a specific share loan, but before the expiry of the agreed loan period, to conclude an agreement to extend the loan period by up to a further 6 months. The wording below provides for the possibility that the same share loan can be extended one or more times.

The binding advance notice published as TfS 1999,408 states, among other things:

"In addition, when the borrowed shares cannot be returned, suspension will occur until delivery is possible, cf. sections 19, 3 of the standard terms. Suspension will be equivalent to a new loan relationship or extension of the term. If delivery is abandoned, the relationship be to be considered for realization at the time of lending. "

It thus seems to follow from TfS 1999,408 that an extension of a share loan does not in itself lead to the shares being considered divested. As a result, it is our opinion that it does not matter for the answer to questions 1 - 4, if A and B had to enter into an agreement on one or more occasions to extend a share loan for up to 6 months.

**Adviser's additional comments on Question 5 after consultation**

We agree that pkt. 19 of the Danish Bankers Association's standard terms only relate to situations where the parties are unable to fulfill their obligations as a result of force majeure.

However, as A's lending of shares to B as described will be based on the ISLA agreement, the content of the Danish Bankers Association's standard terms is not relevant in our opinion. When we emphasize the statement from TfS 1999,408, it is because the Tax Assessment Council states that:

 "... suspension will be equated with a new loan relationship or extension of the term."

It appears from the Tax Assessment Council's use of the wording *"... will be to equate with ..."* that the Tax Assessment Council is aware that the suspension, which pkt. 19.3 of the Danish Bankers Association's standard terms deals with, is not immediately the same as an extension of the term. At the same time, the wording shows that the Tax Assessment Council, regardless of this immediate difference, is of the opinion that a suspension and an extension of the term must be equated in tax law, ie. must have the same tax consequences.

The Tax Assessment Council's statement that a suspension *"... will be equated with ..."* an extension of the term is thus precisely an expression that the tax law consequences of a suspension and an agreed extension of the term in the Tax Assessment Council's view are the same. When a suspension according to pkt. 19.3 of the Danish Bankers Association's standard terms do not constitute a waiver, the same must therefore apply to an agreed extension of the term.

This legal position is further supported by the fact that there are no real reasons why an agreed extension of the term should be considered a waiver in tax law. If one imagines a situation where A lends shares to B for a period of 6 months, where B then delivers the shares back to A, and where A 1 month later lends shares of the same type to B for a period of 5 months, the shares can in our view are not considered waived. There do not appear to be any real reasons why such a situation should be treated differently for tax purposes than the situation where A and B immediately before the end of the first period of 6 months agree to extend the share lending for another 6 months.

In view of the above, it is therefore our view that Question 5 should be answered in the affirmative.

**SKAT's recommendation and justification**
*Ad question 1*

The starting point for the assessment of the share loan agreement is TfS 1999, 408, in which the Tax Assessment Council determined that share lending in accordance with the Danish Bankers Association's standard terms should be regarded as a loan and not a realization of the shares. The Tax Assessment Council placed decisive emphasis on the fact that the standard terms only concerned listed shares, so that a certain amount and trading activity was secured with the shares in question. In addition, it was stated that suspension would occur if delivery was not possible. Suspension would be equated with a new loan relationship or extension of the term, while the relationship would be considered realization at the time of lending if delivery was abandoned. According to the standard terms pkt. 7, the loan period could not exceed 6 months.

In **SKM2001.360.LR** , the Tax Assessment Council found that share-based distributing investment associations must include lent shares in their shareholding when the 25% limit in the Capital Gains Taxation Act, section 2 d, subsection 1, 2. pkt. (now § 21, subsection 3) is calculated. The shares lent related to shares lent pursuant to the Danish Bankers

Association's standard terms, which were approved by the Tax Assessment Council in TfS 1999, 408. The Tax Assessment Council also found that shares listed on FIBV exchanges can be lent on an equal footing with shares listed on the Copenhagen Stock Exchange.

