# Exhibit 98

**Claim No. CL-2018-000297, CL-2018-000404, CL-2018-000590, CL-2019-000487**
**& CL-2020-000369**

<u>**In the High Court of Justice**</u>
<u>**Business and Property Courts of England & Wales**</u>
<u>**Queen's Bench Division**</u>
<u>**Commercial Court**</u>

Between:

**SKATTEFORVALTNINGEN**
**(the Danish Customs and Tax Administration)**

<u>**Claimant**</u>

**and**

**SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) & OTHERS**
<u>**Defendants**</u>

_____

**REPLY TO THE DEFENCE OF MR KNOTT AND MR HOOGEWERF**

_____

**A    INTRODUCTION**

1.    Save where stated otherwise or where the context otherwise requires:

    1.1    Abbreviations and definitions are adopted from the Particulars of Claim as amended (the "**Particulars of Claim**") and the Defence of CK and JH (the "**Defence**"). Where abbreviations and definitions have been adopted from the Defence, this is for convenience only and without admission;

    1.2    References to paragraph numbers in this Reply are to paragraphs in the Defence;

    1.3    Any headings are for convenience only. To the extent that the headings are adopted from the Defence, no admission is made, or should be inferred, therefrom.

2.    Save insofar as the Defence consists of admissions, and save insofar as expressly admitted or denied below, SKAT requires CK and JH to prove the matters set out in the Defence and does not admit any allegation of fact, any pleaded inference or any pleaded proposition of law not expressly admitted herein.

1

3.    SKAT's Reply to CK's Defence to the Amended Schedule 5Z (pages 108 to 113 of the Defence) is set out in Schedule 1, SKAT's Reply to JH's Defence to the Amended Schedule 5AA (pages 114 to 119 of the Defence) is set out in Schedule 2 and SKAT's Reply to CK's and JH's Defence to the Further Particulars (Annex 1 of the Defence; pages 120 to 134) is set out in Schedule 3 hereto.

**B    THE FURTHER PARTICULARS**

4.    As to paragraphs 4.1, it is denied that the Further Particulars "*abandoned* [SKAT's] *former case*", "*pleaded new claims*" or constitutes a "*revised case*". Rather, as required by the Order of Mr Justice Andrew Baker dated 24 June 2020, the Further Particulars:

4.1    provide further particulars of SKAT's existing allegations that CK and JH: (a) procured and/or induced Old Park/West Point to do the acts which make them liable for the Agent Representations and the Custodian Representations: Schedule 5Z/[3], Schedule 5AA/[3]; (b) provided substantial assistance to facilitate the making of the WHT Representations: Schedule 5Z/[4]; Schedule 5AA/[4]; and (c) provided substantial assistance in the execution of the WHT Scheme: Schedule 5Z/[5]; Schedule 5AA/[5].

4.2    set out the best particulars that SKAT is presently able to plead of: (a) CK's and JH's knowledge or understanding of, or relating to, the WHT Scheme; and (b) what SKAT says should be inferred as to CK's or JH's actions or omissions in relation to the WHT Scheme.

4.3    set out SKAT's case that, as a minimum, CK and JH possessed the knowledge and understanding, and undertook the actions and omissions, pleaded therein.

**C    DICEY RULE 3, REVENUE MATTER AND USE OF PUBLIC POWERS**

5.    As to paragraph 9:

5.1    The first sentence is denied. SKAT's claims do not infringe the rule stated in Rule 3 of Dicey, Morris & Collins on the Conflict of Laws ("**Dicey Rule 3**"), for the reasons set out below and in SKAT's written submissions on Dicey Rule 3 dated 11 December 2020. Without prejudice to the generality of the foregoing:

2

(a)    As set out below and in section G of SKAT's written submissions, SKAT's claims are civil and commercial matters which fall within the scope of the Brussels I Regulation No 1215/2012 (EU) ("**Brussels I**"). Each of CK and JH is domiciled in England, as a result of which the English Court has jurisdiction against them pursuant to article 4(1) of Brussels I. In the circumstances, Dicey Rule 3 does not apply to the claims against CK and JH.

(b)    It is denied, if alleged, that SKAT's claims seek to enforce the revenue laws of Denmark. In particular:

(i)    There is no unpaid tax or unsatisfied tax debt due under Danish revenue law from CK or JH (or, for the avoidance of doubt, any other Defendant or the WHT Applicants).

(ii)    SKAT is not entitled under Danish law to issue a tax assessment to CK or JH (or, for the avoidance of doubt, any other Defendant or the WHT Applicants) or make any other public law decision obliging them under Danish revenue or public law to pay the sums sought in these proceedings.

(iii)   SKAT makes no claim to tax (and has never made any claim to tax) against CK and JH (and, for the avoidance of doubt, all other Defendants and the WHT Applicants), who were never taxpayers in Denmark, in connection with the WHT Applications.

5.2    As to the second sentence:

(a)    The allegations contained in points (a) and (b) are inadequately particularised, but are in general terms denied. In particular: (i) the juridical basis of SKAT's claims is the loss of its property out of which it was defrauded and the central interest of SKAT in bringing the claims is to recover such property or compensation for the loss of such property, which is not a "*governmental*" interest; and (ii) the claims being pursued do not involve the exercise or assertion of sovereign rights, are not of a sovereign character, and are not being pursued by virtue of sovereign authority.

3

B/108.5/3

Rather, they are patrimonial claims that seek to vindicate property rights arising under private law, which could be brought by a private litigant.

(b)    The allegation contained in point (c) is addressed further in paragraphs 8 to 38 below, but it is denied in any event that it is relevant to the applicability of Dicey Rule 3.

5.3    As to the third sentence:

(a)    As to point (a), it is denied that SKAT's claim is "*predicated*" on it having paid "*tax refunds*". As set out in section C of SKAT's Further Particulars Regarding the Validity of WHT Refund Applications, the WHT Applicants were not persons liable to taxation in Denmark, as they owned no shares and had received no dividends (on which tax had been withheld or at all), beneficially or otherwise. As a result, the payments made by SKAT as a result of the WHT Applications were not "*refunds*" of any "*tax*".

(b)    As to point (b), it is admitted that any financial recovery in these claims will ultimately accrue to the Danish Treasury. That is true of any claims of whatever nature brought by SKAT, or by any other Danish ministerial authority. It is admitted that the aim of these proceedings is to recover from the Defendants all sums to which SKAT is legally entitled under civil law.

5.4    Save as aforesaid, paragraph 9 is denied.

6.    Paragraph 10 is denied. SKAT's claims are civil and commercial matters and are not claims concerning revenue matters for the purposes both of Rome II and Brussels I, for the reasons set out below and in SKAT's written submissions on Dicey Rule 3.

7.    As to paragraph 11, the meaning and effect of the European Court's decision in *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391 and *Belgische Staat v Movic BV* Case C-73/19 will be the subject of legal submissions in due course.

8.    As to paragraph 12:

8.1    CK and JH adopt a definition of "Claimant" which includes all ministries and authorities of the Kingdom of Denmark (including SØIK). Paragraph 12 and its subparagraphs include unqualified allegations that the "Claimant" has, inter alia, exercised "public powers" for "the purposes of investigating the fraud", that it has "used and is using evidence obtained thereby". In so doing, CK and JH make allegations about the manner in which SØIK has conducted its criminal investigation, to which SKAT is not able to respond. SKAT only pleads to the allegations against the "Claimant" insofar as each allegation relates to it.

8.2    As to the first sentence, it is denied that SKAT relies on, or is acting in, the exercise of "public powers" in these proceedings within the meaning of the European jurisprudence, namely: special powers of a public authority which go materially beyond those existing under the legal rules applicable to private persons ("**Public Powers**").