The Tax Assessment Council confirmed in **SKM2002.402.LR** that the Tax Assessment Council's previous decisions regarding share loans according to the standard terms will also apply to agreements entered into on terms under Morgan Stanley's international framework agreements "Morgan Stanley & Co. International Limited - Overseas Securities Lender´s Agreement, Version: December 1995 "(OSLA agreement) and" International Securities Lenders Association - Global Master Securities Lending Agreement Version May 2000 "(ISLA agreement). Thus, the shares would not have to be considered to have been relinquished by the lender in connection with the share loan. However, it was crucial for equality with the Danish terms and conditions that the term of lending under Morgan Stanley's international framework agreements was limited.

The Danish Bankers Association amended the standard terms in 2002. The new standard terms have been changed in relation to the original standard terms with regard to covered shares (shares listed on a stock exchange within the EU or EEA and members of the international association of exchanges are now also covered), reporting (parties must report separately to the relevant authorities to the extent that they are obliged to do so) as well as delivery (the definition of the value date for return is specified).

However, SKAT is of the opinion that the changes to the standard terms in 2002 do not change Morgan Stanley's international framework agreements' equality with the Danish Bankers Association's standard terms, cf. also **SKM2008.168.SR** .

A's lending of shares will be based on the ISLA agreement, A will only lend shares listed on the OMX Nordic Exchange, and each individual share lending will have a maximum duration of six months.

On this basis, SKAT proposes to confirm that to the extent that A's share loan agreement is not in conflict with the Danish FSA's executive order on short-selling of 10 October 2008, shares lent by A to B in accordance with the ISLA agreement will not be considered taxable, and thus still be considered shares owned by A in accordance with the Capital Gains Taxation Act, section 21, subsection. 3, no. 1, in deciding whether A fulfills the conditions for having the status of a share-based distributing investment association.

*Ad question 2*

It appears from **SKM2004.51.LSR** that "In the third situation, the borrower has not resold the shares, but has during the loan period received dividends for which he must compensate the lender. Since the borrower has not become the owner of the shares by virtue of the loan agreement or otherwise way, he is not liable to tax on the dividends due to the lender under the agreements entered into. "

According to the National Tax Court, the dividend must not be taxed with the borrower when, according to the loan agreement, it belongs to the lender.

It is stated that A's share lending agreement with B will be based on the ISLA agreement, which is why dividends on the lent shares accrue to the lender (A), cf. section 6.1 of the ISLA agreement.

On the basis of **SKM2004.51.LSR** , it is therefore proposed to confirm that payments received by A from B as compensation for non-dividends on shares lent from A to B, cf. section 6.1 of the ISLA agreement, would be taxable as dividends from lenders, if they were natural persons and therefore by A must be distributed as share income.

*Ad question 3*

It follows from **SKM2002.402.LR** that shares lent on the basis of the ISLA agreement are not considered to have been relinquished by the lender.

As stated by the enquirer, it follows from clause 4.2 of the ISLA agreement that the parties in connection with share lending must ensure that ownership in relation to the loans lent during the loan period is transferred from lender to borrower, and that ownership in relation to securities secured by the shares lent are transferred from the borrower to the lender, as stated in clause 4.2. of the ISLA agreement, that:

"The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(a) any Securities borrowed pursuant to paragraph 3;

(b) any Equivalent Securities redelivered pursuant to paragraph 8;

(c) any Collateral delivered pursuant to paragraph 5;

(d) any Equivalent Collateral redelivered pursuant to paragraphs 5 or 8;

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, on delivery or redelivery of the same in accordance with this Agreement with full title guarantee, free from all liens, charges and encumbrances. In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a computer based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or redeliver any of the assets so acquired but, in so far as any Securities are borrowed or any Collateral is delivered to such Party,

The terms for the lender's lending of shares and the borrower's security for this in the form of securities are thus identical.

On this basis, as well as the fact that the rules on lending of listed bonds are equated in tax law with rules or practice on lending of listed shares, cf. **SKM2008.316.SR** , it is SKAT's opinion that the tax legal effect of lender's lending of shares, according to which, despite the transfer of ownership, is nevertheless a loan and not a realization of the shares, the same must apply to the borrower's collateral in the form of listed bonds.