8.3    As to the second sentence, as particularised further at paragraphs 9 to 38 below:

(a)    it is denied that SKAT has obtained evidence for these proceedings through the exercise of Public Powers;

(b)    alternatively, it is denied that SKAT has, to any material extent, used evidence in these proceedings which it has obtained through the exercise of Public Powers;

(c)    further or alternatively:

(i)    even if (which is denied) SKAT has used evidence in these proceedings that has been obtained through the exercise of Public Powers, it is averred that SKAT remains in the same or a materially similar position as a person governed by private law would be in the context of a similar action; and/or

(ii)    it is denied that any use or exercise of Public Powers by SKAT has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants), which remains a legal relationship

arising out of civil wrongs voluntarily committed by the Defendants against SKAT; and

(d)    it is therefore denied that SKAT is acting in the exercise of Public Powers in these proceedings.

8.4    Paragraph 12 is otherwise denied.

### Response to particulars of SKAT's alleged use of Public Powers

**C1.    Alleged general use of Public Powers and use of material from criminal investigations**

9.    As to paragraph 12(1) and (2), it is admitted that: (a) SKAT's decisions to accept the WHT Applications were administrative decisions taken under Danish tax or administrative law; and (b) SKAT could not as a matter of Danish law abrogate or delegate the exercise of its authority to determine the WHT Applications (in particular its decision making power whether to accept such applications) to others without statutory basis.

10.   As to paragraph 12(3), the meaning and effect of paragraphs 24(c) and 53 of the Particulars of Claim will be the subject of legal submissions in due course. Without prejudice to that:

10.1   In paragraph 24(c) of the Particulars of Claim, SKAT relies on the WHT Applicants' failure to provide any proper explanation as to how they managed to acquire the relevant shareholding (or to provide supporting documentation) in their responses to SKAT's preliminary annulment decisions. SKAT does not rely on the substance of its preliminary and final annulment decisions.

10.2   In paragraph 53 of the Particulars of Claim, SKAT relies on its issue of preliminary and final annulment decisions as one act of rescission, if (contrary to SKAT's primary case) rescission is a necessary element of any of the claims which it pursues. SKAT does not rely on the validity of those decisions as a matter of Danish administrative law or on their substantive content but only on the fact that the issue of such decisions manifested an election to rescind the payments as a matter of English law.

6

11.    As to paragraph 12(4), it is admitted that in these proceedings SKAT pleads and relies upon the content of certain aspects of Danish law (including Danish revenue laws). However, SKAT's claim involves the recognition (and not enforcement) of such law insofar as such law is relevant to SKAT's patrimonial claims against the Defendants. It is denied that SKAT relies on the Danish constitution to "*deny the relevance of its own failings*" (whatever that means). The allegation that SKAT seeks to "*avoid scrutiny of its own conduct in relation to the WHT Applications by invoking its own laws*" is not understood and is therefore denied.

12.    As to paragraph 12(5):

12.1    As to the first sentence:

(a)    It is admitted that, in these proceedings, SKAT has used some of the documents obtained in Danish, British, Luxembourg and German criminal investigations. With the consent of the Malaysian Attorney General, SKAT also obtained documents provided to SØIK by the Malaysian police (the "**SØIK Malaysian Material**"). SKAT has not used the SØIK Malaysian Material in these proceedings.

(b)    It is denied that SKAT obtained such documents as a result of the exercise of Public Powers.

(c)    Further or alternatively, it is denied that any use by SKAT in these proceedings of documents obtained in Danish or foreign criminal investigations means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

(d)    It is in any event denied that any such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

(e)    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

7

12.2    As to the second and third sentences, the summaries of and quotations from the public statements referred to in paragraph 215 are admitted as being broadly accurate (but will be relied on by SKAT for their full terms and effect). The sentences are otherwise not admitted. The central interest of SKAT in bringing the claims is to recover property of which it has been defrauded or compensation for the loss of such property.

13.    The quotation in paragraph 12(6) is admitted.

14.    As to paragraph 12(7):

14.1    The press release referred to in the first sentence and the quotation in the second sentence are admitted, save that it is denied that it was SKAT (as opposed to SØIK) which issued the press release.

14.2    As to the third sentence, it is denied that a private person has no ability to seek to obtain (and in fact obtain) documents deriving from a criminal investigation. In particular, as a matter of Danish law and/or practice, a private person who is the victim of a fraud may obtain from SØIK documents from a criminal investigation about such fraud which are important for a civil claim by such private person.

14.3    In particular, such documents could be obtained from SØIK by a private person reason of section 14 of the Danish Access to Public Administration Files Act (the "**Public Access Act**"), which reflects the broader principle of "meroffentlighedsprincippet" (extended openness) applicable to public authorities. This imposes a mandatory obligation on a public authority considering a request under sections 7 or 8 of the Public Access Act (for information or documents created or obtained by the public authority as part of its administrative activities or which mention the personal circumstances of a private person):

(a)    to consider, on the public authority's own initiative, whether more extensive disclosure can be given by such public authority;

8

(b) even in cases covered by sections 19 (cases within the criminal justice system), 30 (financial information) and 35 (confidential information) of the Public Access Act;

(c) save where this would contravene prohibitions under other legislation in particular section 27 of the Danish Public Administration Act (the "**Public Administration Act**") and section 152 of the Danish Criminal Code, which:

   (i) are equally applicable to SKAT's requests for information or documents under section 31 of the Public Administration Act;

   (ii) would not prohibit SØIK from disclosing documents where it has a legal obligation to do so or has a justified interest in doing so for the benefit of the general public or in the interests of the requesting party, provided that it would not prejudice an ongoing criminal investigation or otherwise be contrary to the public interest;

   (iii) whilst weighing the different interests involved (including whether the private person has a specific interest in obtaining the documents) and taking into account public law principles including objectivity and equality in the exercise of the public authority's discretion; and

   (iv) giving a reasoned decision for any refusal of access, which is capable of challenge (i) to the Rigsadvokaten (being the individual responsible for complaints under section 37 of the Public Access Act); and (ii) if a complaint is rejected, before the Danish civil court.

14.4 Further or alternatively, such documents could be obtained by a private person from SØIK under section 299 of the Danish Administration of Justice Act (the "**Administration of Justice Act**"), pursuant to which the Danish Court can and will order a third party (including SØIK) to produce documents that are at its disposal:

(a) where such documents are of importance to litigation brought by a private person; and

9

(b)  which the public authority like SØIK is not prohibited from disclosing under sections 169-172 of the Administration of Justice Act, which prevents a public official from disclosing evidence about matters that, in the public interest, must be kept confidential, unless:

(i)  the relevant public authority consents to the disclosure, which SØIK could do in its discretion based on the same or substantially the same legal principles applicable to a request from a public authority under the Public Administration Act. In particular, SØIK could consent to disclosure if it considered that it had a justified interest in doing so for the benefit of the general public or in the interests of the requesting party, and provided that it would not prejudice an ongoing criminal investigation or otherwise be contrary to the public interest. Furthermore, in considering whether to give such consent, SØIK is obliged by section 41(h) of the Administration of Justice Act to apply the broader principle of "meroffentlighedsprincippet" (extended openness) in the same or a materially similar manner described in paragraph 14.3 above; or

(ii)  where such disclosure is essential to the civil proceedings and where the Danish Court considers that the interests of obtaining the material outweighs its confidentiality (save where consent is withheld for reasons of national security, foreign powers or a third party's life or health).

14.5  Further or alternatively, SØIK is required by section 741(s) of the Administration of Justice Act to inform the victim of a crime (whether it is a public authority or a private person) of certain information about a criminal case including the content of the indictment.

14.6  Further, there is no restriction under Danish law on SØIK consenting to requests for documents from a victim of a fraud as a matter of its discretion, if SOIK considers that it has a justified interest in doing so for the benefit of the general public or in the interests of the requesting party, and provided that it would not

10

prejudice an ongoing criminal investigation or otherwise be contrary to the public interest.