SKAT therefore recommends that it be confirmed that the securities that B provides as security to A in accordance with the ISLA agreement are not considered to be acquired by A for tax purposes, and thus must not be included in the decision on whether A pursuant to section 21 (1) of the Capital Gains Tax Act. . 3, fulfills the conditions for having the status of a share-based distributing investment fund.

*Ad question 4*

It appears from **SKM2004.51.LSR** that "In the third situation, the borrower has not resold the shares, but has during the loan period received dividends for which he must compensate the lender. Since the borrower has not become the owner of the shares by virtue of the loan agreement or otherwise, he is not liable to tax on the proceeds accruing to the lender under the agreements entered into. "

According to the National Tax Court, the dividend must not be taxed with the borrower when, according to the loan agreement, it belongs to the lender.

It is stated that A's share lending agreement with B will be based on the ISLA agreement, which is why income from the securities pledged as security for the borrowed shares accrues to the borrower (B), cf. section 4.4 of the ISLA agreement.

It is SKAT's opinion that the National Tax Tribunal's remarks on the borrower's lack of tax liability on dividends on the borrowed shares apply correspondingly to the lender's income from the securities pledged as security for the borrowed shares.

On the basis of **SKM2004.51.LSR** , it is therefore recommended to confirm that income received by A on the securities that B provides as security to A in accordance with the ISLA agreement, is not to be considered earned by A for tax purposes, and thus should not be included in the minimum distribution, to the extent that A under the ISLA agreement must repay such interest to B.

*Ad question 5*

The Tax Assessment Board confirmed in **SKM2002.402.LR** that the Tax Assessment Board's previous decisions regarding share loans according to the standard terms will also apply to agreements entered into on terms according to Morgan Stanley's international framework agreement "International Securities Lenders Association - Global Master Securities Lending Agreement Version May 2000" (ISLA agreement) .

However, the Tax Assessment Council stated that it is crucial for equality with the Danish terms and conditions that the term of lending under OSLA and ISLA is limited.

This must be understood as a reference to the standard terms of a maximum term of 6 months, cf. 7.1.

However, it appears from the standard terms pkt. 19.1 that the parties' obligations under the standard terms are suspended to the extent that force majeure prevents their fulfillment.

Furthermore, it appears pkt. 19.3 that a party's obligation is also suspended as long as the party is unable to deliver or return certain shares because it is not possible to trade or settle a trade in shares corresponding to the borrowed shares.

SKAT therefore agrees with the adviser that it follows from TfS 1999,408 that an extension of a share loan does not in itself lead to the shares being considered divested.

On the basis of the section heading to pkt. 19.0: "Force majeure", as well as the wording of pkt. 19.1: "... to the extent that force majeure prevents fulfillment ..." and pkt. 19.3: ... as long as the party is unable to deliver or return ... "it is, however, SKAT's opinion that the exceptions described in clause 19 to clause 7.1 of the standard terms regarding a maximum term of 6 months, only applies to situations where the parties are unable to meet their obligations because it is not possible to trade or settle trades in the shares in question.

As stated by the adviser, it follows from the Tax Assessment Council's comments on the standard terms in TfS 1999, 408 LR, that in cases of force majeure, suspension occurs until the agreement can be fulfilled. Suspension due to force majeure is equated with a new loan relationship or extension of the term.

However, it does not follow that the effect of a voluntary agreement to extend the term beyond 6 months is that a suspension occurs, ie. tax exemption from the requirement of a maximum term of 6 months.

The possibility of agreeing on any number of extensions of the term of a share loan beyond 6 months would also weaken the presumption that it was a share loan and not a waiver.

SKAT therefore does not agree with the adviser that as a result of pkt. 19.3 is not relevant to the answer to questions 1 - 4, if A and B had to enter into a voluntary agreement one or more times to extend a share loan for up to 6 months.

It is therefore not recommended to confirm that it will not change the answer to questions 1 - 4 if an agreement is reached between A and B one or more times to extend a share loan for up to 6 months.

**The Tax Council's decision and justification**
The Tax Council agrees with SKAT's recommendation.

**The answer is binding on the tax authorities in the following period**
For 5 years, calculated from the receipt of the answer, cf. SFL § 25, para. 1.