14.7    As to the fourth sentence:

(a)    It is denied that SKAT has obtained materials and information from the criminal investigation as a result of the exercise of Public Powers by SKAT.

(b)    It is admitted that SKAT has used some materials and information in these proceedings which result from the criminal investigation (as set out in section C2 below). No admissions are made as to whether these result from "*international collaboration*" between criminal authorities, as to which SKAT has no direct knowledge (save that it is admitted that SØIK has informed SKAT that some of the material provided to SKAT was provided to SØIK by foreign criminal authorities).

(c)    It is denied that such use by SKAT in these proceedings means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

(d)    It is in any event denied that such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

(e)    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

(f)    The allegation is otherwise too vague for SKAT to respond to it.

## C2.    Allegedly via SØIK

15.    As to paragraph 12(8), the quotations are admitted.

16.    As to paragraph 12(9), the first sentence is admitted. As to the second sentence:

16.1    It is admitted that SKAT has requested and been provided by SØIK with information or documents (the "**SØIK Material**") pursuant to sections 28 and

11

31 of the Public Administration Act. It is necessary to make such requests to obtain documents from SØIK because (whilst an integral part of the Kingdom of Denmark) it is a separate and independent ministerial authority from SKAT with which there is no free flow of information. It has averred that numerous such requests by SKAT have been refused by SØIK.

16.2    As a matter of Danish law, sections 28 and 31 of the Public Administration Act:

(a)    are not Public Powers which SKAT is entitled to assert vis-à-vis a private citizen (including any of the Defendants) or at all:

(i)    section 31 does not provide the requesting authority with any power to obtain disclosure. It provides a power for the requested authority to give disclosure in certain circumstances where it is entitled to do so;

(ii)    the assessment of whether the relevant circumstances have been met involves an exercise of discretion by the requested authority;

(iii)    this exercise of discretion applies the same or materially similar legal principles as those applicable to the regime governing the access of documents and information from public authorities at the request of private persons (as set out in paragraphs 14.3 and 14.4 above);

(iv)    only permit a public authority to disclose information where it is of importance for the performance of the requesting authority's duties or decisions and there are no reasons to deny the request; and

(b)    are in any event subject to exceptions, including where disclosure of the requested information: (a) would result in additional work for the disclosing authority which significantly exceeds the receiving authority's interests; and/or (b) be contrary to the public interest including, in the case of SØIK, where it would prejudice an ongoing criminal investigation; and/or (c) would disproportionately infringe significant private interests; and/or (d) contravene section 27 of the Public Administration Act in circumstances where the need for confidentiality outweighs the need for

disclosure; and/or (e) contravene data protection rules including the GDPR.

16.3    A private person who was a victim of a fraud could also have obtained the same or materially similar information and documents from SØIK as the SØIK Material, including pursuant to the Public Access Act and/or the Administration of Justice Act. Paragraphs 14.2 to 14.6 above are repeated.

16.4    SKAT has produced or will shortly produce to the Defendants all relevant SØIK Material obtained by SKAT (which it has been required to disclose to the Defendants to date). Accordingly, the Defendants are or will be in the same or a materially similar position as SKAT in these proceedings.

16.5    In the circumstances, it is denied that SKAT is acting in the exercise of Public Powers in these proceedings:

(a)    SKAT has not obtained any evidence from SØIK through the exercise of Public Powers; and/or

(b)    SKAT has not used in these proceedings any evidence from SØIK in such a way that it is not in the same or a materially similar position as a person governed by private law in the context of a similar action; and/or

(c)    No such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

16.6    Save as aforesaid, paragraph 12(9) is denied.

17.    As to paragraph 12(10):

17.1    The quotations in the first and second sentences are admitted.

17.2    As to the third sentence, it is denied that SKAT obtained access to the "said material", which appears to be a reference to 2.6 Gigabytes of material held by SØIK. Rather, as was made clear in the letter from SØIK dated 22 March 2018, representatives of SKAT were invited to attend the offices of SØIK to identify more specifically the information to which SKAT requested access. Following

13

such attendance and identification (which occurred on 23 March 2018), SØIK decided whether or not to grant the requests made and, in some cases, agreed to provide the requested documents.

17.3    It is admitted that some of that SØIK Material so provided has been relied on by SKAT in these proceedings. Paragraph 16 above is repeated.

18.    As to paragraph 12(11):

18.1    The quotation in the first sentence is admitted.

18.2    As to the second sentence, as the context to the quotation referred to in the first sentence makes clear, the quotation relates to bank statements provided to SKAT as part of the SØIK Material showing payments to CK/JH, as to which paragraph 16 above is repeated.

18.3    As to the third sentence, it is denied that any of the matters pleaded by SKAT are as a result of the exercise by SKAT of Public Powers for the reasons set out in this Reply.

19.    As to paragraph 12(12), it is denied that SKAT has conducted any interviews with any "key individuals" in the context of ongoing criminal investigations. SKAT became aware of the fact that SØIK had conducted an interview with Mr Sanjay Shah in or around December 2019 through media reports. For the avoidance of doubt, SKAT has not been provided with any record or summary of what was said in that interview.

20.    As to paragraph 12(13):

20.1    The first sentence is admitted.

20.2    As to the second, third and final sentences:

(a)    It is admitted that Mr Steen Bechmann Jacobsen is and has since February 2018 been Deputy Director General in SKAT. He is head of the department within SKAT which has overall responsibility, amongst other things, for dealing with these proceedings. He does not provide day-to-day instructions in relation to these proceedings, but does have a role (amongst

14

other responsibilities and along with others) in making decisions relevant to the conduct of these proceedings.

(b)　It is admitted that, prior to his current employment, Mr Jacobsen was employed by SØIK as Chefanklager (one translation of which is "Senior Chief Prosecutor"). He reported, with together others of equivalent seniority, to the Attorney General. During his employment at SØIK, Mr Jacobsen was responsible for the prosecution service within SØIK (including in relation to the alleged fraud related to these proceedings).

20.3　As to the fourth sentence, Mr Jacobsen is subject to confidentiality restrictions regarding the information which he learned while he was employed at SØIK. It is averred that Mr Jacobsen has complied with such confidentiality restrictions, including for the purposes of these proceedings and/or for the purposes of identifying documents which SKAT might seek to obtain from other authorities (including SØIK).

20.4　As to the fifth sentence, the letter is admitted as a document.

## C3.　Allegedly via other parts of the Kingdom of Denmark

21.　As to paragraph 12(14):

21.1　It is admitted that, between April and December 2016, SKAT had communications with the Danish Financial Supervisory Authority ("**DFSA**") in which it requested information under the Public Administration Act and was provided with information under the Danish Securities Trading Act (the "**DFSA Material**"). A private person who was a victim of a fraud could also have obtained the same or materially similar information and documents from the DFSA, including pursuant to the Public Access Act and/or the Administration of Justice Act.

21.2　The purpose of SKAT's requests for information was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts). The purpose was to assist SKAT in coming to an informed view as to:

15

(a)    whether its previous administrative decisions to accept WHT applications were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions; and/or

(b)    whether to make further criminal complaints to SØIK; and/or

(c)    what, if, any changes should be made to SKAT's processes and procedures in the future.

21.3    In these proceedings, SKAT has not used any DFSA Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

21.4    All relevant DFSA Material has been disclosed and produced to the Defendants, who are accordingly in the same or a materially similar position as SKAT in these proceedings.

21.5    It is in any event denied that SKAT's conduct in relation to the DFSA Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants) or means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

21.6    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

22.    As to paragraph 12(15), it is denied that SKAT has exercised Public Powers to gather information or documents from other Danish ministries, authorities or instrumentalities for the purposes of these proceedings.

## C4.    Allegedly via the German criminal authorities

23.    As to paragraph 12(16):

23.1    As to the first sentence:

16

(a)   It is admitted that Fortnam 1 stated that SKAT was provided with the Bundeskriminalamt Report in May 2017;

(b)   It is denied that this was accurate. SKAT was in fact provided with the Bundeskriminalamt Report, excluding some appendices, by SØIK (via SKAT's Danish lawyers, "KPS") in or around late March 2018.

23.2   The second sentence is admitted save that page 3 of the Bundeskriminalamt Report stated that Bundeskriminalamt were engaged both: (a) to implement a request for mutual assistance that was submitted by SØIK; and (b) to conduct an investigation for the purposes of the independent money laundering proceedings against Sanjay Shah (case reference 6081 Js 853/15).

23.3   As to the third sentence, it is denied that SKAT obtained the Bundeskriminalamt Report as a result of the exercise of Public Powers, for the reasons set out in paragraph 16 above.

23.4   Further or alternatively:

(a)   it is denied that use by SKAT in these proceedings of the Bundeskriminalamt Report means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action;

(b)   it is in any event denied that any such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants);

(c)   It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

24.   As to paragraph 12(17):

24.1   The quotations are admitted.

24.2   It is further admitted that a note was provided to SKAT by the Hamburg Public Prosecutor on 16 June 2017 (the "**Hamburg Note**").

24.3   SKAT did not use any Public Powers to obtain the Hamburg Note. KPS approached the Hamburg Public Prosecutor on behalf of SKAT on the basis that it was representing an injured party that had been victim of a fraud. The Hamburg Public Prosecutor confirmed to KPS that it was co-operating with SKAT as the victim of a crime. As an injured party, SKAT had the right to request to inspect the files regarding a criminal investigation (Section 406e of the German Code of Civil Procedure). The Hamburg Public Prosecutor exercised his prosecutorial discretion (as he could have done for a private person who had been the victim of a crime) to provide the Hamburg Note to KPS on behalf of SKAT.

24.4   It is denied that use by SKAT in these proceedings of the Hamburg Note means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

24.5   It is in any event denied that any such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

24.6   It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

25.   As to paragraph 12(18), the quotations are admitted. For the avoidance of doubt, the "*report*" referred to was the Bundeskriminalamt Report and the "*aspect of the case*" referred to in the quotation in paragraph 12(18)(a) was the allegations regarding the acquisition of Varengold Bank.

26.   As to paragraph 12(19):

26.1   In or around late March 2018, in the course of the communications and requests described in paragraph 17 above, KPS (on behalf of SKAT) identified the BaFin Report as a document in the possession of SØIK which was relevant to the present proceedings and requested that SØIK provide it to SKAT. SØIK declined to do so.

26.2   On 29 May 2018, SKAT (via Hengeler Mueller) wrote directly to BaFin to request a copy of the BaFin Report, pursuant to the Freedom of Information Act

18

(Informationsfreiheitsgesetz). On 29 June 2018, BaFin acceded to SKAT's request and provided a copy of the BaFin Report to SKAT (via Hengeler Mueller). SKAT did not thereby use any Public Power but rather a right available to a private person.

26.3    In the meantime:

(a)    on 22 June 2018, SKAT (via KPS) requested that SØIK provide a copy of the BaFin Report;

(b)    in a letter dated 27 June 2018, SØIK indicated that the release of the report would require the German authorities' consent;

(c)    in a letter dated 14 August 2018, SØIK indicated that BaFin had consented to the disclosure of the BaFin Report (by which point, however, the BaFin Report had already been provided to SKAT directly and SKAT did not ask for or receive a further copy from SØIK).

26.4    It is denied that use by SKAT in these proceedings of the BaFin Report means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

26.5    It is in any event denied that any such use by SKAT in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

26.6    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

## C5.    Allegedly via the United Kingdom authorities

27.    As to paragraph 12(20):

27.1    The first sentence is admitted, albeit that there was no intention to create binding legal obligations.

27.2    The second sentence is admitted.

27.3    The third sentence is denied: SKAT has never made such use, whether for the purposes alleged or at all.

28.    As to paragraph 12(21), the quotations are admitted. For the avoidance of doubt, the bank statements referred to were provided to SKAT by SØIK, as to which paragraph 16 above is repeated. SKAT understands that SØIK had obtained them from criminal authorities in the United Kingdom, who subsequently consented to them being provided to SKAT. It is averred that SKAT (or a private person who was the victim of a fraud) could have obtained the necessary SCP bank statements by an application to the English Court  against SCP's bank (seeking Norwich Pharmacal/Bankers Books/Bankers Trust relief) or the criminal authorities in the UK (seeking Norwich Pharmacal relief).

29.    As to paragraph 12(22):

29.1    Save as set out in paragraph 32 below, all information and documents that SKAT received from HMRC concerning the subject matter of these proceedings was provided spontaneously by HMRC without any prior request by SKAT, let alone any use of Public Powers by SKAT (the "**Spontaneous HMRC Material**"). In any event, in these proceedings, SKAT has not used any Spontaneous HMRC Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

29.2    All information and documents that SKAT has received from the FCA concerning the subject matter of these proceedings was provided spontaneously by the FCA without any prior request by SKAT, let alone any use of Public Powers by SKAT (the "**FCA Material**"). In these proceedings, SKAT has not used any FCA Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

29.3    Save as set out in paragraph 30 below, all relevant Spontaneous HMRC Material and all FCA Material has been disclosed and produced to the Defendants, who are accordingly in the same or a materially similar position as SKAT in these proceedings.

29.4    It is in any event denied that SKAT's conduct in relation to the Spontaneous HMRC Material and the FCA Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

29.5    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

30.    As to paragraph 12(23):

30.1    It is admitted that SKAT has withheld from production in whole or in part the documents from HMRC and the FCA set out in Pinsent Masons' letter dated 11 January 2021 (the "**Withheld Documents**"), pursuant to paragraph 14.1 of Practice Direction 51U.

30.2    SKAT has a duty to withhold production of all but one of the Withheld Documents by reason of section 348 of the Financial Services and Markets Act 2000 ("**FSMA**") and/or Regulation 7 of the Financial Services and Markets Act 2000 (Disclosure of Confidential Information) Regulations 2001 (2002/2188) (the "**FSMA Regulations**"). Breach of section 348 FSMA or Regulation 7 of the FSMA Regulations is a criminal offence.

30.3    SKAT has a duty to withhold production of one document (HMRC's letter dated 27 July 2015) under section 19(5) of the Anti-Terrorism, Crime and Security Act 2001 ("**ATCSA**"). This letter was rejected by SKAT, which asked HMRC to resend it on a different basis. HMRC duly did so by letter dated 29 July 2015, which is not covered by section 19 of ATCSA and has been produced in full. The Defendants are therefore not prejudiced in any way by the withholding of the 27 July 2015 letter.

30.4    It is denied that no private person could be in an equivalent position to SKAT with respect to the information in the Withheld Documents. Disclosure of information by the FCA under FSMA or the FSMA Regulations, or by HMRC under section 19 of ATCSA, is not limited to public bodies but can also be to private persons. The FCA could therefore have disclosed information covered by section 348 FSMA and the FSMA Regulations to a private person and HMRC could have disclosed information under section 19(2) ACTSA to a private

21

person. Any such private person would be bound by the same prohibitions with respect to further disclosure as SKAT and would therefore also be obliged to withhold production in legal proceedings.

30.5   In any event, in these proceedings, SKAT has not used any Withheld Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

30.6   It is in any event denied that SKAT's conduct in relation to the Withheld Material in these proceedings has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

30.7   It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

31.   As to paragraphs 12(24) and 178:

31.1   Neither HMRC or the FCA ever told SKAT that any of the information or documents provided to SKAT was derived from a "Solo whistleblower".

31.2   SKAT does not know whether, and if so when, any such information or documents was in fact derived by HMRC or the FCA from a "Solo whistleblower".

31.3   The first contact from HMRC or the FCA about the subject matter of these proceedings was in late July 2015 (not April 2015, as alleged). SKAT ceased to make any payments pursuant to WHT reclaim applications under the Form Scheme on 6 August 2015.

31.4   Save as set out in paragraph 32 below, it is denied that SKAT obtained any information or documents from HMRC or the FCA relevant to the subject matter of these proceedings through the use of Public Powers. In these proceedings, SKAT has not used any such material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits. Paragraphs 29.3 to 29.5 above are repeated.

22

31.5    It is denied that SKAT's case on loss is predicated upon such information being shared with SKAT "*by the UK authorities through the exercise of public powers*".

31.6    It is denied that any report by the UK authorities to SKAT would have been passed on to SKAT pursuant to the use of SKAT's Public Powers. Any such report would have been provided to SKAT without prior request by SKAT (let alone any use of Public Powers by SKAT). In any event, it is denied that SKAT is required to prove a causal link between CK's/JH's failure to report the conspiracy (rather than the conspiracy itself) and SKAT's loss.

32.    As to paragraph 12(25):

32.1    It is admitted that:

(a)    on 5 July 2017, SKAT made a request to HMRC pursuant to Council Directive 2011/16/EU (the "**Directive**") for information regarding Europa LLP Executive Pension Scheme ("**Europa**");

(b)    HMRC responded to this request on 9 August 2017 (collectively, with SKAT's Request: the "**HMRC Directive Material**"); and

(c)    a request under the Directive could not have been made by a private person.

32.2    The purpose of SKAT's request for information under the Directive was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts).

32.3    The purpose was to assist SKAT in coming to an informed view as to whether its previous decisions to accept WHT Applications by Europa were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions.

23

32.4    HMRC provided no substantive information in response to SKAT's request under the Directive. HMRC's response said that it had no records of Europa.

32.5    In these proceedings, SKAT has not used any HMRC Directive Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

32.6    The HMRC Directive Material has been disclosed and produced to the Defendants, who are accordingly in the same or a materially similar position as SKAT in these proceedings.

32.7    It is in any event denied that SKAT's conduct in relation to the HMRC Directive Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants).

32.8    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

32.9    The only other requests made by SKAT under the Directive relating to the subject matter of these proceedings were to the German Federal Ministry of Finance (Bundesministerium der Finanzen) ("**BMF**") as to which paragraph 36.3 below is repeated.

32.10  Save as aforesaid, paragraph 12(25) is denied.

**C6.    Allegedly via the United States authorities/the IRS**

33.    As to paragraph 12(26):

33.1    Between November 2015 and June 2018, SKAT had periodic communications (including at certain meetings) with the Internal Revenue Service of the United States of America (the "**IRS**") by which SKAT requested and was provided with information pursuant Article 26 of the Denmark/USA Double Taxation Agreement (the "**IRS Material**"). As to these communications:

(a)    In each case, the purpose of SKAT's requests for information was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts).

24

(b)   The purpose of SKAT's communications was to assist it to come to informed views as to:

(i)   whether to accept pending applications for the refund of dividend withholding tax, which are not the subject of this claim (but included some applications on behalf of US pension plans who made other WHT applications that are the subject of the claim and which SKAT considered might be fraudulent); and/or

(ii)   whether SKAT's previous administrative decisions to accept WHT applications on behalf of US pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions; and/or

(iii)   the circumstances in which claims for a refund of dividend withholding tax should be accepted in the future (including what, if any, changes should be made to SKAT's processes and procedures).

33.2   SKAT's very limited (and immaterial) use of the IRS Material as evidence in these proceedings (at an early stage of the proceedings for interlocutory purposes only) is set out in Schedule 4 to this Reply. Save as aforesaid, in these proceedings, SKAT has not used any IRS Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

33.3   All relevant IRS Material been disclosed to the Defendants and has been (or will be) produced to all Defendants who sign the confidentiality schedule to the IRS Confidentiality Order made on 14 December 2020 (the "**IRS Confidentiality Schedule**"). The Defendants are accordingly in the same or a materially similar position as SKAT in these proceedings (or would be, but for their own failure to sign the IRS Confidentiality Schedule as required by the Court).

33.4   It is in any event denied that SKAT's use of the IRS Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants) or means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

25

33.5   It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

33.6   Save as aforesaid, paragraph 12(26) is denied.

34.   As to paragraph 12(27), it is admitted that SKAT has relied on some IRS Material in some of SKAT's preliminary or final annulment decisions, including in respect of Blue Ocean. The relevance of the same is denied for the reasons set out in paragraph 10 of this Reply.

35.   Paragraph 12(28) is admitted.

**C7.    Allegedly via other authorities**

36.   As to paragraph 12(29):

36.1   It is admitted that, between March 2017 and November 2017, SKAT had communications with the Inland Revenue Board of Malaysia (the "**IRBM**") by which SKAT requested and was provided with information pursuant to Article 22 of the Denmark/Malaysia Double Taxation Agreement (the "**IRBM Material**"):

(a)   The purpose of these communications was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts).

(b)   The purpose was to assist SKAT in coming to an informed view as to whether its previous administrative decisions to accept WHT applications on behalf of Labuan companies were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions.

(c)   SKAT's very limited (and immaterial) use of IRBM Material as evidence in these proceedings (at an early stage of the proceedings for interlocutory purposes only) is set out in Schedule 4 to this Reply. Save as aforesaid, in

these proceedings, SKAT has not used any IRBM Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

(d)    All relevant IRBM Material been disclosed to the Defendants to whom such material is relevant and has been (or will be) produced to all such Defendants who sign the confidentiality schedule to the IRBM Confidentiality Order made on 14 December 2020 (the "**IRBM Confidentiality Schedule**"). The relevant Defendants are accordingly in the same or a materially similar position as SKAT in these proceedings (or would be, but for their own failure to sign the IRBM Confidentiality Schedule as required by the Court).

(e)    It is in any event denied that SKAT's use of the IRBM Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants) or means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

(f)    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

36.2    It is admitted that, between December 2015 and August 2018, SKAT had periodic communications with the Canadian Revenue Agency (the "**CRA**") by which SKAT requested or was provided with information pursuant to Article 26 of the Denmark/Canada Double Taxation Agreement (the "**CRA Material**"):

(a)    The purpose of SKAT's requests for information was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts).

(b)    The purpose was to assist SKAT in coming to an informed view as to whether its previous administrative decisions to accept WHT applications on behalf of Canadian pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded)

27

and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions.

(c)    In these proceedings, SKAT has not used any CRA Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

(d)    All relevant CRA Material been disclosed to the Defendants to whom such material is relevant and has been (or will be) produced to all such Defendants who sign the confidentiality schedule to the CRA Confidentiality Order made on 14 December 2020 (the "**CRA Confidentiality Schedule**"). The relevant Defendants are accordingly in the same or a materially similar position as SKAT in these proceedings (or would be, but for their own failure to sign the CRA Confidentiality Schedule as required by the Court).

(e)    It is in any event denied that SKAT's conduct in relation to the CRA Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants) or means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

(f)    It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

36.3    Between March 2016 and June 2018 SKAT had periodic communications with the BMF in relation to requests for information made by SKAT pursuant to the Directive (not the Denmark-Germany Double Taxation Agreement) (the "**BMF Material**"):

(a)    In each case, the purpose of SKAT's requests for information was not to gather evidence or information for civil litigation proceedings including in this jurisdiction (or for assistance in the recovery of taxes or enforcement of tax liabilities or debts).

(b)    The purpose was to assist SKAT in coming to an informed view as to whether its previous administrative decisions to accept WHT applications

were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions.

(c)   In these proceedings, SKAT has not used any BMF Material as evidence, or otherwise, for the purpose of advancing SKAT's case on the merits.

(d)   All relevant BMF Material been disclosed to the Defendants and has been (or will be) produced to all Defendants who sign the confidentiality schedule to the BMF Confidentiality Order made on 29 January 2021 (the "**BMF Confidentiality Schedule**"). The Defendants are accordingly in the same or a materially similar position as SKAT in these proceedings (or would be, but for their own failure to sign the BMF Confidentiality Schedule as required by the Court).

(e)   It is in any event denied that SKAT's conduct in relation to the BMF Material has altered the nature of the legal relationship between SKAT and CK/JH (or any of the other Defendants) or means that SKAT is not in the same or a materially similar position as a person governed by private law in the context of a similar action.

(f)   It is denied that, in the circumstances, SKAT is acting in the exercise of Public Powers in these proceedings by reason of the same.

36.4   SKAT has made no requests using Public Powers for documents or information to the Swiss authorities, the Luxembourgish authorities or the United Arab Emirates authorities in relation to or for the purposes of these proceedings.

36.5   It is otherwise denied that the Claimant has made any requests using Public Powers to other foreign authorities in relation to or for the purposes of these proceedings.

37.   In the premises, paragraph 13 is denied.

38.   As to paragraphs 14-15:

B/108.5/29

38.1   It is admitted that SKAT (via Pinsent Masons) wrote to the IRS on 5 October 2020. SKAT will rely at trial on the full terms of the letter. Without prejudice to that, the letter:

(a)   explained that SKAT was under an obligation in civil proceedings to disclose all relevant IRS Material in SKAT's control;

(b)   explained that, under English law, SKAT was not excused from complying with its civil law disclosure obligation merely because relevant IRS Material was confidential;

(c)   explained that there were no proper grounds on which SKAT could refuse to give disclosure of relevant IRS Material in the proceedings;

(d)   sought the IRS' consent to disclosure of relevant IRS Material in these proceedings, on confidential terms if necessary;

(e)   attached SKAT's Fourth Amended Particulars of Claim, which stated in paragraph 1 that it brought the claims "in a private capacity as a result of the civil wrongs set out herein".

(f)   attached a summary of the proceedings at Annex A which further explained that:

(i)   SKAT was bringing civil law claims of a tortious, proprietary or restitutionary nature by reason of fraudulent misrepresentations and/or conspiracy and/or negligent misrepresentations and/or mistake; and

(ii)   the Defendants alleged that SKAT's claims could not be heard by the English Court because they sought to enforce, or recover sums due under, Danish tax law, or would require the English Court to opine on matters involving sovereign authority (including in the obtaining of material relating to the WHT Applications).

38.2   It is admitted that the IRS responded on 12 October 2020 consenting to disclosure of relevant IRS Material in these proceedings on confidential terms.

SKAT will rely at trial on the full terms of the IRS's letter, which included the passage cited in paragraph 14.2 of the Defence. The precise reasons that the IRS gave consent are immaterial in circumstances where (as had been explained to the IRS) SKAT was obliged by its civil disclosure obligations to disclose all relevant IRS Material in these proceedings. Without prejudice to that, it appears that the IRS took a broad view of what constituted "*tax administration matter concerning*" taxes covered by the USA-Denmark Double Taxation Agreement and that this included proceedings arising out of a dividend tax fraud scheme.

38.3   It is admitted that SKAT responded to the IRS' letter by letter dated 30 October 2020. SKAT will rely at trial on the full terms of the letter. Without prejudice to that:

(a)   SKAT's letter re-iterated that the reason that SKAT wished to disclose relevant IRS Material in these proceedings was because it was "*obliged*" to do so by reason of "*its disclosure obligations in civil proceedings*".

(b)   SKAT's letter also made clear that SKAT was only responding to practical matters in the IRS' letter, which were necessary in connection with SKAT's confidentiality application in respect of IRS Material. It was expressly stated that "*we do not respond to any substantive points in your letter, as to which SKAT's position is reserved*".

38.4   It is accordingly denied that SKAT misled the IRS or allowed it to proceed on the basis of a mistake as to the nature of these proceedings. There has been no approbation or reprobation by SKAT. At all material times, SKAT made clear to the IRS that:

(a)   disclosure was proposed to be given in civil proceedings in which civil claims were brought by SKAT as a result of civil wrongs suffered by SKAT; and

(b)   SKAT was obliged to give such disclosure (and had no proper reason to refuse to provide it) by reason of its mandatory civil law disclosure obligations.

31

38.5    Paragraph 14.4 is admitted.

38.6    Save as aforesaid, paragraphs 14 to 15 are denied.

**D        DANISH LAW LIMITATION**

39.    As pleaded in paragraph 56 of the Particulars of Claim, the law applicable to SKAT's claims against CK and JH is English law. Without prejudice to that position, SKAT responds to CK's and JH's allegations as to the Danish law of limitation in this section.

40.    As to paragraph 17:

40.1    Paragraph 17.1 is admitted insofar as it relates to SKAT's Danish law claims seeking damages for loss.

40.2    Section 3(2) of the Danish Limitation Act provides that the limitation period is postponed if the claim (or the defendant) was unknown to the claimant and starts from the date when the claimant had, or should have had, knowledge of the claim (and the defendant). To this extent, the first sentence of paragraph 17.3 is admitted.

40.3    The 3-year limitation period provided in the Danish Limitation Act does not apply to proprietary claims. For such claims, Danish law does not prescribe a limitation period.

41.    As to paragraph 18:

41.1    As pleaded in the second paragraph of the Further Particulars, a key fact upon which SKAT's claims against CK and JH is based is their receipt of payments of €2,760,000 each from Mr Sanjay Shah to their Varengold Bank accounts on or around 5 June 2015.

41.2    SKAT only obtained bank statements for the relevant Varengold Bank accounts in late March 2018. Until then SKAT had no knowledge of its claims against CK and JH.

41.3    The Third Claim Form was issued on 11 September 2018.

41.4    Accordingly, it is denied that SKAT was, or should have been, aware of its claims against CK and JH three years before 11 September 2018.

42.    As to paragraph 19:

42.1    It is denied that the Further Particulars constitute an amendment to SKAT's case against CK and JH. Alternatively, it is denied that the Further Particulars add or substitute a new claim against CK and JH. Paragraph 4 above is repeated. Accordingly, no separate limitation period applies to the Further Particulars.

42.2    Alternatively, SKAT will seek the Court's permission pursuant to CPR 17.4(2) to allow the Further Particulars as an amendment that adds or substitutes a new claim on the basis that it arises out of the same facts, or substantially the same facts, as the original claim.

42.3    It is denied (if it is alleged) that CPR 17.4(2) has no application to the Further Particulars even if: (a) the Further Particulars constitute a new claim (which is denied); and (b) pursuant to the Rome II Regulation, SKAT's claims against CK and JH are governed by Danish law (which is also denied).

## E    ENGLISH LAW LIMITATION

43.    Paragraph 20 is denied:

43.1    As to the first sentence, it is denied that SKAT's claims against CK and JH were brought after six years from the date on which the cause of action accrued. The Defence identifies no basis for alleging otherwise.

43.2    As to the second sentence, paragraphs 42.1 and 42.2 above are repeated, *mutatis mutandis*.

## F    FORGIVABLE LOANS

44.    As to paragraph 48.1, for the reasons provided in paragraph 5 of the Further Particulars, it is to be inferred that the Short Form Agreements were sham documents. These documents were entered into by Mr Sanjay Shah, CK and JH knowing that they did not create the legal rights and obligations that they purported to create.

B/108.5/33

**G      REPLY TO DETAILED RESPONSE TO PARTICULARS OF CLAIM**

45.    As to paragraph 71, if Mr Nielsen was a fraudulent participant in the fraud alleged in these proceedings (which is not admitted), as a matter of Danish law:

45.1    Mr Nielsen's state of mind and/or actions are not attributable to SKAT; and

45.2    SKAT is not vicariously liable for Mr Nielsen's conduct.

46.    As to paragraph 126:

46.1    As set out in paragraph 9 above, it is admitted that SKAT's decisions to accept the WHT Applications were administrative decisions under Danish tax or administrative law.

46.2    Whether such decisions were valid and effectual under Danish administrative law is immaterial to SKAT's ability to bring its claims under both English and Danish law:

(a)    In relation to SKAT's claims under English law, this will be the subject of legal submissions in due course.

(b)    As to SKAT's claims under Danish law, as a matter of Danish civil law such claims can be brought regardless of the validity under Danish administrative law of: (a) SKAT's decisions to accept the WHT Applications; and (b) SKAT's decisions to annul or reverse those decisions. Further, as a matter of Danish law, SKAT's civil claims are not predicated upon, and can be brought independently of, SKAT's decisions to annul or reverse its decisions to accept the WHT Applications.

46.3    It is denied that there can be no tortious liability "outside the administrative law regime" (the meaning of which is unclear and is not explained), whether as a matter of Danish law or otherwise.

47.    As to paragraph 145.1, it is inferred that the allegation that "*the Claimant has admitted and accepted*" the matters pleaded in this paragraph is based on Response 15 of the RFI Response. If so:

47.1    Response 15 confirmed that "*[SKAT] does not allege that CK/JH conspired with any Alleged Fraud Defendants other than those identified at paragraph 19 of the Further Particulars*".

47.2    Paragraph 19 of the Further Particulars alleges that "*Mr Knott and Hoogewerf tacitly combined with Mr Sanjay Shah, Ms Stratford, each other, and (respectively) Old Park Lane and West Point to achieve the common end of the continued conduct of the WHT Scheme*".

47.3    Accordingly, there is no basis for the allegation (and it is denied) that SKAT has "*admitted and accepted that… allegations in relation to the alleged Principal WHT Scheme do not concern [CK and JH]*".

48.    As to paragraphs 145.2 and 172.1:

48.1    The allegation that "*the Claimant has abandoned any case that CK/JH conspired with the Alleged Fraud Defendants*" is denied.

48.2    Each of Mr Sanjay Shah, Ms Stratford, Old Park Lane and West Point are Alleged Fraud Defendants.

49.    As to CK's and JH's reliance on Response 15 of the RFI Response, paragraph 47 above is repeated.

50.    As to paragraphs 149.4 to 149.7 and 151.2:

50.1    SKAT's primary case is that as a matter of both English and Danish law it is not necessary to rescind any "transactions". As to English law, the requirement that a transaction be rescinded is limited to payments made pursuant to contractual obligations or obligations arising from deeds. The requirement does not exist where: (a) there is no relevant private law obligation which needs to be "set aside" (for example in the case of a mere mistaken payment or a non-contractual payment induced by fraud); and/or (b) the purported obligation was itself an instrument of fraud. This will be the subject of legal submissions in due course. As to Danish law, there is no requirement that SKAT rescind or annul any decision made in relation to the WHT Applications. Paragraph 46.2(b) above is repeated.

35

50.2   In the alternative, if it is necessary as a matter of English law for rescission to occur, the question is whether (as a matter of English law) SKAT has conveyed by words or conduct an intention to disaffirm the payments which it made (which are the relevant "transactions"). In that regard, SKAT relies (only) on the fact that it issued the preliminary and final decisions to the WHT Applicants as expressions of such an intention as a matter of English law.

50.3   The question is not whether SKAT's decisions to accept the WHT Applications are invalid or have been validly annulled as a matter of Danish administrative law. It is therefore denied that the English Court will be required to adjudicate upon such matters.

50.4   In the further alternative, in the event that (a) rescission is necessary and (b) the Court is unable to adjudicate on the effectiveness of the preliminary and final decisions issued between September 2016 and April 2020 as acts of rescission (such that paragraph 53 of the Particulars of Claim stands struck out), then SKAT's case is that rescission occurred by the Particulars of Claim in September 2018.

51.    As to paragraph 150, paragraph 46 above is repeated. Further:

51.1   Paragraph 150.1 does not accurately reflect SKAT's case and is in any event denied.

51.2   Paragraph 150.2 is denied. The Court is not being asked to adjudicate on the validity of the preliminary and final decisions as a matter of Danish administrative law. For the same reasons, the facts and matters set out in paragraph 150.3 and 150.5 are irrelevant.

51.3   As to paragraph 150.4, it is denied as a matter of law that there was any transaction as between SKAT and CK/JH which needed to or could be rescinded (and the Particulars of Claim does not allege as much or purport to do so).

51.4   Paragraph 150.6 is denied.

52.    As to paragraph 153, it is denied that SKAT's claims against CK and JH are barred by Dicey Rule 3, for the reasons set out in paragraph 5 above.

53.    As to paragraph 173.1, it is denied that SKAT's claim is or ought to be characterised as one which alleges a conspiracy to contravene Denmark's revenue law and rules. In any event, it is denied that such characterisation would be determinative of the applicability of Dicey Rule 3.

54.    As to paragraphs 156.5 and 174, it is denied that any tax is due to or claimed by SKAT for the reasons set out in paragraph 5.1(b) above. In particular, it is denied, if alleged, that SKAT's preliminary and final decisions which annulled SKAT's decision to accept the WHT Applications (and the subsequent challenges to those preliminary and final annulment decisions in Danish administrative proceedings) do or could give rise to any liability on the part of the WHT Applicants to pay tax or any money to SKAT (save potentially in respect of the legal costs of those administrative proceedings). It is therefore denied, as alleged in paragraph 214, that any credit for recovery must be given following the making of the preliminary and final annulment decisions.

## H    CONTRIBUTORY NEGLIGENCE

55.    As to paragraph 205, if SKAT's claims against CK and JH are governed by Danish law (which is denied):

55.1    it is denied that contributory negligence is a defence to such claims; and

55.2    it is denied that contributory negligence is capable of reducing or setting-off such claims.

## I    DANISH LIABILITY FOR DAMAGES ACT

56.    As to paragraph 209:

56.1    It is admitted that under section 24 of the Danish Liability for Damages Act, liability for damages may be reduced or eliminated if the liability will have an unreasonably onerous impact on the defendant.

56.2    Any decision under section 24 of the Danish Liability for Damages Act must take into account the degree of injury suffered by the injured person, the nature of the liability, the circumstances of the person causing the injury, the interests

of the injured person, any insurance cover taken out and any other relevant circumstance.

56.3    In evaluating whether liability for damages may have an unreasonably onerous impact on the defendant, the Court will consider the degree of *culpa* of the defendant.

56.4    CK and JH are required to prove that their liability is to be eliminated (alternatively reduced) under section 24 of the Danish Liability for Damages Act.

Michael Fealy QC

Jamie Goldsmith QC

Sam O'Leary

Abra Bompas

James Ruddell

KV Krishnaprasad


<u>One Essex Court</u>

3 March 2021

**STATEMENT OF TRUTH**


The Claimant believes that the facts stated in this Reply are true. I am duly authorised by the Claimant to sign this statement on its behalf. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.


Signed    …………………………………………

Name:    Gry Ahlefeld-Engel

Position:    Director at Skattestyrelsen, part of Skatteforvaltningen (the Danish Customs and Tax Administration)

Date:    3 March 2021

**SCHEDULE 1**

**REPLY TO CK'S DEFENCE TO THE AMENDED SCHEDULE 5Z**

1.    Paragraph 13.4 is admitted. The allegation in paragraph 8 of Schedule 5A is only in respect of the sum of €2,760,000.

**SCHEDULE 2**

**REPLY TO JH'S DEFENCE TO THE AMENDED SCHEDULE 5AA**

1.    Paragraph 5.2 is denied:

   (a)    The amendment to paragraph 14 of the Further Particulars clarifies that the allegation that "*Mr Knott and Mr Hoogewerf accepted senior positions… in entities that they knew were involved in the production of Credit Advice Notes*" is not made in respect of JH's involvement in West Point.

   (b)    This does not constitute an acceptance that "*no allegation of deceit is made against JH in respect of West Point*".

2.    The second sentence of paragraph 7 is admitted. The relevant date is 31 March 2014.

3.    Paragraph 13.4 is admitted. The allegation in paragraph 8 of Schedule 5AA is only in respect of the sum of €2,760,000.

**SCHEDULE 3**

**REPLY TO CK'S AND JH'S DEFENCE TO THE FURTHER PARTICULARS**

1.      Paragraph 1 is denied. Paragraph 4 of the Reply is repeated.

2.      The first sentence of paragraph 3 is denied. Paragraph 42 of the Reply is repeated.

3.      The last sentence of paragraph 14.1 and paragraph 14.3 are denied. Without prejudice to SKAT's primary position that the loans agreements were shams:

   (a)      Clause 2.2 of the settlement agreement between JH and West Point addresses "*loans owing from the Employee to the Company*". The "*Company*" is defined as West Point Derivatives Limited.

   (b)      It is inferred that, similarly, clause 2.2 of the settlement agreement between CK and SCP applies to loans owed by CK to SCP.

   (c)      Accordingly, neither provision addresses (alleged) loans owed by CK/JH to Mr Sanjay Shah.

4.      As to the allegation in paragraph 24.2 that "*no allegation of deceit is now pursued against JH in respect of West Point*", paragraph 1 of Schedule 2 above is repeated.

5.      As to paragraphs 26.1 and 26.2:

   (a)      Paragraph 14(ii) of the Further Particulars alleges that CK and JH "*accepted these positions… to make the respective entities appear to the outside world and to SKAT as genuine businesses with experienced individuals in senior management positions*".

   (b)      That is not an "*allegation that SKAT was aware of CK/JH during the Relevant Period*".  Paragraph 26.1 is denied.

   (c)      Accordingly, the assertion in paragraph 26.2 that "*the Claimant knew both of the alleged fraud and CK/JH more than three years before the Third Claim Form*" does not follow and is denied.

41

**SCHEDULE 4**

| Document | Description |
|---|---|
| First Affidavit of Jonathan Fortnam ("**Fortnam A1**")/ 22(a), 96-97, 101, 110, 113, 121 | These paragraphs refer to and place some reliance on the content of preliminary and final administrative decisions taken by SKAT to annul its decisions to accept the WHT Applications, which in turn relied upon documents or information provided by the IRS or IRBM.[1] <br><br> The following documents were exhibited: <br><br> 1. Preliminary administrative decision in relation to Blue Ocean Equity LLC Retirement Plan & Trust ("Blue Ocean") (translated into English) in relation to a pending application: JRFA1/481-495.[2] <br><br> 2. Preliminary administrative decision in relation to Blue Ocean (translated into English) in relation to previously accepted WHT Applications: JRFA1/496-511.[3] <br><br> 3. Final administrative decision in relation to Blue Ocean (in Danish) in relation to a pending application: JRFA1/518-534. <br><br> 4. Final administrative decision in relation to Blue Ocean Blue Ocean (in Danish and translated into English) in relation to previously accepted WHT Applications: JRFA1/537-554, 560-578[4] <br><br> 5. Preliminary administrative decision in relation to DWM Pension Plan (translated into English): JRFA1/656-666. <br><br> 6. Preliminary administrative decision in relation to Loggerhead Services LLC Roth 401K Plan (in Danish): JRFA1/1723-1733. English translation provided subsequently: JRFA3/38-48. <br><br> 7. Preliminary administrative decision in relation to Argyle Smith Ltd (in Danish): JRFA1/1734-1744. English translation provided subsequently: JRFA3/16-26. <br><br> 8. Final administrative decision in relation to Argyle Smith Ltd (in Danish): JRFA1/1745-1755. English translation provided subsequently: JRFA3/27-37.[5] |
| Fortnam A1/94-95 | These paragraphs rely on the content of information provided by the IRS to SKAT, namely Blue Ocean's publicly available Form 5500-EZ for 2013 (which was provided by the IRS spontaneously |

[1] Such matters were also relied on in SKAT's skeleton argument for the hearing on 26-27 June 2018 (the "**WFO Skeleton**") at paragraphs 28, 29, 37-39, and at the hearing on 26-27 June 2018 at Day 1/Page 39/Line 14-Page 40/Line 8; Page 53/Line 13-Page 54/Line 8; and (by way of full and frank disclosure) Page 55/Line 12-Page 56/10.

[2] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 41/Line 6-Page 45/Line 10 (mistakenly identified as a decision in respect of a payment which had already been made).

[3] Also relied on in the WFO Skeleton at paragraph 37 and at the hearing on 26-27 June 2018 at Day 1/Page 46/Lines 6-20, Page 47/Lines 11-16 (mistakenly identified as the final decision in relation to previously accepted WHT Applications).

[4] Referred to at the hearing on 26-27 June 2018 at Day 1/Page 47/Line 23-Page 48/Line 12.

[5] Also referred to in the hearing on 26-27 June 2018 at Day 1/Page 55/Line 11- Page 57/Line 14 by way of full and frank disclosure.

B/108.5/42

| | |
|---|---|
| | and not pursuant to a request by SKAT under Article 26 of the Denmark/USA Double Taxation Agreement) and the fact that Blue Ocean did not file a (publicly available) tax return in 2014. The following documents were exhibited:<br>1. Cover letter from the IRS providing the Form 8802 and 5500-EZ of Blue Ocean referred to below: JRFA1/462- 464.[6]<br>2. IRS Form 8802 in relation to Blue Ocean, provided by the IRS: JRFA1/465-467. This has been disclosed in the US Proceedings.[7]<br>3. IRS Form 5500-EZ in relation to Blue Ocean for 2013, provided by the IRS, but which is stated on its face to be open to public inspection: JRFA1/468-469.[8] This has been disclosed in the US Proceedings.<br>4. Transaction Detail Results document in relation to Blue Ocean provided by the IRS: JRFA1/470.<br>5. IRS guidance on 401(k) Plans sent to SKAT, but also available on the IRS's publicly available website: JRFA1/471-477.[9]<br>6. Redacted letter from the IRS to SKAT with (illegible) attachment: JRFA1/478-480. |
| Fortnam A1/116 | This paragraph refers to the fact that only 27 out of 227 (later corrected to 277 in Fortnam A2/5(c)) pension plans had filed tax returns in the USA, which was based on information provided by the IRS (but concerned publicly available documents). |
| Fortnam A1/374-376 | These paragraphs refer in general terms to correspondence with the IRS or IRBM as part of a section on the chronology of the claims which was relevant to full and frank disclosure on limitation (see Fortnam A1/242). |
| Fortnam A1/Schedule 4 | This schedule refers in the entries for Mankash Jain and Paul Preston to the fact that they were owners of various Malaysian WHT Applicants (which was based on information from the IRBM). SKAT did not rely on such information when pleading its claims against Messrs Preston and Jain and therefore originally made no claim against them by reason of their ownership of such entities. SKAT only later (based on information from other sources) made such an allegation, which was admitted by the Messrs Jain and Preston.<br>A further updated version of this schedule (but with no material changes for present purposes) was provided at JRFA4/460. |

---

[6] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Lines 7-14.
[7] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Line 15.
[8] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Line 15-Page 38/Line 16.
[9] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 38/Line 17-Page 39/Line 12.